```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           —   —   —

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,
 5                                        Case No. 15-20652
          vs.
 6                                        Hon. George Caram Steeh
     BILLY DARRELL ARNOLD D-1,
 7   ROBERT BROWN, II D-6,
     JEROME GOOCH D-7 and
 8   DEVON PATTERSON D-10,

 9              Defendants.
     _____/
10
                         MOTION TO SUPPRESS
11
             BEFORE THE HONORABLE GEORGE CARAM STEEH
12                 United States District Judge
             Theodore Levin United States Courthouse
13                 231 West Lafayette Boulevard
                         Detroit, Michigan
14                 Thursday, August 31, 2017

15
     APPEARANCES:
16
     For the Plaintiff:    CHRISTOPHER GRAVELINE
17                         United States Attorney's Office
                           211 West Fort Street, Suite 2001
18                         Detroit, MI  48226
                           (313) 226-9155
19
                           JULIE A. FINOCCHIARO
20                         U.S. Department of Justice
                           1301 New York Avenue, N.W., 7th Floor
21                         Washington, DC  20005
                           (202) 514-0842
22
                           JUSTIN WECHSLER
23                         U.S. Department of Justice
                           450 5th Street, N.W., Suite 11440
24                         Washington, DC 20005
                           (202) 598-2428
25
```

```
 1   APPEARANCES:  (Continued)

 2   For Defendant            MARIA P. MANNARINO
     Billy Arnold:            431 Gratiot
 3                            Detroit, MI  48226
                              (248) 761-7347
 4
                              ERIC K. KOSELKE
 5                            6202 North College Avenue
                              Indianapolis, IN  46220
 6                            (317) 722-2591

 7
     For Defendant
 8   Jerome Gooch:            JOSEPH R. ARNONE
                              Arnone & Lawter, P.L.L.C.
 9                            10 South Main Street, Suite 403
                              Mt. Clemens, MI  48043
10                            (586) 777-7720

11
     For Defendant
12   Devon Patterson:         BERTRAM L. JOHNSON
                              Law Offices of Christian Ray & Assoc.
13                            23756 Michigan Avenue, Suite 300
                              Dearborn, MI  48124
14                            (313) 974-7544

15
     For Defendant
16   Jeffery Adams:           RYAN H. MACHASIC
                              Ryan H. Machasic, P.C.
17                            134 Market Street
                              Mt. Clemens, MI  48043
18                            (586) 914-6140

19

20

21

22

23

24        To obtain a copy of this official transcript, contact:
             Robert L. Smith, Official Court Reporter
25           (313) 234-2612 • rob_smith@mied.uscourts.gov
```

TABLE OF CONTENTS

WITNESSES:                                                          PAGE

SPECIAL AGENT VICENTE RUIZ
Direct Examination by Mr. Graveline................  6
Cross-Examination by Ms. Mannarino................ 16
Redirect Examination by Mr. Graveline............. 39
Recross-Examination by Ms. Mannarino.............. 46

OFFICER NICHOLAS DEDELUK
Direct Examination by Mr. Graveline............... 49
Cross-Examination by Ms. Mannarino................ 58

SERGEANT CRAIG SCHRAMECK
Direct Examination by Mr. Graveline............... 69
Cross-Examination by Ms. Mannarino................ 74

Argument by Ms. Mannarino......................... 88
Argument by Mr. Graveline......................... 92
Ruling by the Court............................... 95

Motion by Mr. Machasic............................101
Joinder by Ms. Mannarino..........................106
Joinder by Mr. Arnone.............................106
Joinder by Mr. Johnson............................106
Response by Mr. Wechsler..........................107
Reply by Mr. Machasic.............................114
Ruling by the Court...............................117

| | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | Thursday, August 31, 2017 |
| 3 | at about 9:16 a.m. |
| 4 | —   —   — |
| 5 | (Court, Counsel and Defendant Arnold present.) |
| 6 | THE CASE MANAGER:  Please rise. |
| 7 | The United States District Court for the Eastern |
| 8 | District of Michigan is now in session, the |
| 9 | Honorable George Caram Steeh presiding. |
| 10 | You may be seated. |
| 11 | Case No. 15-20652, United States vs. Billy Arnold. |
| 12 | You may be seated. |
| 13 | THE COURT:  Good morning. |
| 14 | MR. GRAVELINE:  Good morning, Your Honor.  Chris |
| 15 | Graveline, and Justin Wechsler, and Julie Finocchiari on |
| 16 | behalf of the United States. |
| 17 | THE COURT:  Welcome. |
| 18 | MS. MANNARINO:  Good morning.  Maria Mannarino on |
| 19 | behalf Mr. Billy Arnold, who is present. |
| 20 | MR. KOSELKE:  And Eric Koselke on behalf of |
| 21 | Mr. Arnold. |
| 22 | MS. MANNARINO:  Good morning.  Also at counsel |
| 23 | table with us, for the record, is our paralegal Cathy Murphy. |
| 24 | THE COURT:  Okay.  Fine.  The first matter to |
| 25 | address, I think, is the motion to suppress filed on behalf |

1    of Mr. Arnold.

2              MR. GRAVELINE:  That's correct, Your Honor.

3              THE COURT:  All right.  Mr. Graveline.

4              MR. GRAVELINE:  The government will be calling

5    three witnesses this morning.  We will begin with FBI

6    Special Agent Vince Ruiz.

7              THE COURT:  Okay.  Good morning.

8              SPECIAL AGENT RUIZ:  Good morning.

9              THE COURT:  I'm going to have you take an oath.

10             Do you swear that the testimony you are about to

11   give in this cause will be the truth, the whole truth, and

12   nothing but the truth, so help you God?

13             SPECIAL AGENT RUIZ:  I do.

14             THE COURT:  All right.  Take a seat, please.  I'm

15   going to have you begin by stating your name and spelling

16   your last name for us.

17             SPECIAL AGENT RUIZ:  Certainly.  My name is

18   Vicente, V-I-C-E-N-T-E, Ruiz, R-U-I-Z.

19             THE COURT:  All right.  Thank you.  You may

20   proceed.

21             MS. MANNARINO:  I'm sorry, Judge.  If I might?  I

22   don't know if there is a sequestration order in place.  There

23   are other witnesses, and I believe there are other witnesses

24   in the courtroom.  I would ask that they be sequestered for

25   purposes of this hearing.

 1          MR. GRAVELINE:  We have no problem with the

 2   sequestration order, Your Honor.  Both of the Detroit police

 3   officers that are going to testify are outside of the

 4   courtroom right now.  The only other federal agent is

 5   Special Agent Shawn Horvath, who is not going to be a witness

 6   in this motion.  He will be a trial witness but I don't

 7   believe on the facts of September 25th/26th, 2013, so I would

 8   ask if Agent Horvath can stay in the courtroom?

 9          THE COURT:  Any objection, Ms. Mannarino?

10          MS. MANNARINO:  If he's not going to be a fact

11   witness as to the events I have no objection.

12          THE COURT:  Okay.  All right.  You may proceed.

13          MR. GRAVELINE:  Thank you.  They are in the witness

14   room down the hallway.

15          THE COURT:  That's fine.  Thanks.

16               SPECIAL AGENT VICENTE RUIZ,

17   called at about 9:24 a.m., was examined and testified on his

18   oath as follows:

19                    DIRECT EXAMINATION

20   BY MR. GRAVELINE:

21   Q.   Agent Ruiz, who do you work for?

22   A.   I work for the FBI.

23   Q.   And specifically what group or task force do you work

24   with?

25   A.   I'm part of the Violent Gang Task Force here in Detroit.

1    Q.   What are some of your duties as part of the Violent Gang

2    Task Force?

3    A.   We investigate violent gangs looking at federal

4    violations to include gun violations, drug violations, VICAR

5    incidents, nonfatal shootings, homicides, witness

6    intimidation and others.

7    Q.   I'm going to take you back to 2015, and specifically

8    September 25th, 2015?

9    A.   Okay.

10   Q.   Were you investigating a particular gang at that time?

11   A.   I was.

12   Q.   And what gang is that?

13   A.   It was the Seven Mile Bloods.

14   Q.   And did you receive certain information in the days

15   leading up to September 25th, 2015 about the

16   Seven Mile Bloods?

17   A.   Yes, I did.

18   Q.   What was that information?

19   A.   There was going to be a party at the Crazy Horse, which

20   is a dance club on Michigan Avenue near Lonyo.  It was going

21   to be a party in remembrance of one of the gang members, his

22   name was Devon McClure, who also went by the street name of

23   Rider or Block.

24   Q.   So you say this was going to be at the Crazy Horse club,

25   is that in the City of Detroit?

1   A.   It is.

2   Q.   All right.  And you said that the party, from what you

3   understood was going to be in remembrance of a deceased Seven

4   Mile Bloods member by the name of Rider or Block?

5   A.   That's correct.

6   Q.   And how did you actually come into this information?

7   A.   It was a social media post calling it a block party, had

8   a photo of him, and had the date and time that it was to

9   occur.

10  Q.   And with that information, did you come up with a plan

11  about how this might assist you in your investigation of this

12  group?

13  A.   Yes, I did.

14  Q.   And what was your plan?

15  A.   The plan was to conduct surveillance on the club, we

16  figured that we would probably see many of the Seven Mile

17  Bloods gang members show up for this party, and given their

18  propensity for violence some of those gang members might be

19  armed with firearms or might have them in their car, so our

20  goal was to identify the key folks that we wanted to

21  investigate that evening.  We had a list of I think it was

22  about six guys that we were going to attempt to traffic stop

23  if they arrived.  And we set up multiple surveillance teams,

24  both static and dynamic surveillance.  We partnered with

25  Michigan State Police, Detroit Police departments, Gang Intel

1   Unit as well as their TRU group.

2   Q.   Excuse me.   You just used an acronym.   What is TRU?

3   A.   I think it is Tactical Response Unit is what that stands

4   for.

5   Q.   And you also mentioned static surveillance.   What is a

6   static surveillance?

7   A.   So we had vehicles that were not moving but people could

8   conduct surveillance from those vehicles as well as people

9   that were in vehicles that were moving up and down the street

10   to help gather license plates for vehicles that were arriving

11   to the club that night.

12   Q.   Were you personally out there at the club that night?

13   A.   I was.

14   Q.   And in your investigation before that date had you

15   already identified someone by the name of Billy Arnold as a

16   person of interest?

17   A.   I did.

18   Q.   And did you see Billy Arnold arrive that night on

19   September 25th?

20   A.   Billy Arnold and others.

21   Q.   All right.   And so you personally saw Billy Arnold

22   arrive that night?

23   A.   I did.

24   Q.   And what type of vehicle did he arrive in?

25   A.   It was a blue TrailBlazer I believe.

| | |
|---|---|
| 1 | Q.  And was -- did you or another member of your team, were |
| 2 | you able to identify the license plate of that car? |
| 3 | A.  It might have been another member of the team called out |
| 4 | the license plate, and obviously we had analysts that were |
| 5 | running license plates for us throughout the night. |
| 6 | Q.  All right.  And that particular license plate, were you |
| 7 | able to -- so they were able to identify it? |
| 8 | A.  Correct. |
| 9 | Q.  What state was that from? |
| 10 | A.  It was an Ohio license plate. |
| 11 | Q.  And do you remember the numbers of that plate? |
| 12 | A.  The license plate was GJH 1851. |
| 13 | Q.  And was that Ohio license plate called in that night to |
| 14 | find out about the registration of that vehicle? |
| 15 | A.  Yes, yes, it was. |
| 16 | Q.  And what was the information provided back to you? |
| 17 | A.  That it had been reported stolen. |
| 18 | Q.  And so when you observed Mr. Arnold arrive that night, |
| 19 | was he the only person that arrived in that TrailBlazer? |
| 20 | A.  No. |
| 21 | Q.  Who else was there with him? |
| 22 | A.  Steve Arthur. |
| 23 | Q.  And did -- prior to September 25th, 2015, had you |
| 24 | identified Steven Arthur as a person of interest? |
| 25 | A.  Yes. |

1    Q.   And so were they the only two people in the TrailBlazer

2    when it arrived?

3    A.   I would have to review the video to be certain but I

4    think, yes.

5    Q.   And do you remember who was driving and who was the

6    passenger at that time?

7    A.   Steve Arthur was driving, and Billy Arnold was the

8    passenger.

9    Q.   And do you remember the approximate time that they

10   showed up there that night?

11   A.   I would have to review my 302.  I want to stay it was

12   late in the 11:00 hour.

13   Q.   I'm sorry, I think I left your 302 back in the office.

14           But -- so did you remain at the Crazy Horse as --

15   past midnight and into the early morning hours of September

16   26th --

17   A.   Yes.

18   Q.   -- 2015?

19   A.   Yes, I did.

20   Q.   Once you obtained the information that this vehicle was

21   a stolen vehicle, what was your plan at that point?

22   A.   At that point the plan was we had several surveillance

23   teams, we assigned a surveillance team to take that car away

24   when the occupants came back out of the club and decided to

25   travel away for the evening.  That's essentially what

1    happened.

2    Q.   All right.  So did you pass that information along to

3    other members of the surveillance teams that night?

4    A.   Yes.

5    Q.   And did you, in fact, see who left the club that night

6    in that TrailBlazer?

7    A.   It was Steve Arthur and Billy Arnold.

8    Q.   And who was driving the TrailBlazer at the time?

9    A.   Steve Arthur.

10   Q.   And where was Billy Arnold in terms of the -- inside of

11   that vehicle?

12   A.   He got in the front passenger seat.

13   Q.   Now, do you remember approximately what time that was

14   when they left?

15   A.   I want to say late in the 1:00 hour, maybe early in the

16   2:00 hour.

17   Q.   And at that point the plan was to do a traffic stop of

18   that vehicle?

19   A.   Correct.

20   Q.   And are you aware whether a traffic stop was attempted

21   on that vehicle?

22   A.   Yes, I am.

23   Q.   And eventually was that vehicle stopped?

24   A.   Yes.

25   Q.   And did you personally go to the scene of that stop that

1    night?

2    A.   I did not.

3    Q.   Was that vehicle eventually towed that night?

4    A.   It was, yes.

5    Q.   And was it taken into FBI custody that night?

6    A.   I think initially it was in DPD custody, but we asked

7    them to put a hold on it for us.

8    Q.   And so the FBI actually had it in the -- in its evidence

9    custody after that night?

10   A.   Correct.

11   Q.   And were you able to determine who the actual owner of

12   the vehicle was?

13   A.   Yes.

14   Q.   I'm going to show you what was attached as Exhibit 2 to

15   our motion.

16           Your Honor --

17           THE COURT:  Uh-huh.

18           MS. MANNARINO:  Can I see it?

19   BY MR. GRAVELINE:

20   Q.   I'm sorry.  You were saying you were able to identify

21   who the owner of the vehicle was?

22   A.   Yes.

23   Q.   Who was that?

24   A.   I believe her name was Tesha Robinson.

25   Q.   Did you meet Ms. Robinson?

1   A.   Yes.

2   Q.   Did you ask her if you had her consent to search the

3   vehicle?

4   A.   Yes.

5   Q.   And did you obtain that consent?

6   A.   We obtained consent on October 5th, 2015.

7   Q.   Now, at that point had certain items already been

8   retrieved out of evidence from that vehicle?

9   A.   Yes.

10  Q.   And you had prepared -- I'm going to show you what was

11  attached to the government's exhibit as Government's

12  Exhibit 3, the motion, Exhibit 3.  Specifically, I'm going to

13  point you to page 5 of Exhibit 3.

14  A.   Okay.

15  Q.   Did you seek and fill out an application and affidavit

16  for a search warrant of certain items that had been seized

17  from that vehicle?

18  A.   Yes.

19  Q.   And what date did you apply for that search warrant?

20  A.   That was October 7th, 2015.

21  Q.   And specifically, were you seeking authority to search

22  six cell phones that had been seized from that vehicle?

23  A.   Yes.

24       MR. GRAVELINE:  Thank you.  No further questions,

25  Your Honor.

1            THE COURT:  All right.  Thank you.

2            Ms. Mannarino?

3            MR. GRAVELINE:  I'm sorry, there are three more

4    questions, Your Honor.  I apologize.

5            THE COURT:  Okay.

6            MR. GRAVELINE:  I apologize.

7    BY MR. GRAVELINE:

8    Q.   So with this vehicle in FBI custody, when the FBI takes

9    a vehicle into its evidentiary control, what is -- is it

10   common to do an inventory search of that vehicle?

11   A.   Yes.

12   Q.   And why is it that the FBI does an inventory search?

13   A.   Just to make sure that any property that was in there

14   can't end up being reported as missing or stolen or whatever

15   by the occupants of that vehicle.

16   Q.   And so with this vehicle, even though there had been the

17   initial search of that vehicle on September 25th/26th, and a

18   consent, would the FBI also have conducted an inventory

19   search of that vehicle?

20   A.   Certainly.

21           MR. GRAVELINE:  Thank you.  No further questions.

22           THE COURT:  All right.  Thank you.

23           Ms. Mannarino?

24

25

```
 1                          CROSS-EXAMINATION
 2    BY MS. MANNARINO:
 3    Q.   Good morning.
 4    A.   Good morning.
 5    Q.   Agent Ruiz, you -- on September 25th you were in charge
 6    of a surveillance at the Crazy Horse; is that correct?
 7    A.   Yes.
 8    Q.   And part of that surveillance involved other units who
 9    were static?
10    A.   Correct.
11    Q.   And what does that mean?
12    A.   Not moving.
13    Q.   And how many?
14    A.   Oh, jeez, there was quite a few units out there.  I
15    don't know the exact number.
16    Q.   Umm --
17    A.   I would say we probably had, a guess, maybe 60 law
18    enforcement agents or officers.
19    Q.   All right.  So the area was pretty well covered?
20    A.   Yes.
21    Q.   So it had static in all avenues of egress and ingress;
22    is that right?
23    A.   That's correct.
24    Q.   Nobody was going to come or go without you knowing about
25    it?
```

1    A.   Correct, that's what we had hoped anyway.

2    Q.   And this was -- and then there was also cameras set up,

3    correct?

4    A.   There was.

5    Q.   And a camera was set up to capture everything that

6    happened coming and going?

7    A.   We had it set up kind of directed at the front entrance

8    of the club that night.

9    Q.   And what time was that set up?

10   A.   Early in the day, my guess is somewhere maybe around

11   4:00 p.m.

12   Q.   Okay.  And to your knowledge it recorded everything

13   that -- everybody who came and went at the club throughout

14   the course of that night?

15   A.   Correct.

16   Q.   Coming and going?

17   A.   Yes.

18   Q.   Even as people were leaving?

19   A.   Yes.

20   Q.   It captured who left?

21   A.   It did.

22   Q.   Okay.  And in addition to that, there was also -- did I

23   see that there was also helicopter support, air support?

24   A.   We did have some helicopter support that night as well

25   as canine support too.

Motion to Suppress - August 31, 2017

| | |
|---|---|
| 1 | Q.   And this was in response to information you had gotten |
| 2 | that there would be a memorial for somebody by the name of |
| 3 | Devon McClure? |
| 4 | A.   That's correct. |
| 5 | Q.   And that it was your belief that at this memorial for |
| 6 | Devon McClure that there would be perhaps members of the |
| 7 | Seven Mile Bloods? |
| 8 | A.   Yes, that's correct. |
| 9 | Q.   Because it was your belief that Devon McClure was a |
| 10 | member of the Seven Mile Bloods? |
| 11 | A.   Yes. |
| 12 | Q.   And being a member of the Seven Mile Bloods in and of |
| 13 | itself is not a crime; is that fair? |
| 14 | A.   Fair. |
| 15 | Q.   And so you wanted to see if other people that you |
| 16 | associated with the Seven Mile Bloods would be at this |
| 17 | memorial? |
| 18 | A.   Right. |
| 19 | Q.   Because you expected people who knew Devon McClure to go |
| 20 | and participate in the memorial for him? |
| 21 | A.   Correct. |
| 22 | Q.   Okay.  His friends, correct? |
| 23 | A.   Yes. |
| 24 | Q.   His family? |
| 25 | A.   Possibly. |

1    Q.   There were members of his family there too, weren't

2    there?

3    A.   I believe there were.

4    Q.   People who were -- thought of Devon McClure as a friend

5    or an associate or a classmate would be there to honor his

6    memory?

7    A.   Sure.

8    Q.   But you specifically wanted to see and get some

9    information regarding some specific people that night,

10   correct?

11   A.   Right.

12   Q.   I believe you said there was, in fact, a list of -- was

13   it at least six people that you wanted to target?

14   A.   Yes, I believe it was either four or six.

15   Q.   Do you know who those people were?

16   A.   I do.

17   Q.   Who were those people?

18   A.   Donell Hendrix was one of those people, Derrick Kennedy

19   was one of those people, Billy Arnold was one of those

20   people, I think Jeffery Adams was one of those people.

21   Q.   And those people were because of other information that

22   you had that led you to want to target them?

23   A.   That's right.

24   Q.   So you were going to find some reason to make contact

25   with those people?

1  A.   Sure.

2  Q.   And when -- did you say Steve Arthur, was Steve Arthur

3  one of those people?

4  A.   I would have to look at the operation plans from that

5  night to determine if he was one of the six.  He was

6  definitely one of the identified members that we had.

7  Q.   Sure, he was somebody who was on your radar?

8  A.   Right, but due to limited resources we were specifically

9  targeting certain individuals.

10  Q.   Okay.  And -- but you don't recall right offhand whether

11  Steve Arthur was one of those people who you were going to

12  target to make some contact with that night?

13  A.   Right, but be mindful that in addition to those

14  individuals that we said, hey, these are the ones we are

15  focusing on this evening, we had a printout with all

16  identified members and associates so that way should officers

17  do a traffic stop and there are multiple people in the

18  vehicle they would know if, in fact, there was somebody on

19  that list that was important to us.

20  Q.   And if they made contact with somebody on the list who

21  was important to you, they would find a reason to --

22  A.   That information would be relayed back to the command

23  post, and we would make determinations from there.

24  Q.   So these people that you had targeted, it was because

25  you had some specific information about them; is that right?

1    A.    That's right.

2    Q.    And Steve Arthur was somebody you had some specific

3    information about?

4    A.    He was.

5    Q.    Okay.  And when you have information about these people,

6    is it fair to say that you wanted as much information about

7    these people as possible in the course of your investigation?

8    A.    That's correct.

9    Q.    So did you have, for example, information regarding

10   where any of these targeted individuals lived?

11   A.    We did have some information.

12   Q.    Who they were associated with?

13   A.    Yes, we had that information also.

14   Q.    What kind of vehicles they drove?

15   A.    We had some of that information as well.

16   Q.    Okay.  Did you have any of that information regarding

17   Steve Arthur, do you know?

18   A.    No, I do not.

19   Q.    Okay.  Do you know whether or not there was any specific

20   vehicle that Mr. Arthur may have been associated with or seen

21   in possession of previously?

22   A.    No, I do not.

23   Q.    You don't know that now or is that -- strike that.

24          Is that information that you would seek to develop?

25   A.    Absolutely.  I mean, I would have liked to have known

1    all sorts of information about everybody.

2    Q.   Sure, because that's what you were doing there that

3    night?

4    A.   Correct.

5    Q.   Right.  You were taking license plates, you were trying

6    to associate people with vehicles and gather as much

7    information about these people?

8    A.   That is correct.

9    Q.   So you indicated that you -- you saw Billy and

10   Steve Arthur arrive together that night; is that correct?

11   A.   That's correct.

12   Q.   And you knew who Billy Arnold was?

13   A.   I did.

14   Q.   And you knew who Steve Arthur was?

15   A.   I did.

16   Q.   And then afterwards did you fill out a 302 describing

17   what you saw that night?

18   A.   Yes.

19   Q.   Did you indicate in the 302 --

20   A.   Let me clarify that.  I personally did not write the

21   302, there was a 302 done for that evening for the

22   surveillance that was conducted.

23   Q.   Well, who would have filled that out?

24   A.   I believe it was written by Jeffery Wittfield.

25   Q.   Okay.  But your name appears on the 302 also, right?

1    A.   It may as a coauthor.

2    Q.   You indicated before that you don't have it with you?

3    A.   I do not -- I did not bring it.

4         MS. MANNARINO:  May I approach, Judge?

5         THE COURT:  Yes.

6    BY MS. MANNARINO:

7    Q.   Is that the 302 that was completed after the

8    surveillance at the Crazy Horse?

9    A.   Yes, this is the one.

10   Q.   Okay.  And that purports to detail in a timeline fashion

11   all of the comings at the club that evening; is that correct?

12   A.   That's correct.

13   Q.   And there are a couple of pages of detailing all of the

14   comings, right?

15   A.   That's correct.

16   Q.   Who arrived, what car they arrived in; is that correct?

17   A.   That is correct.

18   Q.   All right.  By looking at that, can you tell what time

19   you say that Billy Arnold and Steve Arthur arrived at the

20   club?

21   A.   On the report here it was during the 1:00 hour.

22   Q.   Well, what does the report say?

23   A.   It has got 1:00 with question marks where the minute

24   times would be.

25   Q.   So in the 1:00 hour but it doesn't detail what time; is

1    that correct?

2    A.   Based on this report it occurred sometime between

3    12:44 a.m. and 1:20 a.m.

4    Q.   Okay.  Because the arrival before that vehicle, correct,

5    is detailed by the hour and the minute that car arrived,

6    correct?

7    A.   Correct.

8    Q.   And there -- the arrival of the vehicle after that is

9    detailed to the hour and the minute, correct?

10   A.   Correct.

11   Q.   But the vehicle that you say Billy Arnold arrived in

12   isn't detailed by any specific time?

13   A.   Right.

14   Q.   Is that fair?

15   A.   Right, yes.

16   Q.   Do you know why, when every other vehicle can be

17   detailed to the time and minute, there is no detail as to the

18   time that vehicle arrived?

19   A.   The explanation I can offer is that a lot of these

20   vehicles arrived at about the same time, and it could be that

21   while somebody is taking notes as to the license plate of

22   those vehicles he may not have jotted down the time at that

23   exact moment.  When we went through this I remember recalling

24   that we thought these vehicles all arrived at the same time

25   but since it hadn't been noted I think that's why Jeff put in

1    the question marks.

2    Q.   So you're speculating as to why we don't know what time

3    Billy and Steve arrived, right?

4    A.   Yes, pure speculation.

5    Q.   Okay.  And it could be, you say, because he was busy

6    filling out the details for the vehicle in front?

7    A.   Certainly.

8    Q.   And the vehicle in front arrived how long before?

9    A.   That one was at 12:44 a.m. -- I'm sorry, yeah, a.m.

10   Q.   So the car that you detailed Mr. Arnold and Mr. Arthur

11   arriving in was at least 15 minutes later, if not more?

12   A.   At least.

13   Q.   And what about the vehicle after?

14   A.   1:20 a.m.

15   Q.   Okay.  So in a more-than-half-hour period there was one

16   vehicle that arrived?

17   A.   True.

18   Q.   Right?

19   A.   True.

20   Q.   Okay.  So one colon -- we don't know what time -- is the

21   vehicle that you say Mr. Arthur and Mr. Arnold arrived in,

22   correct?

23   A.   If we wanted to dial that time in we could look at the

24   vehicle.

25   Q.   Okay.  So the vehicle that Mr. Arnold and Mr. Arthur

1   arrived in sometime during that time period, Mr. Arthur being

2   known to you and your squad that was out there, correct?

3   A.   Right, right.

4   Q.   And Mr. Arnold being somebody who was known to you and

5   your squad that night, correct?

6   A.   Right.

7   Q.   In fact, as being one of the people who was being

8   targeted, right?

9   A.   Correct.

10  Q.   We were going to find some reason to pick up

11  Billy Arnold that night, right?

12  A.   We were going to find a reason to do a traffic stop.

13  Q.   Okay.  So who was described as coming out of that

14  TrailBlazer at 1:00-something in the morning?

15  A.   Two black males, one wearing red and black, exited the

16  vehicle.

17  Q.   Not Steve Arthur?

18  A.   No.

19  Q.   Not a known target, right?

20  A.   No.

21  Q.   Not Billy Arnold, a known target?

22  A.   Right.

23  Q.   Other people are described by their name in that report;

24  is that correct?

25  A.   I think you are referring to the notes as to what the

1   license plates returned to.  Is that what you are referring

2   to?

3   Q.   All right.  Well, let's get to that.  Every vehicle that

4   arrived that night --

5   A.   Okay.

6   Q.   -- a license plate is noted for that vehicle; is that

7   correct?

8   A.   I wouldn't say every vehicle.  I wouldn't say -- there

9   were quite a few vehicles at that club that night.

10   Q.   But certainly the vehicle that you are now associating

11   with Mr. Arnold and Mr. Arthur, that is a license plate that

12   was noted?

13   A.   Right.

14   Q.   And you indicated that -- you indicated that there was

15   some kind of search into each of those license plates to

16   determine the status of them?

17   A.   Correct.

18   Q.   And you indicated that there was -- that you -- did you

19   personally conduct any kind of search of that or did somebody

20   else do that and relay the information to you?

21   A.   That would have been one of our analysts.

22   Q.   So you caused someone else to research that license

23   plate?

24   A.   Yes.

25   Q.   Is that correct?

1   A.   Yes.

2   Q.   And as a result of researching that license plate, you

3   received some information?

4   A.   I did.

5   Q.   Because you -- every single one of those license plates

6   that were observed that night were researched?

7   A.   Any license plate that we called out that was of

8   interest to us, yes, we researched that license plate.

9   Q.   And, in fact, the second part of that report details

10  what you learned about every single one of those license

11  plates, right?

12  A.   That's correct.

13  Q.   Okay.  And it gives you that information?

14  A.   Right.

15  Q.   Tell us what information your report reflects was

16  received on the license plate associated with the vehicle

17  that Mr. Arthur and Mr. Arnold were reported in?

18  A.   In this particular report it says came back with no

19  record.

20  Q.   That's the information that you had that night?

21  A.   That's not the information I had that night.

22  Q.   Okay.  But that's the information that was put in the

23  report?

24  A.   That is correct.

25  Q.   Okay.  And you're indicating to us that you actually

 1   received other information?

 2   A.   That's correct.

 3   Q.   Can you tell us where that information would be

 4   reflected?

 5   A.   In the LEIN printout, not in this report.

 6   Q.   There is a LEIN printout?

 7   A.   Correct.

 8   Q.   You've seen the LEIN printout?

 9   A.   I have.

10   Q.   When did you cause this LEIN printout to be run and

11   printed out?

12   A.   It would have been run that night.

13   Q.   Is there any -- is that -- has that printout then been

14   relayed to the U.S. attorneys on the file?

15   A.   I don't believe it was.

16   Q.   So you had information -- had a printout printed out

17   that was the basis for the stop of the vehicle that night but

18   it is not information that you preserved or presented?

19   A.   It may not have been printed out that night but, yes, I

20   had information that that vehicle had been reported stolen.

21   Q.   Is there any reason that's not in the 302 that you are

22   holding in your hands?

23   A.   I can tell you what we generally do when we have reports

24   like this, is we draft those reports and then go back through

25   and do the license plates, we will rerun them.  Okay.  I

1    would be speculating here.

2    Q.   Well, I don't want you to speculate.

3    A.   Okay.

4    Q.   You don't know why in this situation that information is

5    not reflected on the 302 that was prepared following the --

6    A.   That's correct.  I don't know why it says no record.

7    Q.   But you will agree with me that that's indeed what that

8    302 says?

9    A.   Yeah, that's what it says.

10   Q.   And did you -- did you learn at some point that that

11   vehicle was in any way connected with Steve Arthur?

12   A.   I learned that it was his girlfriend's vehicle.

13   Q.   Just so I'm clear, that vehicle -- well, strike that.

14          That vehicle, in fact, belonged to Steve Arthur's

15   girlfriend?

16   A.   Right.

17   Q.   And Steve Arthur on the evening of August 25th, the

18   morning hours of the 26th, had permission to be in lawful

19   possession of that vehicle?

20   A.   I think are you referring to September 25th?

21   Q.   I'm sorry.  I don't know what I just said but --

22   A.   You said August.

23   Q.   -- but that's exactly what I just meant.

24   A.   I'm assuming she gave him permission to use it.

25   Q.   Because you didn't have any information otherwise,

1    right?

2    A.   That's correct.

3    Q.   In fact, you had some contact with her after the fact

4    and she didn't indicate to you otherwise?

5    A.   Right.

6    Q.   All right.  In fact, as of the evening of September 25th

7    and into the early morning hours of the 26th, that vehicle

8    was not considered by the owner to be a stolen vehicle?

9    A.   I hadn't talked to the owner that night.

10   Q.   But you subsequently found out that was true?

11   A.   Days later.  The information I had that night was that

12   it was a stolen vehicle.

13   Q.   And that information -- the information that is not

14   reflected in your 302?

15   A.   Right.

16   Q.   Okay.  There were, in fact, other vehicles that night

17   that you did learn were stolen?

18   A.   Yes.

19   Q.   Okay.  And do you know which vehicles those were?

20   A.   Not off the top of my head.

21   Q.   Is that reflected in the 302?

22   A.   I would have to read through the 302 to find out.

23   Q.   You recall that there were other vehicles that had

24   been -- you know, the basis of the stop of those vehicles was

25   because they were stolen vehicles?

1   A.   I believe there was one other vehicle that had been

2   reported stolen.

3   Q.   Okay.  And the reason you caused the stop of the vehicle

4   that Mr. Arthur was driving was because you thought that

5   vehicle was a stolen vehicle?

6   A.   Yes.

7   Q.   You indicated that at some point you see the --

8   Mr. Arnold leaving the Crazy Horse; is that correct?

9   A.   I'm sorry.  What was it?

10  Q.   The evening of September 25th, into the early morning

11  hours of the 26th, at some point you see Mr. Arnold leaving

12  the Crazy Horse?

13  A.   Yes.

14  Q.   And Mr. Arnold leaves the Crazy Horse, and he's in the

15  company of Mr. Arthur?

16  A.   That's correct.

17  Q.   You see him go into the passenger side of the vehicle?

18  A.   Right.

19  Q.   And after the vehicle being driven by Mr. Arthur leaves

20  the Crazy Horse, what time is it?

21  A.   Are you asking what time the vehicle left?

22  Q.   Correct.

23  A.   I don't know the exact time.

24  Q.   Are the comings and goings reflected in the report?

25  A.   At that time -- they are not, they are not.  At that

| 1 | time of the night it was a lot happening, it was multiple |
| 2 | vehicles leaving at the same time, and it just didn't get |
| 3 | captured in the report here. |
| 4 | Q.   But you recall seeing Mr. Arnold and Mr. Arthur leaving? |
| 5 | A.   Right. |
| 6 | Q.   And, in fact, you made a note of them leaving together? |
| 7 | A.   Yes. |
| 8 | Q.   And it was your recollection now that it was about the |
| 9 | time that the party was breaking up? |
| 10 | A.   Right. |
| 11 | Q.   So what time was that, what time did the party break up? |
| 12 | A.   I don't know the exact time. |
| 13 | Q.   Well, if Mr. -- if you -- if your records reflect that |
| 14 | you saw Mr. Arnold arrive some time after 1:00 -- |
| 15 | A.   Okay. |
| 16 | Q.   -- how much time do you think Mr. Arnold was at this |
| 17 | location before he left? |
| 18 | A.   My guess, and it's purely that, he left in the 2:00 hour |
| 19 | sometime. |
| 20 | Q.   Okay. |
| 21 | A.   Like we said, we can certainly review the camera footage |
| 22 | and we would probably be able to dial that time in. |
| 23 | Q.   So you think the party broke up sometime around 2:00? |
| 24 | A.   Or later. |
| 25 | Q.   And at that point, according to your notes, Mr. Arnold |

1    would have been at the club less than an hour?

2    A.   Or thereabouts.

3    Q.   Okay.  And so after he leaves you do something to cause

4    that vehicle to be stopped?

5    A.   Yes.

6    Q.   Okay.  And you had already had that in place; is that

7    correct?

8    A.   That's correct.

9    Q.   And so sometime after 1:00 when the vehicle arrives, the

10   vehicle is run and you get information that leads you to

11   believe that it is a stolen vehicle, and then within the hour

12   the party breaks up and there's a lot going on and people are

13   leaving?

14   A.   Right.

15   Q.   So sometime after 1:00 you run the plate?

16   A.   Yes.

17   Q.   You get the information that it is stolen?

18   A.   Right.

19   Q.   Make contact with DPD giving them that information?

20   A.   That's right.

21   Q.   And giving them instructions on how -- you know, how and

22   to take this vehicle down?

23   A.   That's correct.

24   Q.   Okay.  And so sometime around 2:00, DPD then, pursuant

25   to your instructions, goes to make a stop of the vehicle; is

| | |
|---|---|
| 1 | that about what happened? |
| 2 | A.   That's about right. |
| 3 | Q.   You do not actually participate in the arrest of |
| 4 | Mr. Arnold? |
| 5 | A.   I did not. |
| 6 | Q.   You do not participate in seizing any items from him? |
| 7 | A.   I did not. |
| 8 | Q.   You do not participate in any search of the vehicle? |
| 9 | A.   I did not. |
| 10 | Q.   Or anything that was recovered -- |
| 11 | A.   I did not. |
| 12 | Q.   -- pursuant to that? |
| 13 | A.   Un-un -- well, recovered later from the vehicle |
| 14 | obviously. |
| 15 | Q.   That evening. |
| 16 | A.   That evening, no, I did not. |
| 17 | Q.   Just so I'm clear, you do participate in some kind of |
| 18 | search or seizure afterwards? |
| 19 | A.   Subsequent search, the consensual search of the vehicle. |
| 20 | Q.   And were there items seized pursuant to the consent |
| 21 | search? |
| 22 | A.   Yes. |
| 23 | Q.   That were not seized on the -- in the early morning |
| 24 | hours of September 26th? |
| 25 | A.   Yes, there were. |

1    Q.   The phones had been seized on the night of the 25th and

2    the early morning hours of the 26th?

3    A.   That's correct.

4    Q.   And items recovered in the rear of the TrailBlazer had

5    been seized on the night of the 25th into the early morning

6    hours of the 26th; is that correct?

7    A.   That's also correct.

8    Q.   The vehicle that -- this TrailBlazer that we have been

9    talking about that you subsequently learned was owned by

10   Mr. Arthur's friend, somebody he was connected to, did you

11   have any information regarding that TrailBlazer before?

12   A.   Before that night?

13   Q.   Yeah?

14   A.   No, I did not.

15   Q.   You didn't have any information before that time that

16   that wasn't or was a vehicle that Mr. Arthur had been

17   previously associated with and had -- in fact, that license

18   plate had been connected with him previously?

19   A.   I did not have any of that information.

20   Q.   You had that information regarding other people at the

21   club that night?

22   A.   I did.

23   Q.   Yeah.  In fact, I mean, you knew that when other

24   vehicles arrived and you had their license plates, you knew

25   who those vehicles were going to be connected to and

1    associated with; is that fair?

2    A.   We had information on particular vehicles that might

3    arrive that night.

4    Q.   Was this TrailBlazer one of those vehicles that you were

5    on the lookout for that night?

6    A.   No, it was not.

7    Q.   You indicated that the reason this evening was of

8    interest was because of information that you had received

9    regarding this memorial for Devon McClure that was going to

10   be held there; is that correct?

11   A.   That's right.

12   Q.   Prior to that evening, had you personally seen any

13   social media announcements for this memorial?

14   A.   Yes, I saw that social media announcement.

15   Q.   When did you first become aware of the social media

16   posts that were announcing this event for Devon McClure?

17   A.   I couldn't tell you the exact date and time I became

18   aware of it.

19   Q.   Would --

20   A.   My guess, again, at least a week because it took some

21   time to prepare for this event.

22   Q.   Well, that's my question.  Does -- I believe the date of

23   September 16th or so ring a bell?  I thought I saw that

24   somewhere in one of your affidavits.

25              In any event, a week or ten days, sometime before

1      this?

2      A.    Sure.

3      Q.    Okay.  You became aware that there was this memorial

4      planned?

5      A.    Yes, I did.

6      Q.    And so in the week to ten days or so prior to the event

7      there was, in fact, some planning that went on?

8      A.    Oh, yes.

9      Q.    In terms of trying to compile as much information about

10     people who might attend?

11     A.    Yes.

12     Q.    Any information regarding what vehicles they might be

13     arriving in?

14     A.    Yes.

15     Q.    And especially in terms of the people you were

16     targeting, you were looking for that type of information?

17     A.    Yes, I was.

18     Q.    And this information that you compiled in advance of the

19     memorial, in preparation for the memorial, you documented it

20     where?

21     A.    In our operations plan.

22     Q.    I'm sorry.  In your --

23     A.    Operations plan.

24     Q.    In your operations plan.  That's something that is

25     memorialized somewhere?

```
 1   A.   Yes.

 2   Q.   And that's information that you have shared with the

 3   prosecution?

 4   A.   I believe I have.

 5   Q.   Okay.  You don't have anything yourself --

 6   A.   I didn't bring --

 7   Q.   -- that documents that?

 8   A.   I didn't bring it today.  Sorry.

 9   Q.   You didn't bring it today, but everything you do have

10   you have turned over to the prosecution?

11   A.   I believe I have.

12            MS. MANNARINO:  All right.  Thank you.

13            THE COURT:  All right.  My redirect?

14                   REDIRECT EXAMINATION

15   BY MR. GRAVELINE:

16   Q.   Agent Ruiz, there was a lot of talk about the

17   information you had when the license plate was called in?

18   A.   Right.

19   Q.   All right.  And did you actually get a physical printout

20   of the LEIN reporting this car as stolen that night?

21   A.   I don't believe so.

22   Q.   All right.  And so where were you physically that night?

23   A.   I was on static surveillance right next to our command

24   post.

25   Q.   So were you on Michigan Avenue in Detroit?
```

1    A.   I was.

2    Q.   Outside of the Crazy Horse?

3    A.   I was.

4    Q.   All right.  And where was the person who was -- you

5    called in the license plate to?

6    A.   Just a room over, two rooms over maybe.

7    Q.   So did they actually bring you a physical copy of the

8    LEIN report or did they tell you the information they found?

9    A.   All of the communication was over the radio that

10   evening.  We would call out a plate, Michigan plate this,

11   Ohio plate that, they would relay the information once they

12   had determined the information associated with that plate.

13   Q.   All right.  So in terms of -- when we are talking about

14   printouts, you didn't have a physical printout that night?

15   A.   No, sir.

16   Q.   The information that you had received was this car had

17   been reported stolen?

18   A.   That's correct.

19   Q.   With this Ohio license plate?

20   A.   That's correct.

21   Q.   Let's talk about the 302.  Now, this is not your 302

22   personally, correct?

23   A.   I did not write this.  It was Jeffery Wittfield that

24   wrote this.

25   Q.   And is Jeffery Wittfield an FBI agent at that point that

1  was part of the Violent Gang Task Force?

2  A.   Yes.

3  Q.   And so the annotations that he made, that is based upon

4  what he observed or what was called out to him?

5  A.   That's correct.

6  Q.   And in terms of the last page where it talked about the

7  license plate with the TrailBlazer?

8  A.   Okay.

9  Q.   Specifically, the 302 reports a license plate of G -- or

10  Golf Juliette Hotel 1851, correct?

11  A.   That's correct.

12  Q.   Does it annotate a state next to it in the 302?

13  A.   It does not.

14  Q.   And so could it be possible that Agent Wittfield ran it

15  as a Michigan plate as opposed to an Ohio plate?

16          MS. MANNARINO:   Object to speculation, Judge.

17          MR. GRAVELINE:   I'm just saying it is possible.

18          THE COURT:   I will permit the question.

19  A.   It is a possibility.

20  BY MR. GRAVELINE:

21  Q.   And the other plates that are reflected on that 302 that

22  were ran that day, are there any other states other than

23  Michigan plates reflected?

24  A.   I -- excuse me.  I see one here that says Pennsylvania

25  plate.

1    Q.   All right.  And then are the others all Michigan plates?

2    A.   It doesn't even specify Michigan.

3    Q.   So the other ones are just plate numbers just like the

4    annotation for this Golf Juliette Hotel 1851?

5    A.   That's correct.

6    Q.   The information you had about the Ohio plate of Golf

7    Juliette Hotel 1851 that was there was a stolen car that

8    night?

9    A.   That's correct.

10   Q.   And that's what you called out to your fellow officers?

11   A.   That's correct.

12   Q.   Now, in the preparation for this particular motion

13   hearing, did I ask you to get an actual physical printout of

14   the LEIN report?

15   A.   You did.

16   Q.   Have we -- and then you gave that to me, correct?

17   A.   I did.

18   Q.   And based upon your knowledge, was that at the request

19   of the defense in this case?

20   A.   I believe it was.

21   Q.   And so you had this printed off in the last week?

22   A.   Yes.

23        MR. GRAVELINE:  Your Honor, I'm sorry, I didn't

24   bring any government exhibit stickers but I'm going to label

25   this as Government's Exhibit 4.

```
 1                    THE COURT:  Okay.
 2    A.   I have a copy.
 3    BY MR. GRAVELINE:
 4    Q.   You have a copy of it right there?
 5    A.   Yes, I do.
 6    Q.   So I'm going to hand this to the Court.  I think this
 7    might call for a little bit of deciphering here.
 8    A.   Okay.
 9    Q.   Do you see what date it was reported stolen on?
10    A.   It says the date of entry is September 7th, 2015.
11    Q.   Where do you see that on this particular piece of paper?
12    A.   There is a designation, I don't know, the tenth line
13    down in the actual detail of this VIN that's being searched;
14    it says DTE, which I'm told that stands for date of entry.
15    Q.   All right.  So when you say ten lines down that's from
16    where it says purged?
17    A.   Correct.
18    Q.   You count ten lines down from there on the line that
19    states with NIC, correct?
20    A.   Correct.
21    Q.   And then that's the date of entry for this particular
22    vehicle?
23    A.   That's right.
24    Q.   And do you see three lines up from that on the line that
25    states MIS, the first one?
```

1    A.   Yes.

2    Q.   And do you see after the back slash UDAA?

3    A.   Yes.

4    Q.   Do you know what that acronym stands for?

5    A.   Unlawful driving away auto I think.

6    Q.   Is that a Detroit police acronym?

7    A.   Yes.

8    Q.   And then does it say what date it was recovered on or

9    returned to owner?

10   A.   On that same line of the date of entry, farther to the

11   right, there is a designation DLU, and I was told that stands

12   for date of last update, and that particular date is

13   October 7th, 2015.

14   Q.   All right.  And that corresponds with the -- after the

15   consent search of October 5th, 2015?

16   A.   That's correct.

17   Q.   And is there any annotation when this VIN number is run

18   that anyone had taken this vehicle out of its designation as

19   a stolen vehicle before October 7, 2015?

20   A.   No.

21   Q.   Now, in terms of the overall plan for that evening, once

22   you determined that this Chevy TrailBlazer was a stolen

23   vehicle, did it matter who got in that vehicle upon leaving

24   that night whether it was going to be stopped?

25   A.   It did not.

| | |
|---|---|
| 1 | Q.   So it did not matter that Mr. Arnold was in that vehicle |
| 2 | that night in your mind whether it was going to be stopped? |
| 3 | A.   That's correct. |
| 4 | Q.   Did it matter that Steve Arthur was going to be the |
| 5 | driver that night? |
| 6 | A.   It did not. |
| 7 | Q.   So the information that you had, this was a stolen |
| 8 | vehicle and a traffic stop was going to be done on that |
| 9 | vehicle that night? |
| 10 | A.   That's right. |
| 11 | Q.   And going back to the actual information that you had |
| 12 | leading up to this, Ms. Mannarino talked about trying to |
| 13 | accumulate as much information as you could have prior to |
| 14 | this event.  And this event was once again called what on |
| 15 | social media? |
| 16 | A.   The block party. |
| 17 | Q.   How much -- how many cars had you identified at that |
| 18 | point as belonging to a Seven Mile Bloods member or you knew |
| 19 | to be on the lookout for that night? |
| 20 | A.   Not many.  I couldn't give you an exact number but not |
| 21 | many.  Knowledge that we had was a lot of these guys used |
| 22 | rental vehicles and were always changing them up, so as far |
| 23 | as having a specific vehicle for all of our guys we just |
| 24 | didn't have it. |
| 25 | Q.   The owner of this vehicle was a Tesha Robinson; is that |

1    correct?

2    A.   Yes, that's correct.

3    Q.   Had you ever heard her name prior to that night?

4    A.   Never.

5    Q.   Did you know that Tesha Robinson was somehow connected

6    with Steve Arthur prior to that night?

7    A.   No.

8    Q.   So the information you had is that this vehicle was a

9    stolen vehicle with no connection to any of the participants

10   who you knew to be a Seven Mile Bloods member or expected to

11   be a Seven Mile Bloods member?

12   A.   That's correct.

13            MR. GRAVELINE:   Thank you.  No further questions.

14            MS. MANNARINO:   If I might just follow up?

15            THE COURT:   Okay.  A couple questions.

16            MS. MANNARINO:   Just a couple of questions.

17                    RECROSS-EXAMINATION

18   BY MS. MANNARINO:

19   Q.   So if I get this straight, you did run a paper LEIN,

20   correct?

21   A.   Yes.

22   Q.   And that was at my request?

23   A.   Correct.

24   Q.   Okay.  And so the LEIN you ran was 8/29, correct?  Lower

25   right-hand corner, report date.

1   A.   Yes, I see that now.

2   Q.   This being 8/31, right?

3   A.   Right.

4   Q.   So you run a LEIN and you see that, in fact, the vehicle

5   had been reported stolen on the 6th of September, right?

6   A.   It actually shows the 7th here.

7   Q.   Well, did you ever actually go and look at the police

8   reports that had originally been filed by the owner of the

9   car?

10  A.   Yes, I did.

11  Q.   There were police reports that were filed --

12  A.   Yes.

13  Q.   -- reporting it stolen?

14  A.   Yes, I have a copy of it here.

15  Q.   Was that on the 6th?

16  A.   That was September 6th.

17  Q.   So it goes into the LEIN on the 7th?

18  A.   Right.

19  Q.   Okay.  And so you subsequently learned that, in fact,

20  the vehicle had been recovered, right, by the owner?

21        On the night that Mr. Arthur is seen driving this

22  vehicle he had that vehicle with permission of the owner of

23  the vehicle, right?  On that night it wasn't a stolen

24  vehicle?

25  A.   That was not knowledge that I had that night.

1   Q.   But you subsequently learned that because you had

2   contact with the owner of vehicle?

3   A.   Right.

4   Q.   And the owner of the vehicle told you that the vehicle

5   had been recovered, right?

6   A.   Yep.

7   Q.   So if it was still in the LEIN that was because it was

8   an error, it should have been removed from the LEIN, right?

9   A.   It should have.

10  Q.   Right.  And no one took it out?

11  A.   I don't believe so.

12          MS. MANNARINO:  Thank you.

13          THE COURT:  All right.  Thank you.  You may step

14  down.

15          (Witness excused at 10:19 a.m.)

16          MR. GRAVELINE:  The government calls Officer

17  Nick Dedeluk to the stand.

18          THE COURT:  Good morning.

19          OFFICER DEDELUK:  Good morning.

20          THE COURT:  Would you raise your right hand, sir?

21          Do you swear the testimony you are about to give in

22  this cause will be the truth, the whole truth, and nothing

23  but the truth, so help you God?

24          OFFICER DEDELUK:  Yes.

25          THE COURT:  All right.  Take a seat please.  We

```
 1    will have you begin by stating your name and spelling your

 2    last name for us.

 3              OFFICER DEDELUK:  Nicholas Dedeluk, D-E-D-E-L-U-K.

 4              THE COURT:  All right.  Thank you.  You may

 5    proceed.

 6                    OFFICER NICHOLAS DEDELUK,

 7    called at about 10:19 a.m., was examined and testified on his

 8    oath as follows:

 9                        DIRECT EXAMINATION

10    BY MR. GRAVELINE:

11    Q.   Who do you work for?

12    A.   Detroit Police Department.

13    Q.   And how long have you worked with the Detroit Police

14    Department?

15    A.   Approximately nine years.

16    Q.   And were you on duty on the night of September 25th --

17    night of September 25th, 2015 going into the early morning

18    hours of September 26th, 2015?

19    A.   Yes.

20    Q.   And what were your duties that night?

21    A.   That night we were working with VCTF on detail up at the

22    Crazy Horse strip club on Michigan Avenue.

23    Q.   And what were you -- what were your duties in terms of

24    working with the FBI that night?

25    A.   Basically a takedown unit.
```

1    Q.  All right.  And describe that for the Court.  So what

2    did you understand your duties to be that night?

3    A.   That night we were staged away from the club in a fully

4    marked car, full uniform, and VCTF and other units that were

5    up at the club would relay us information on vehicles that

6    they may want -- need to be stopped or people they wanted to

7    be investigated.

8    Q.  All right.  And was your patrol car -- were you in a

9    fully marked scout car that night?

10   A.   Yes.

11   Q.  And did that have video capability?

12   A.   Yes, it did.

13   Q.  Have you reviewed what has been marked as Government's

14   Exhibit 1 in this case, the video from your scout car from

15   that night?

16   A.  Yes, I have.

17   Q.  Is that an accurate video taken from your scout car that

18   night?

19   A.  Yes, it is.

20   Q.  Specifically, were you radioed information about a

21   particular Chevy TrailBlazer?

22   A.  Yes, I was.

23   Q.  And what information was passed along to you?

24   A.   That a blue Chevy TrailBlazer with an Ohio plate was

25   reported -- confirmed stolen vehicle was at the club.

Motion to Suppress - August 31, 2017

1    Q.   And were you asked to stop that vehicle?

2    A.   When it left they -- they had us positioned west of the

3    club since that's the way the vehicle was faced, and

4    basically told us they would advise us when that vehicle

5    would leave, and we were to effect a traffic stop on that

6    vehicle.

7    Q.   Were you told who were some of the occupants of the

8    vehicle at that point?

9    A.   No, I don't believe so.

10   Q.   All right.  And did you, in fact, attempt to traffic

11   stop that vehicle?

12   A.   Yes, I did.

13   Q.   Do you remember the exact time that you tried to stop

14   that vehicle that night?

15   A.   No, I do not.

16   Q.   Did you bring your report with you today?

17   A.   Yes, I did.

18   Q.   And if you take a look at your report would that refresh

19   your memory as to what time a traffic stop was attempted

20   effectuated that night?

21   A.   It may.

22   Q.   Okay.  Can you take a look at that?

23   A.   Yes.  I believe it was around 4:00 in the morning.

24   Q.   Well, let me -- is it reflected in your report there, an

25   exact time of the traffic stop, not of the entire incident?

1    A.   No, it is not.

2    Q.   Okay.  Who was your partner there that night?

3    A.   Officer Johnnie Hanna.

4    Q.   And to be clear, when there are -- there is an incident,

5    is it common that both officers would write a report --

6    A.   Yes.

7    Q.   -- and log?

8         And is it a Detroit police system known as Crisnet

9    system?

10   A.   It was, yes.

11   Q.   So Crisnet is C-R-I-S-N-E-T, correct?

12   A.   Yes.

13   Q.   And in terms of knowing where one report is associated

14   with a case, there is a case number and then it is called a

15   .1 or a .2, .3, correct?

16   A.   Correct.

17   Q.   What number is yours -- what is the case number and

18   what's your report numbered as?

19   A.   The case number is 1509070072, and .2 is my report.

20   Q.   .2 is your report.  I'm going to show you .3, okay, and

21   ask if you recognize who wrote that report.

22   A.   This report is written by my partner, Johnnie Hanna.

23   Q.   I would like you to read his description of the evening,

24   just read it to yourself and look up once you are done

25   reading.  All right.

1    Does his report reflect the time that the traffic

2    stop was initiated?

3    A.   Yes.

4    Q.   And what time was the traffic stop initiated?

5    A.   1:57 a.m.

6    Q.   And where specifically was the traffic stop initiated?

7    A.   Lonyo, eastbound 94.

8    Q.   And --

9    A.   I should say on 94 and Lonyo.

10   Q.   So are we talking about the entrance ramp or --

11   A.   Actually on the freeway.

12   Q.   On the freeway.  And how did you attempt to establish

13   this traffic stop?

14   A.   I pulled behind the vehicle and activated my lights and

15   siren.

16   Q.   And did the vehicle comply with the lights and siren?

17   A.   No.

18   Q.   The Court has the video, but can you describe what you

19   remember of that particular attempted traffic stop?

20   A.   Do you want me to go all the way to the end?

21   Q.   Yes.

22   A.   Okay.  We were given the description of the vehicle,

23   advised that it was getting on -- it was on Michigan

24   westbound to northbound Lonyo to eastbound 94.  We were on

25   Trenton Street just south of Michigan, which is west of

1    Lonyo.  We got on Michigan, got on the eastbound ramp of 94,

2    got on 94, observed the vehicle being described on 94 heading

3    eastbound.  I pulled behind the vehicle, activated my lights

4    and sirens.  The vehicle disregarded the lights and sirens,

5    and took off at a high rate of speed on eastbound 94.

6    Q.   Now, when you say high rate of speed, do you remember

7    how fast you were going to keep up with that vehicle?

8    A.   In excess of 100 miles an hour.

9    Q.   What is the speed limit on I-94 there in the city?

10   A.   55.

11   Q.   And were you able to keep up with the vehicle as you

12   were going over 100 miles an hour?

13   A.   I was.  I had to back off several times because there

14   was traffic coming.

15   Q.   And why did you want to back off with the traffic?

16   A.   In case I had to make a sudden stop or maneuver in case

17   the suspect wrecked.

18   Q.   All right.  And were you able to keep up with the

19   vehicle?

20   A.   Yes.

21   Q.   And did you eventually see it come to a stop?

22   A.   Yes, I did.

23   Q.   How did it come to a stop?

24   A.   The vehicle was heading eastbound on 94 and entered the

25   southbound ramp to I-75, while it was making the -- so it was

1    a sweeping right turn to get on southbound 75, and it went

2    up -- it couldn't make the turn, it went up the embankment,

3    came back down on the ramp, and both driver's front and rear

4    tires were blown out, and the driver of the vehicle fled on

5    foot westbound up to the embankment.

6    Q.   And did you chase after him?

7    A.   No, I did not.

8    Q.   All right.  What did you do?

9    A.   I noticed that there was a passenger in the vehicle, and

10   I approached the passenger side of the vehicle, ordered the

11   passenger to open the door, which he eventually did, and I

12   detained the passenger.

13   Q.   All right.  So once again, referring back to the video,

14   you are the officer with the gun drawn at the side door of

15   the vehicle that night?

16   A.   Yes, I am.

17   Q.   Okay.  Now you say that you detained the passenger.  Did

18   you put him on the ground?

19   A.   Yes -- well I assisted him to the ground.

20   Q.   All right.  And did you put some type of restraint on

21   his hands?

22   A.   Yes, I did.

23   Q.   What type of restraints did you put on his hands?

24   A.   Handcuffs.

25   Q.   And now at this point what was your plan or what was

1    your procedure going to be for processing this individual

2    that night?

3    A.   He was going to be arrested.

4    Q.   And why was that?

5    A.   Fleeing -- a stolen vehicle, and then fleeing and

6    eluding.

7    Q.   And so you put him in handcuffs?

8    A.   That is correct.

9    Q.   And then what did you do with him from there?

10   A.   I took him to the back of the scout car.

11   Q.   And also it appears on the video that you might have

12   patted him down?

13   A.   Yes, I'm sorry.  Yes, I did, I did a pat down for

14   weapons.

15   Q.   And did you find any weapons on his person?

16   A.   Not on his person, no.

17   Q.   And then you brought him back to the scout car?

18   A.   That is correct.

19   Q.   Did you participate at all in the rest of the search of

20   the vehicle that night?

21   A.   Not of the vehicle.

22   Q.   Now, just taking a step back outside of this particular

23   incident right here, if you had -- just as a Detroit police

24   officer, if you have information about a stolen vehicle and

25   there are more than one person in that vehicle, what are your

 1    procedures when you eventually pull over that vehicle?

 2    A.   Arrest all occupants of the vehicle.

 3    Q.   And bring them where?

 4    A.   To the Detroit Detention Center.

 5    Q.   And is that pending further investigation?

 6    A.   Yes.

 7    Q.   So regardless in terms of investigating the stolen car,

 8    the occupants were going to be arrested that night pending

 9    that investigation?

10    A.   That is correct.

11    Q.   Now, I just want to ask one other thing about the

12    Crisnet.   You mentioned that the case number in this case was

13    1509070072, correct?

14    A.   Correct.

15    Q.   What was the initial -- I'm going to hand you -- and

16    yours was the .2, correct?

17    A.   That's correct.

18    Q.   If you take a look at the top of your report, on the

19    left-hand side it says occurred on September 6th, 2015 at

20    11:15 p.m.?

21    A.   That's correct.

22    Q.   But that's not September 26th, 2015?

23    A.   No.

24    Q.   Why is September 6th, 2015 reflected on that report?

25    A.   When a vehicle is stolen in the City of Detroit an

1   initial report is generated.  If there is an arrest or
2   anything involving that vehicle later on, recovery of the
3   vehicle, it is a dot off of the initial report so they linked
4   together so that there's not separate reports.
5   Q.  Okay.  So your report is then forever linked back to the
6   initial stolen car report?
7   A.  That is correct.
8   Q.  I'm going to show you the .1 in this case.  What was the
9   date that this car was reported stolen on?
10  A.  It was reported on September 7, 2015.
11  Q.  All right.  And the date entered into the Crisnet
12  system?
13  A.  The date entered was September 7, 2015.
14          MR. GRAVELINE:  Thank you.  No further questions.
15          THE COURT:  Thanks, Mr. Graveline.
16          Ms. Mannarino?
17                        CROSS-EXAMINATION
18  BY MS. MANNARINO:
19  Q.  Good morning.
20  A.  Good morning.
21  Q.  You were on duty that evening with a partner, correct?
22  A.  That is correct.
23  Q.  And that would be Hanna?
24  A.  Yes.
25  Q.  Okay.  And you two were called into -- called in as a

1   takedown unit?

2   A.   Correct.

3   Q.   Okay.  You were there to provide backup and to arrest

4   people, correct?

5   A.   Possibly, correct.

6   Q.   And so you arrived at that location what time?

7   A.   Oh, I'm going -- it was early.  We were there for quite

8   awhile.  I can't give you an exact, we were probably there

9   four or five hours --

10  Q.   Okay.

11  A.   -- if not longer.

12  Q.   So you just took a look at your report, and you don't

13  have that in front of you anymore?

14  A.   I do have my report in front of me.

15  Q.   Does the report indicate 11:00-ish p.m., does that sound

16  about right?

17  A.   If I could refer --

18  Q.   No, I'm looking at the wrong report.  Tell me what time

19  did you get there?

20  A.   Probably around 10:00, 10:30 maybe.

21  Q.   And you are nearby, you are not at the Crazy Horse,

22  right?

23  A.   That is correct.

24  Q.   From your location are you static, were you stationary

25  somewhere?

1    A.   Yes, yes.

2    Q.   And you were there for a number of hours in that one

3    location, right?

4    A.   That is correct.

5    Q.   And in that one location you were at could you see the

6    Crazy Horse?

7    A.   No.

8    Q.   All right.  So everything that you are getting, you are

9    getting via the radio?

10   A.   Yes.

11   Q.   Okay.  So people are giving you information but you

12   can't really see what is going on, right?

13   A.   Correct.

14   Q.   You get some information regarding the TrailBlazer, you

15   don't see this TrailBlazer, right?

16   A.   No, no.

17   Q.   You don't see who is in the TrailBlazer getting in,

18   getting out, right?

19   A.   No, I did not.

20   Q.   Did you get information about what time that TrailBlazer

21   got there?

22   A.   I do remember them calling out -- what they were doing

23   is they were running plates, someone was running them through

24   the LEIN.

25   Q.   Sure.

```
 1    A.   And I do remember hearing about that TrailBlazer pulling
 2    up to the location, the plate being ran, and being confirmed
 3    stolen.  What time that was I couldn't tell you.
 4    Q.   What about any information about who was in the vehicle?
 5    A.   I don't recall.
 6    Q.   Okay.  Did you have -- did you get information that
 7    there were certain people being targeted that night?
 8    A.   Yes, I did.
 9    Q.   Did you get any information that one of the people that
10    they were targeting that night was going to be in the
11    TrailBlazer?
12    A.   No.
13    Q.   You are there for a number of hours and you finally get
14    some information that the TrailBlazer is on the move, right?
15    A.   Correct.
16    Q.   And so you have some information on the plate of this
17    TrailBlazer?
18    A.   That's correct.
19    Q.   And the information -- did you have the plate number?
20    A.   Yes, I did.
21    Q.   Okay.  You got information that it was an Ohio plate; is
22    that correct?
23    A.   Correct.
24    Q.   That's -- you wrote that in your report, right?
25    A.   Yes, ma'am.
```

1   Q.   It is an Ohio plate, that's the information you got, and

2   you had the number -- or the letters GJH 1851?

3   A.   I believe that's right.   If I could look at the report

4   real quick?

5   Q.   Sure, if that would refresh your recollection.

6   A.   What plate did you say?

7   Q.   Ohio -- did you have information that it was a blue 2002

8   Chevy TrailBlazer, Ohio plate GJH 1851?

9   A.   Yes, that is correct.

10  Q.   Okay.   But this is information that you got over the

11  radio, you are not actually putting eyes on it?

12  A.   Not at that time, no.

13  Q.   And you are not doing anything with that information;

14  you are not in your scout car running the plate yourself?

15  A.   I don't know if we did or not, to be honest.   We might

16  have earlier in the day but not at that time, no, not when it

17  was on the move, but when they called it out earlier we may

18  have ran it.   I don't remember if we did or not.

19  Q.   Okay.   You do know if you did, but in your report you

20  are indicating that you are operating on the information that

21  you got from the people talking over the radio?

22  A.   Correct.

23  Q.   You may have run it yourself, you could have run it

24  yourself, right?

25  A.   Right.

```
 1   Q.   Because you have those capabilities in the vehicle?

 2   A.   That is correct.

 3   Q.   But you don't know if you did or not?

 4   A.   I don't recall.

 5   Q.   You don't recall?

 6   A.   No.

 7   Q.   So -- and when you get this information that the

 8   TrailBlazer was on the move, you don't know what time it was;

 9   is that fair?

10   A.   According to my partner's report it was just prior to

11   1:57 a.m.

12   Q.   Okay.  Because 1:57 is what was noted as the time that

13   you attempted the stop?

14   A.   That's correct.

15   Q.   But you got the information before that?

16   A.   Correct.

17   Q.   Okay.  So sometime before 1:57 you got the information

18   the TrailBlazer is on the move?

19   A.   Literally minutes, not even, less than two minutes

20   probably.

21   Q.   Sure.  That's fine.  Because you get this information,

22   and then you have to put yourself in position to get to the

23   TrailBlazer?

24   A.   I was already in position, I just had to get to the

25   TrailBlazer.
```

| | |
|---|---|
| 1 | Q.   You had to get to the TrailBlazer because you weren't in |
| 2 | a position to see the TrailBlazer? |
| 3 | A.   No, I could not see it. |
| 4 | Q.   So you get the information and you go and put yourself |
| 5 | in a position to see the TrailBlazer? |
| 6 | A.   Correct. |
| 7 | Q.   And the first time you see the TrailBlazer is on 94 |
| 8 | because that's when you attempt the stop it; is that fair? |
| 9 | A.   Yes. |
| 10 | Q.   So you travel -- you get the information and then you |
| 11 | travel from a location near the Crazy Horse, right, on |
| 12 | Michigan Avenue? |
| 13 | A.   Right, yes. |
| 14 | Q.   Down Michigan Avenue, right, pass Lonyo, right? |
| 15 | A.   No. |
| 16 | Q.   Well, to -- |
| 17 | A.   I was just west of Lonyo on Trenton, which isn't that |
| 18 | far. |
| 19 | Q.   Sure. |
| 20 | A.   I went northbound on Trenton to Michigan, eastbound on |
| 21 | Michigan to west -- to northbound 94 -- or northbound Lonyo, |
| 22 | and then onto the freeway.  So I didn't pass Lonyo, I was |
| 23 | only a few blocks away. |
| 24 | Q.   So you then get on the freeway? |
| 25 | A.   Correct. |

Motion to Suppress - August 31, 2017

```
 1    Q.   And you are on the freeway --
 2    A.   Correct.
 3    Q.   -- when you then catch up with the TrailBlazer?
 4    A.   Correct.
 5    Q.   All right.  And that takes, you said, at least a couple
 6    minutes?
 7    A.   No, no, it didn't take -- when they told -- it was less
 8    than a minute.  From the time they told me it was moving to
 9    the time I got behind it had to be less than a minute.
10    Q.   Okay.  And so you get behind the TrailBlazer?
11    A.   Correct.
12    Q.   And you try to stop it, right?
13    A.   Right.
14    Q.   Can you see who is in that TrailBlazer?
15    A.   No, I cannot.
16    Q.   Can you tell if there are people in the TrailBlazer?
17    A.   Yes.
18    Q.   You can tell there are people in there?
19    A.   Yes.  And I believe we were advised that it was occupied
20    by two black males over the radio before we made the stop.
21    Q.   Okay.  But you couldn't see them?
22    A.   No, I could not.
23    Q.   Did you have information about their positions in the
24    vehicle; is one driving and one in the back seat or both --
25    A.   No, I don't remember.  I believe they said two people
```

1    got in the vehicle.

2    Q.   Okay.  And when you finally stop the vehicle there are

3    two people in the vehicle?

4    A.   Correct.

5    Q.   Well, one got out and ran?

6    A.   Yes.

7    Q.   So then there was a front-seat passenger?

8    A.   Correct.

9    Q.   Okay.  And that front-seat passenger you've identified

10   as Mr. Arnold, right?

11   A.   I haven't yet but he's sitting right there in the red.

12   Q.   Oh, let's do that.  So the -- because at the time you

13   didn't have a description of the people, right?

14   A.   In the vehicle or are you talking about --

15   Q.   In the vehicle.

16   A.   No, I didn't.

17   Q.   You know, Officer Dedeluk --

18   A.   Dedeluk.

19   Q.   -- you didn't get information saying hey, front-seat

20   passenger is one of the targets of this, you know, he's a

21   really bad guy, be careful, he may be armed?

22   A.   Well, we figured that with all the people that were

23   leaving the club that night, that's why we were doing this

24   detail.

25   Q.   But you didn't have information that there was this huge

```
 1    party, there was five people being targeted, and the person
 2    you are following is one of those people we are targeting?
 3    A.   No, I don't believe so.
 4    Q.   You go up to the passenger --
 5    A.   Correct.
 6    Q.   -- and you ask him to exit the vehicle?
 7    A.   Correct.
 8    Q.   He does?
 9    A.   Yes.
10    Q.   And in all manner, shape, and form, according to the
11    video, cooperative?
12    A.   Correct.
13    Q.   But your instructions were -- or your intent was I --
14    you were going to arrest everybody in that vehicle?
15    A.   Yes, that's what we do.
16    Q.   That's what you do?
17    A.   That is correct.
18    Q.   Because -- because you arrest everybody in the vehicle,
19    whether or not there is anything that you can objectively see
20    that connects them to the vehicle?
21    A.   On a case like that, yes.
22    Q.   I mean, well -- strike that.
23              And do you now personally search the vehicle?
24    A.   No.
25    Q.   Do you see the vehicle being searched?
```

Motion to Suppress - August 31, 2017

1    A.   Yes.

2    Q.   Who is conducting that search?

3    A.   Sergeant Schrameck and my partner, Johnnie Hanna.

4    Q.   Okay.  So at the time the vehicle was searched, you have

5    Mr. Arnold under arrest and he's -- has he already been

6    placed in the scout car at the time?

7    A.   He's in the back seat of the scout car, yes, ma'am.

8    Q.   Do you see items recovered from the vehicle?

9    A.   Yes, I do.

10   Q.   Okay.  Do you -- prior to the search by the sergeant,

11   had you looked in the vehicle and seen anything?

12   A.   All I was looking for was people.

13   Q.   Sure.

14   A.   I just observed Mr. Arnold, I seen him, I took a quick

15   peek through the back window to make sure there was no other

16   passengers in the vehicle, and that's all I did was for

17   people.

18   Q.   Sure.  And you -- did you see anything of note as you

19   peeked in the windows?

20   A.   No, I didn't see any people.  I didn't look for anything

21   else.

22   Q.   If you had seen something else, I mean --

23   A.   I didn't, at that time I didn't see, no.

24          MS. MANNARINO:  All right.  Thank you.

25          THE COURT:  Thanks.

1          MR. GRAVELINE:  Nothing further, Your Honor.

2          THE COURT:  All right, sir.  You may step down.

3          (Witness excused at 10:43 a.m.)

4          MR. GRAVELINE:  United States calls Detroit Police

5   Sergeant Craig Schrameck, Your Honor.

6          THE COURT:  Good morning.

7          SERGEANT SCHRAMECK:  Good morning, sir.

8          THE COURT:  Would you please raise your right hand?

9          Do you swear that the testimony you are about to

10  give in this cause will be the truth, the whole truth, and

11  nothing but the truth, so help you God?

12          SERGEANT SCHRAMECK:  I do.

13          THE COURT:  All right.  Thanks.  Take a seat.  We

14  will have you begin by stating your name and spelling your

15  last name for us.

16          SERGEANT SCHRAMECK:  Craig Schrameck,

17  S-C-H-R-A-M-E-C-K.

18                  SERGEANT CRAIG SCHRAMECK,

19  called at about 10:44 a.m., was examined and testified on his

20  oath as follows:

21                  DIRECT EXAMINATION

22  BY MR. GRAVELINE:

23  Q.   I just want to make sure I got it right.  Schrameck?

24  A.   Schrameck.

25  Q.   And who do you work for?

1   A.   City of Detroit Police Department.

2   Q.   How long have you worked with the City of Detroit?

3   A.   Approximately 20 years.

4   Q.   And what is your current rank?

5   A.   Sergeant.

6   Q.   Were you on duty on September 25th, going into the early

7   morning hours of September 26th, 2015?

8   A.   Yes.

9   Q.   And what were your duties -- well, first of all, what

10  were you doing that night?

11  A.   I was a sergeant at the time in charge of the Tactical

12  Response Unit.  We were on a stakeout operating as a takedown

13  unit for the Violent Crimes Task Force and I think a joint

14  task force with the FBI.

15  Q.   Where was the location that was being surveilled that

16  night?

17  A.   It was around the area of Michigan, Wyoming, Lonyo,

18  basically the Crazy Horse strip bar was the target location.

19  Q.   And at some point did you participate in the traffic

20  stop of a 2002 Chevy TrailBlazer that night?

21  A.   Yes.

22  Q.   And we just heard from Officer Dedeluk.  Were you in his

23  car that night?

24  A.   No, I was not.  I was in a -- I was by myself in our

25  supervisor car, so I was probably -- I think it was -- he was

1   the lead vehicle, I think there was a couple MSP cars, and

2   then I was behind that one because we had two other chases

3   going on at the same time I was monitoring.

4   Q.   All right.   And so did you pull up to the scene --

5   A.   Yes.

6   Q.   -- of that traffic stop?

7   A.   Yes.

8   Q.   And did you observe the condition of the vehicle that

9   night -- at that time?

10  A.   Yes.

11  Q.   Can you describe the condition of the vehicle that

12  night?

13  A.   It kind of drove up onto the embankment, it was kind of

14  on its side, on the southbound ramp to 75, the interior was

15  kind of in disarray.   I believe there was some dents on it

16  and stuff like that.

17  Q.   How about the tires?

18  A.   I believe it had a flat tire, one of them.

19  Q.   And so when you arrive at the scene -- have you observed

20  the video from Officer Dedeluk's vehicle?

21  A.   Yes.

22  Q.   And that has been submitted to the Court as Government's

23  Exhibit 1.   Are you shown in that video?

24  A.   Yes.

25  Q.   What were you doing when you arrived at the scene?

1    A.   The first part of it when I got there, I made sure

2    Officer Dedeluk was good, he had his subject down on the

3    ground.   And then you could see me walking back and forth

4    talking on our radios because we still had two other chases

5    from the same location going on, so I was monitoring those.

6    Then I began to search the vehicle since Officer Dedeluk was

7    monitoring the subject he had in custody.

8    Q.   Now, what was your understanding about why this

9    TrailBlazer was being traffic-stopped that night?

10   A.   Well, it was one of the target vehicles from the

11   incident that we were briefed on, but also the vehicle is a

12   stolen vehicle, it was reported stolen, it was in LEIN as a

13   stolen vehicle.

14   Q.   And when you started searching the vehicle, what were

15   you looking for?

16   A.   When we first started, obviously the subject fled the

17   vehicle -- or the driver fled from the vehicle, so we were

18   looking for any type of weapons or anything like that that

19   with have caused him to flee, or documentation showing who

20   the actual owner was of the vehicle since it was a stolen

21   vehicle, and then once the two were placed in custody it

22   became a search incident to arrest prior to impounding the

23   vehicle.

24   Q.   And then once you impound the vehicle at Detroit police,

25   do you -- does the Detroit police usually do an inventory

 1    search of that vehicle?

 2    A.   We do an inventory search prior to having it towed.

 3    Q.   And what is the purpose of that inventory?

 4    A.   For any type of contraband like narcotics or weapons or

 5    any illegal things that we would not want to go to the

 6    tow yard, anything that could be hazardous, anything like

 7    that.

 8    Q.   And so did you do such a search of the vehicle that

 9    night?

10    A.   Yes, I did.

11    Q.   Did you lift the back tailgate of the TrailBlazer that

12    night?

13    A.   Yes, I did.

14    Q.   And what did you find there?

15    A.   It was a loaded AR-15 assault rifle, it had one in the

16    chamber and I can't remember how many were in the magazine

17    off the top of my head.

18    Q.   And so you are the one that actually recovered that

19    AR-15?

20    A.   Yes, out of the vehicle, yes.

21    Q.   And upon your search, did you also observe cell phones

22    within the vehicle as well?

23    A.   There was cell phones inside the vehicle, yes, I can't

24    remember how many exactly, at least two that I remember I

25    think.

1   Q.   Do you know if the car was, in fact, impounded that

2   night?

3   A.   Yes, it was.

4         MR. GRAVELINE:   Thank you.   No further questions,

5   Your Honor.

6         THE COURT:   Okay.   Thank you.   Ms. Mannarino?

7                     CROSS-EXAMINATION

8   BY MS. MANNARINO:

9   Q.   Where were you physically located that evening?   Were

10  you in the vicinity in a static position waiting for further

11  instructions from the Violent Crimes Task Force?

12  A.   Yeah, I was -- we had -- all of our units were

13  in that -- we were kind of offset of Michigan Avenue in the

14  neighborhood, kind of -- I guess it would be the southwest

15  area from where the strip bar was located.

16  Q.   And, I'm sorry, I don't recall if you said, were you

17  with somebody or were you alone?

18  A.   No, I was by myself in the vehicle.

19  Q.   Okay.   And when did you first get information about this

20  operation that night?

21  A.   We had a briefing prior to deploying to the area.

22  Q.   That evening?

23  A.   I'm pretty sure it was that evening, yeah.

24  Q.   You didn't have any information beforehand that this

25  plan had been in place for, you know, a week, ten days, a

1  couple weeks beforehand?

2  A.  We had -- we had heard there was going to be an

3  operation but, I mean, as far as the specifics of the

4  operation we had a briefing that evening.

5  Q.  Okay.  But ahead of time you knew that, you know, that

6  night it was going to be all hands-on deck in this location?

7  A.  I don't believe I actually knew until maybe a day before

8  that it was actually a go.

9  Q.  Okay.  So you go that evening and you are -- had you

10  been briefed about any specific targets?

11  A.  I can't -- off the top of my head I can't remember what

12  all the targets were that were given out.

13  Q.  But do you recall having some information about specific

14  targets?

15  A.  Just that the UCs that were in the area were going to

16  call out targets as they arrived, and if any of the targets

17  left, the target vehicles they called out, we were

18  responsible for stopping and detaining and IDing subjects.

19  Q.  Okay.  You weren't responsible for actually, you know,

20  running any of these plates or getting any kind of

21  information?

22  A.  No, myself, no.

23  Q.  Okay.  So you were going to be relying solely on the

24  information you got from the task force members?

25  A.  Yes.

```
 1   Q.   And in terms of any specific information about specific
 2   targets, do you recall whether you had any?  I'm not talking
 3   about plates numbers, I'm talking about individuals.
 4   A.   I don't remember if we had pictures or anything like
 5   that.  You talking like how sometimes we hand out the
 6   pictures of subjects?  I don't remember any of that.
 7   Q.   You know --
 8   A.   I think most of it was done, from my recollection, from
 9   the command post by the UCs on scene.
10   Q.   Okay.  So whoever was there that night was going to be
11   targeted, was going to be --
12   A.   I mean, not everybody that was at the bar, no.
13   Q.   Okay.  How many of your -- well, okay.  Strike that.
14           Not everybody who was going to be at the bar
15   because not everybody who was going to be at that bar might
16   have been associated with what was going on there; is that
17   fair?  Do you understand my question?
18   A.   Right, that's what I'm saying, yeah.
19   Q.   Sure.
20   A.   Yeah.
21   Q.   But how many of the DPD was out there in support of the
22   task force?
23   A.   Honestly, I couldn't tell you the total number of
24   resources.  I think that I probably had probably six of my
25   units and myself.  I'm not sure what assets were there from
```

1    violent crimes or whatever other units were on the operation,

2    I'm not aware of that.

3    Q.   All right.  At some point you get some -- do you get

4    some information regarding this TrailBlazer?

5    A.   Yes.

6    Q.   And instructions to stop the vehicle?

7    A.   That it was stolen.

8    Q.   Okay.  And the -- you respond to that request, correct?

9    A.   Yes.

10   Q.   In addition to other -- another unit; is that correct?

11   A.   Officer Dedeluk and Officer Hanna were the primary unit,

12   they responded.  There was basically at the time two other

13   vehicles that left at the same time that my other units

14   were -- ended up being in pursuit of also.

15   Q.   Okay.

16   A.   So I kind of was figuring out which one was the most

17   highest priority to go to.

18   Q.   And you arrive at the scene of the stop of the

19   TrailBlazer?

20   A.   Yes.

21   Q.   After the unit with Dedeluk and Hanna --

22   A.   They -- it was like -- like I stated before, I was

23   probably four or five cars back.

24   Q.   Okay.

25   A.   So I pulled up once they had already -- he had already

1   went up on the embankment and --

2   Q.   All right.   And Dedeluk has one of the occupants in

3   custody?

4   A.   Yes, on the ground but at the passenger side.

5   Q.   And is the -- and has the driver been brought back to

6   the scene by the time you get there?

7   A.   When I first got there, no, he was not back yet.

8   Q.   Okay.   Do you assist in the pursuit or the arrest of the

9   driver, or what do you do when you first get there?

10  A.   My immediate -- Officer Dedeluk's partner was on foot

11  with the MSP officers, so I immediately went to

12  Officer Dedeluk because he was by himself with the subject.

13  Q.   Okay.   So you don't -- you are not involved in the

14  pursuit or bringing back the other individual?

15  A.   No.

16  Q.   Okay.   You immediately go to back up Dedeluk who already

17  has this individual in custody, right?

18  A.   Yes.

19  Q.   And that individual then is put in the scout car?

20  A.   Yes.

21  Q.   And what do you do then?

22  A.   At that point -- well, we still have the other two

23  issues going on so I was monitoring those, and then at the

24  same time I started to search the interior of the vehicle.

25  Q.   Okay.   And while you are monitoring and, you know,

1    keeping an eye on everything, so the -- what is the first

2    thing you do when you search the vehicle?

3    A.   The first thing I do is I look in the passenger side

4    first since the subject had came out of the passenger side, I

5    just checked that general area for any weapons or anything

6    like that.

7    Q.   Did you see anything?

8    A.   In the passenger side?

9    Q.   Right.

10   A.   Not in the passenger side.

11   Q.   And the person who was already in custody, had they been

12   patted down?

13   A.   I would imagine that Officer Dedeluk would have patted

14   him down.

15   Q.   Do you know as a result of that pat down was anything

16   recovered?

17   A.   I'm not aware if anything was recovered.

18   Q.   Okay.  So you go to the passenger compartment where you

19   are told the person who is in custody had been sitting,

20   right?

21   A.   Uh-huh.

22   Q.   You search that passenger?

23   A.   Uh-huh.

24   Q.   I'm sorry?

25   A.   Yes.  Sorry.

1   Q.   So you search that area and you don't find anything of

2   note in that area?

3   A.   Right.

4   Q.   Okay.  And then what do you do next?

5   A.   I maintain in the same area because we were looking for

6   any type of identification that would have shown who the

7   ownership of the vehicle was like title, registration,

8   insurance, and that's usually located on the passenger side

9   in a glove box area or looking in the center console area.

10  Q.   Do you find anything?

11  A.   I don't remember finding anything.  The whole inside was

12  kind of in disarray from rolling up on the thing and so there

13  was lot of stuff thrown around inside the car.

14  Q.   Okay.  So after searching the front passenger

15  compartment and the glove box or whatever else is accessible

16  to that area, what do you do next?

17  A.   Move to the driver's side.

18  Q.   And do you search that area?

19  A.   Yes, ma'am.

20  Q.   Do you find anything in that area?

21  A.   No, ma'am.

22  Q.   What do you do next?

23  A.   We checked the -- like the back seat area, the hatchback

24  area.

25  Q.   Okay.  And just so I'm clear on what this vehicle looks

```
 1   like, it is a TrailBlazer, which is some kind of SUV?
 2   A.   It is midsize smaller SUV.
 3   Q.   Okay.  There is a front passenger compartment?
 4   A.   Uh-huh.
 5   Q.   Is there a rear passenger compartment?
 6   A.   There is -- like as in a back seat?
 7   Q.   Back seat.
 8   A.   Yes.
 9   Q.   Are there rear doors?
10   A.   Yes.
11   Q.   Okay.  So you have to open up the rear doors to look
12   into the back seat area?
13   A.   And you can see -- well, yeah, once you look into the
14   back seat area you can also see up front and towards the back
15   as well.
16   Q.   And so you -- do you do that from the driver's side or
17   from the passenger's side?
18   A.   I believe I do both actually.
19   Q.   Okay.  So you look in the -- in the area behind the
20   driver's seat?
21   A.   Yes.
22   Q.   Do you see anything of note back there?
23   A.   No, I don't remember.
24   Q.   Okay.
25   A.   Or I don't recall seeing anything there.
```

Motion to Suppress - August 31, 2017

1    Q.   Did you go over to the passenger side?

2    A.   I did.

3    Q.   And do you look in the -- open up the door and look at

4    the passenger seat behind the front-seat passenger and do you

5    see anything of note?

6    A.   No.

7    Q.   You don't recover anything there?

8    A.   No.

9    Q.   What do you do next?

10   A.   Go to the rear compartment.

11   Q.   So there's a rear compartment even behind the back seat,

12   correct?

13   A.   Yeah.  I mean, it is not like -- yeah, there is, like

14   the back of the SUV.

15   Q.   How do you access that area?

16   A.   Well, you can access it from inside or you can access it

17   by lifting the tailgate.

18   Q.   If you were to access it from the inside, how would you

19   do that?

20   A.   I mean, you just reach back from -- I would -- I mean,

21   depending on your arm length you can reach it maybe from the

22   front but probably from the middle seats.

23   Q.   Okay.  So there is a passenger seat behind the front

24   compartment?

25   A.   Yes.

Motion to Suppress - August 31, 2017

1  Q.  And from that passenger seat you can reach over the

2  back --

3  A.  Yes.

4  Q.  -- and reach into the back seat?

5  A.  Yes.

6  Q.  And that would require going over the back of the rear

7  passenger seat, right?  I'm just trying to picture what this

8  looks like.

9  A.  I mean, you can get to the back passenger seat from the

10  front, you can climb back into the back passenger seat from

11  the front seat, and then you can have access to the back

12  cargo area from either the back seat area.

13  Q.  Okay.

14  A.  So you could possibly climb into the back seat area -- I

15  guess, are you asking me if you can move from the front to

16  the back seat?

17  Q.  No.  I'm asking, you know, you to describe it.  There is

18  a rear passenger seat?

19  A.  Yes.

20  Q.  And there is an area behind the rear passenger seat?

21  A.  Yes.

22  Q.  And it is humanly possible to get into the rear

23  compartment from that back seat --

24  A.  Yes.

25  Q.  -- for most people?

1   A.   Yes.

2   Q.   Okay.  I am not getting over there, am I?  I'm not

3   hopping over that back seat and getting in the rear portion.

4   A.   I would say you probably could.

5   Q.   On a good day, not happening.

6         So in order for you to access it what do you do?

7   A.   I open the back tailgate.

8   Q.   So you go to the rear of the vehicle and there's a

9   tailgate that you lift?

10   A.   Yes.

11   Q.   You did that?

12   A.   Yes.

13   Q.   Once you lift that tailgate you have access to that rear

14   compartment?

15   A.   Yes.

16   Q.   Do you find something in that rear compartment?

17   A.   Yes.

18   Q.   Okay.  Are there other things back there too?

19   A.   Yeah.  There was some -- I believe there was like some

20   clothing maybe some other boxes or maybe -- but yes.

21   Q.   Okay.  And just so I'm clear, whatever you found in the

22   rear of that vehicle you found after you went to the back and

23   lifted the rear tailgate, right?

24   A.   I recovered it out of the rear tailgate, yes.

25   Q.   You didn't know it was back there until you went and

 1   opened up that rear tailgate, did you?

 2   A.   I was told it may be back there but no one could --

 3   somebody saw something in the side window and we were going

 4   to the back tailgate anyway.

 5   Q.   Okay.

 6   A.   But I personally didn't see it until I opened the back

 7   tailgate.

 8   Q.   And did -- were there -- did you indicate there were

 9   some phones found also in the vehicle?

10   A.   I believe there was.

11   Q.   Do you know where those were found?

12   A.   I do not recall.

13   Q.   Did you recover them?

14   A.   No, I did not.

15   Q.   Do you know who did recover them?

16   A.   No, I do not.

17   Q.   Is there -- is there anything that you could look at

18   that would refresh your recollection about where those were

19   found?

20   A.   I don't -- apparently there's no report or we don't have

21   a copy of my report from the incident, maybe it was on my

22   activity log from that day.

23   Q.   So you, yourself, have not seen any indication in any

24   report that you have seen as to where those were found; is

25   that what you are saying?

1    A.   As far as the cell phones?

2    Q.   Yes.

3    A.   I am not aware, no.

4    Q.   Do you know who recovered them?

5    A.   I believe that the task force may have recovered them

6    but I'm not 100 percent sure.

7    Q.   But you know that they were recovered because somebody

8    told you that?

9    A.   Yes.

10   Q.   And you learned this, that they were recovered.  Did you

11   know it that night?

12   A.   I don't remember if I knew it that night or no.  I

13   believe I did, yes.

14   Q.   Okay.

15   A.   But I know that there was -- I think there were other

16   property that was taken when we turned over the AR-15.

17   Q.   While you were at the location, beside yourself and

18   Dedeluk --

19   A.   Officer Dedeluk.

20   Q.   -- and Hanna, who else was there?

21   A.   I believe 2400 showed up who was the night captain for

22   the city, who that night I believe was Captain Serta, I

23   believe there was some MSP officers, there was also members

24   of the Violent Crimes and the task force.

25   Q.   Okay.  So at the scene of where the TrailBlazer came to

Motion to Suppress - August 31, 2017

1   a stop was yourself and Dedeluk --

2   A.   Dedeluk.

3   Q.   -- and Hanna?

4   A.   Yes.

5   Q.   And the night captain?

6   A.   Yes.

7   Q.   MSP officers?

8   A.   Yes.

9   Q.   More than one?

10  A.   I mean, initially, yeah, there was -- I don't even know,

11  maybe two or three MSP units.

12  Q.   And then there were also members of the task force?

13  A.   Yes.

14  Q.   And how many?

15  A.   I remember personally seeing two, I don't remember how

16  many were actually there.

17  Q.   Do you know -- do you know who they were?

18  A.   Honestly, no.

19          MS. MANNARINO:  Nothing further.  Thank you.

20          THE COURT:  Okay.  Thank you.  Mr. Graveline?

21          MR. GRAVELINE:  No further questions, Your Honor.

22          THE COURT:  All right.  Thank you, sir.  You can

23  step down.

24          (Witness excused at 11:06 a.m.)

25          MR. GRAVELINE:  The government rests subject to I

1   would also move for the admission of Government's Exhibit 4,

2   to be included in the record as well as for the Court's

3   consideration.

4           THE COURT:  The LEIN printout?

5           MR. GRAVELINE:  The LEIN printout, yes.

6           THE COURT:  All right.

7           MS. MANNARINO:  I'm sorry.

8           THE COURT:  Any objection to receiving Exhibit 4?

9           MS. MANNARINO:  None.

10          THE COURT:  All right.  The Court will received it.

11          (Government's Exhibit 4 received into evidence.)

12          THE COURT:  Any other testimony, Ms. Mannarino?

13          MS. MANNARINO:  No.

14          THE COURT:  All right.  Any argument?

15          MR. GRAVELINE:  I think defense goes first since it

16   is their motion, Your Honor.

17          THE COURT:  Okay.  Ms. Mannarino?

18          MS. MANNARINO:  Can I have just a minute, Judge?

19          THE COURT:  Sure.

20          (An off-the-record discussion was held at

21          11:07 a.m.)

22          MS. MANNARINO:  Thank you.  It is our position,

23   Judge, that the arrest of Mr. Arnold that evening -- that the

24   stop of that vehicle and the subsequent search and arrest was

25   without requisite cause.

1          Now, I understand and I -- we laid this out in our
2     motion and brief in support.  I understand what the law is,
3     and I understand that what we heard here today was that the
4     stop of that vehicle was going to happen regardless.  The
5     arrest of the individuals in that vehicle was going to happen
6     regardless.  The police had information that there is a
7     memorial service going on and they, on a mission, call
8     together 60 officers to surround this club, and they are
9     targeting people, and they are going to get their targets.
10          The officers indicate that the reason that the
11     vehicle that Mr. Arnold was a passenger in was stopped was
12     because they had information that the vehicle was a stolen
13     vehicle, but there's some problems we have with that.  And
14     one is we now know that the vehicle on that evening was not,
15     in fact, a stolen vehicle.  That Mr. Arthur was, in fact,
16     driving that vehicle with the consent and permission of the
17     owner of that vehicle, and that as he was driving that
18     vehicle it was not a stolen vehicle, he didn't have any
19     knowledge of that, and certainly Mr. Arnold, the passenger,
20     had no knowledge of that.
21          What the government wants us to do is say, well,
22     perhaps it was an error, perhaps it was just our lucky day
23     that that vehicle was never taken out of the LEIN, and that
24     it was an error; it should have been taken out, it wasn't
25     taken out, and we get to benefit from that, and I don't think

```
 1    that that is correct.  I don't think you get to benefit from

 2    an error if you know that that is, in fact, the status of

 3    that case -- or the status of that vehicle.

 4          And what we have is officers who for at least -- or

 5    agents who for at least a week to ten days, if not two weeks,

 6    were planning this operation, and they knew exactly who they

 7    were targeting, and they gathered together as much

 8    information as they could about the people who were there and

 9    what they were driving and what they were looking for.  And I

10    submit to the Court that they -- if they didn't know they

11    should have known, and they can't, you know, obviously look

12    away from what they should have known and use that as a

13    pretext which is, I believe, exactly what happened here.

14          But, second, Mr. Arnold is a passenger.  And again

15    what we heard of, regardless of whether or not we had any

16    information that he knew or should have known or could have

17    known, or had any connection with this stolen vehicle, the

18    bottom line was he was going to be arrested that night

19    regardless.  He was going to be taken into custody whether or

20    not there was any indicia that he knew of the status of that

21    vehicle because that's what they told us.  We were going to

22    use that to get custody of him so that we could further

23    investigate him because he went to a memorial service for a

24    friend of his, and we were going to use that opportunity to

25    take him into custody.  That's what we heard.
```

1    After he is taken into custody and arrested, the

2    reason for the arrest, I mean, make no mistake about it, is

3    because he's in possession of a stolen vehicle which I submit

4    to the Court the officers knew or should have known was not,

5    in fact, a stolen vehicle, but after he is taken into custody

6    and arrested for being in possession, he is searched and, you

7    know, I'm not sure where because we haven't heard it where

8    any of these items were found, what was on his person, what

9    was in the vehicle but, again, then subsequent to items being

10   seized, what we have is a search warrant that is obtained,

11   and interesting enough the officer says that the search

12   warrant that is obtained to get into the phones, what they

13   are looking for, and it is laid out in the attachments, is

14   everything, all records, all information, everything and

15   anything they could possibly seize from these phones:  You

16   know, identities, locations, contact information, statements,

17   text messages, e-mails, call-log history, everything and

18   anything that is within these phones they are asking for.

19        And what the officer -- or what the agent describes

20   as we -- he believes there were six phones that were

21   associated, but that's not what the search warrant says.  The

22   search warrant is for ten phones because what they do is

23   within the context and confines of one search warrant is lump

24   in all of the phones that were recovered that night.  There

25   are ten phones that detail the exact same information, and

1    they say we want everything and anything associated with
2    these phones that are associated with these people who happen
3    to be at a memorial for a friend that night.
4        It is our position that that search warrant does
5    not establish the requisite -- the affidavit in support of
6    that search warrant does not establish the requisite cause to
7    the broad search that was granted in this case, and we ask
8    that the Court grant our motion.
9        THE COURT:  All right.  Thank you, Ms. Mannarino.
10        Mr. Graveline?
11        MR. GRAVELINE:  Thank you, Your Honor.
12        Counsel argues that the car should not have been
13    still in the LEIN system as reported stolen and argues that
14    it is therefore some type of error.  However, there is no
15    facts establishing that on this record.  What we have is the
16    car was reported stolen on September 7th, 2015, and a report
17    by the Detroit police was initiated on that day.
18        And Officer Dedeluk explained that the way the
19    Detroit reporting system works is you have your case number
20    and then you have your .1, that's the initial report and he
21    talked about that initial report, and then he talked about
22    how his report was the .2 and his partner's was the .3.
23        There is no evidence that Ms. Robinson went back to
24    the Detroit police and said no, no, my mistake, this car is
25    not reported stolen.  The only evidence we have is she

1    reported it stolen on September 6th and that it was entered

2    on September 7th into LEIN as a stolen car.

3         The only evidence that we have on the record is

4    Agent Ruiz's testimony that after the car was stopped and he

5    talked to Ms. Robinson on October 5th is when she relayed to

6    him that she had some ongoing relationship with Mr. Arthur

7    and that the car should not have been reported stolen at that

8    point.  So that's the timeline.

9         There is no evidence at all that Ms. Robinson did

10   anything -- reported any different fact to the Detroit police

11   prior to September 25th or 26th that this car was anything

12   but stolen.  And the reason why that's important is it goes

13   to what do the officers know at the time of the stop.  And

14   what the officers know at the time of the stop is that this

15   car was reported stolen.  So there is no error.  It was not

16   as if the Detroit police knew and just didn't enter it into

17   the database.  There is no evidence that Ms. Robinson did

18   anything to take it out of that status with the Detroit

19   police.  It is only in that subsequent conversation on

20   October 5th that she tells that to Agent Ruiz.  So at the

21   time on September 25th and 26th all the Detroit police know

22   is we have a report of a stolen vehicle, so there is no error

23   in this case, and there is no benefiting from that error in

24   this case.

25        Also I think it was telling because Counsel said

1    they should not benefit from the error if you knew about the

2    error.   I think Counsel highlights exactly what my argument

3    is; it goes to the Detroit police officers' knowledge on the

4    time at the time of the effected traffic stop in this case,

5    and consequently they definitely had probable cause to stop

6    that vehicle and investigate for possession of a stolen

7    vehicle.   Consequently because they had that probable cause

8    it was reasonable to effect the arrest of Mr. Arnold on that

9    night, and therefore and consequently do the subsequent

10   searches that we briefed in our papers.

11           In terms of probable cause, once those phones are

12   seized legally on the night of September 25th or 26th, and

13   whether it was because it was the automobile exception that

14   we talked about in our papers, whether it is incident to

15   arrest, whether it is the subsequent inventory, or the

16   consent that the owner gave, those phones that were in the

17   car were going to be seized lawfully and they were seized

18   lawfully.

19           Now, I believe if the Court takes a look at

20   Agent Ruiz's affidavit in the case, Counsel argues we don't

21   know which phones came from where, but it is on page 20 --

22   I'm sorry, page 21 of Agent's Ruiz affidavit that spells out

23   of the six phones, five of them were found in the vehicle,

24   and the sixth one was located on the person of Mr. Arnold at

25   the time of arrest.   Once those were seized legally, then it

 1    is incumbent on Agent Ruiz to establish probable cause to

 2    find the crimes that he was investigating, could be located

 3    on those phones, and that's the affidavit.

 4         And we believe based upon the arguments that we

 5    made in our papers that he more than established probable

 6    cause to find the evidence for the crimes that he was

 7    investigating, and presented an affidavit that did establish

 8    probable cause, that the magistrate was -- did properly find

 9    probable cause, and as stated in the papers, even if not,

10    this is not that type of bare-bones affidavit or search

11    warrant that an officer cannot rely on, and then we would

12    rely on Leon as well, Your Honor.  Thank you.

13         THE COURT:  All right.  Was there something

14    further?

15         MS. MANNARINO:  No, Judge.  Thank you.

16         THE COURT:  The Court is satisfied that the motion

17    to suppress should be denied.  I do agree that we are

18    addressing knowledge on the part of the officers involved in

19    the incident at the time of the stop and the arrest and,

20    indeed, the evidence falls short of establishing that they

21    knew or should of known that the car was not, in fact, stolen

22    when it was obviously reported stolen and not removed and no

23    information from the owner of the vehicle was made known to

24    the officers prior to the incident and operative time here.

25    The officers then had probable cause to stop, and it was

1   reasonable to arrest the defendant as an occupant of the

2   vehicle.

3           The government has outlined multiple theories of

4   analysis that would apply out of the auto exception.  The

5   argument that this was an appropriate search incident to

6   arrest, the inventory search which was the subject of

7   testimony from the Detroit police officers, all of which

8   would support the conclusion that probable cause --

9   sufficient probable cause existed for the stop and the arrest

10  of the defendant, and ultimately Leon, which is the good

11  faith inevitable discovery arguments that are featured in the

12  briefs.

13          The Court is satisfied that given the deference

14  paid to the Magistrate Judge Patti in this case who issued

15  the search warrant permitting the download from the cell

16  phones that were found, five in the vehicle and one on the

17  defendant himself, that the additional search of the cells

18  phones likewise was conducted with the authority properly

19  extended and the warrants that were ultimately issued

20  permitting the search.

21          The Court will therefore deny the motion.  I will

22  have a short opinion to append that would more thoroughly

23  analyze the issues presented by the briefs, and will get that

24  out as soon as possible, although the ruling today will not

25  be affected by the -- well, I'm announcing the ruling today

1    and the reasoning for that ruling will be more fully set

2    forth later.

3            Anything else, Ms. Mannarino?

4            MS. MANNARINO:   I would inquire of the Court, the

5    Court is aware that I amended this motion to include another

6    argument, and I -- the prosecution has not responded to that,

7    and I will inquire of the Court as to how we are to proceed

8    with that issue.

9            THE COURT:   Mr. Graveline?

10           MR. GRAVELINE:   I was going ask the Court that

11   today as well.   So as Counsel just mentioned, they amended

12   their motion as part of their reply to the government's

13   response.   Normally the government is not allowed to file a

14   sur reply to that.   I believe that the arguments raised in

15   the reply go to whether we need -- we, meaning the

16   government, needed to get a search warrant as opposed to a

17   2703(D) order to get historical cell site records.

18           That issue in the Sixth Circuit is controlled by

19   United States vs. Carpenter, which is binding precedent on

20   the Court.   Now Carpenter is currently being appealed to the

21   Supreme Court.   So I was going to seek the Court's guidance

22   on that whether, one, we could file a sur reply; two, if the

23   Court wants a sur reply on that issue or -- the way the

24   government views it, it appears that the defense is saving

25   that issue for appeal, any type of potential appeal, based

```
 1    upon Carpenter.  If Carpenter got overturned by the
 2    Supreme Court they would still have that issue.
 3              THE COURT:  The Supreme Court has granted cert.
 4              MR. GRAVELINE:  That's correct, and so I was going
 5    to leave it up to the Court whether you wanted the government
 6    to file a response on that new issue recognizing it's really
 7    kind of a sur reply, or whether we will -- our essential
 8    response is going to be Carpenter is the controlling
 9    precedent of the Sixth Circuit unless and until the
10    Supreme Court states otherwise.
11              THE COURT:  Right.  Yes.  Ms. Mannarino, do you
12    acknowledge that absent Supreme Court action in this pending
13    case that the Court would be constrained by the Sixth Circuit
14    authority?
15              MS. MANNARINO:  Judge, this is my answer:  I don't
16    know.  I don't know that I want to concede or that I'm able
17    to concede.  You know, I will concede that Carpenter is, to
18    my understanding, the law of the land until and unless, but
19    I'm not sure that the factual framework might not -- what we
20    have here might not be able to be distinguished from
21    Carpenter, or that there might not still be an argument on
22    the basis of the factual scenario that we have here in the
23    state of the law.
24              So my response to the prosecutor's suggestion is
25    that the Court allow us an opportunity to further brief the
```

 1    issue and flesh it out before we can make that determination.

 2            THE COURT:  Okay.  Well, so I haven't heard any --

 3    and you have not apparently addressed for yourself whether

 4    this case is factually distinguishable from Carpenter as it

 5    relates to the ruling that this cell tower data is -- can be

 6    appropriately accessed by the government without a search

 7    warrant, right?

 8            MS. MANNARINO:  Judge, all I can tell you is that I

 9    wasn't prepared to argue it today, and I would like the

10    opportunity to look at it a little further.  The reason we

11    amended the brief is because we got this information kind of

12    late and so I'm not prepared to fully argue it and address it

13    now, but I did want to raise the issue by way of the amended

14    motion.

15            THE COURT:  Okay.  All right.  Well, I guess we at

16    least have the bones of potential argument that the facts in

17    this case are somehow distinguishable from the operative

18    facts leading to the holding in Carpenter.  With that in

19    mind, I will provide for a pleading by the government and an

20    opportunity to respond by the defendant to that pleading, and

21    we will -- I will have the opportunity to address it before

22    we get underway with the trial.

23            MS. MANNARINO:  I would appreciate that

24    opportunity.  Thank you, Judge.

25            THE COURT:  Okay.  I think I'm likely, unless there

1 is something really startling in the briefing on this, I'm

2 likely to make a ruling without necessarily scheduling oral

3 argument, so you can keep that in mind as you draft your

4 pleadings.

5 MR. GRAVELINE: Understood, Your Honor.

6 THE COURT: Okay. All right. So with that I think

7 Mr. Arnold is also on the next motion; is that right?

8 MR. GRAVELINE: Your Honor, if I may, I'm going to

9 leave the courtroom to excuse the officers.

10 THE COURT: Okay. Sure. Maybe we will take a

11 break since we have to bring the other defendants up also.

12 Hopefully we will get it underway in another five or ten

13 minutes.

14 THE LAW CLERK: All rise. Court is in recess.

15 (Court recessed at 11:34 a.m.)

16 — — —

17 (At 12:00 p.m. Court reconvenes; Court, Counsel and

18 Defendants present.)

19 THE LAW CLERK: The United States District Court is

20 back in session.

21 THE COURT: No wonder I'm hungry, it's noon. Okay.

22 Would you like to state your appearances?

23 MR. WECHSLER: Good afternoon, Judge.

24 Justin Wechsler, along with Chris Graveline and

25 Julie Finocchiari, for the government.

```
 1              THE COURT:  Okay.
 2              MS. MANNARINO:  Good morning -- good afternoon.
 3   Maria Mannarino on behalf of Mr. Billy Arnold.
 4              MR. KOSELKE:  Good afternoon.  Eric Koselke on
 5   behalf of Mr. Arnold also.
 6              THE COURT:  Welcome.
 7              MR. MACHASIC:  Good afternoon, Your Honor.
 8   Ryan Machasic on behalf of Mr. Adams, who is present in court
 9   and to my right.
10              MR. ARNONE:  Good afternoon, Your Honor.  May it
11   please the Court, Joseph Arnone on behalf of Mr. Gooch.
12              THE COURT:  Welcome.  You can all take a seat.
13              How are we going to proceed today?
14              MR. WECHSLER:  Your Honor, it is the defendant's
15   motion so if they would like to --
16              MR. MACHASIC:  Thank you, Your Honor.
17              THE COURT:  Mr. Machasic.
18              MR. MACHASIC:  Your Honor, quite simply, this is a
19   motion to suppress based on an affidavit that did not contain
20   probable cause.  The government has argued that there is good
21   faith reliance in addition to arguing that there was probable
22   cause.  However, that argument cannot prevail.
23              So when we look at Exhibit 1 to my motion, when we
24   look at the search warrant affidavit, he had included -- the
25   affiant has included I believe 42 separate accounts within
```

1    the one affidavit.  Only a small portion of that deals with

2    the Account 23 which is the account of my client, Mr. Adams.

3        He speaks -- the agent who swore to the affidavit

4    speaks in generalizations.  It is replete, and this is

5    mentioned in our motion, and it is also contained in some of

6    the earlier paragraphs 5, 6, 7, 15 of the affidavit, that

7    some members of gangs do X, Y, or Z; that some members of the

8    Seven Mile Bloods post on social media, that it is not

9    uncommon for gang members to associate with one another and

10   for some to retain weapons.  And throughout the affidavit

11   Agent Horvath talks about weapons being stored at people's

12   homes, things that really have nothing to do with an

13   affidavit from a Facebook search.

14       So these kinds of generalizations don't -- he

15   doesn't then tie them in to that small portion of this

16   affidavit that deals with Account 23, which is the account at

17   issue in my motion.  He does nothing to tie that -- to tie

18   these, even though they are generalizations, to tie those

19   generalizations to somehow showing that there are facts

20   supporting probable cause that there is going to be evidence

21   of a crime found within Account 23, Facebook records.  It is

22   bereft of that.

23       And the things that -- the things that

24   Agent Horvath does include as to Account 23 are essentially

25   posting photographs of two former SMB members, one picture of

 1     a current member -- or at the time current member, a picture

 2     of a codeine bottle, the phrase 55, that's numeral 5, numeral

 3     5, the phrase Blood Day, and a posting that someone was a

 4     federal informant.

 5              THE COURT:  I'm sorry.  What was the last --

 6              MR. MACHASIC:  A posting that someone was a federal

 7     informant.

 8              THE COURT:  Okay.

 9              MR. MACHASIC:  That's all in paragraph 51 of the

10     affidavit, Your Honor.  So none of these activities is

11     illegal.  None of these can be tied, and he does, in fact,

12     not tie any of the allegations as to Account 23 to probable

13     cause that he's going to find evidence of a crime within the

14     documents for that account, and so really it was -- as to

15     this account it was just a bare-bones affidavit, a couple of

16     short sentences that just don't tie it in.

17              In addition, he talks about how codeine is used by

18     members of the SMB to create a drink called Sizzurp and Lean

19     or Purple Drank, and he almost seems like this is unique to

20     the SMB.  As I'm sure the Court is well aware, this is not

21     unique to the SMB.  It is not unique to Detroit.  This is a

22     very popular drink all over the place.  I mean, you know,

23     Little Wayne, Justin Bieber, a lot of people use this, it is

24     not unique to the Seven Mile Bloods.

25              And so when we look at this in context and we are,

Motion to Suppress - August 31, 2017

```
 1    of course, limited to the four corners in this argument
 2    because it is a lack of probable cause argument, they don't
 3    have enough.  And it seems like what Agent Horvath was trying
 4    to do was by saying that, okay, we have established that he's
 5    a member or an associate of the SMB, and that's why he has
 6    the 55 and the Blood Day included in there as well as
 7    photographs of former, and at the time, a current member of
 8    the SMB.  However, as has been acknowledged and as was just
 9    acknowledged by an agent earlier, it is not illegal to be a
10    member of the Seven Mile Bloods, it is not illegal to be a
11    member of a gang, and so that fact doesn't lend to an
12    inference that they are -- or a conclusion that they are
13    going to find evidence of a crime within this Facebook
14    account.  It is completely bereft.
15            And that comment, of course, goes to the
16    government's good faith response.  This was, in fact, as to
17    that account while I know that it is many, many pages and he
18    includes information about the investigation and background
19    things that really have nothing to do with Facebook, things
20    like people store drugs in their home or car or people would
21    keep a firearm in their home or a car, it really has nothing
22    to do with the Facebook record.  But as to Account 23, that
23    paragraph 51, even tying it in with some of the prior factual
24    averments that he's made isn't enough, and so really that was
25    a bare-bones affidavit.
```

1          In addition, because there is so little as to

2     Account 23, that's paragraph 51 of the affidavit, his

3     reliance on that was not reasonable, it was not objectively

4     reasonable because that warrant as to that account is

5     deficient, so it is really what it comes down to.  It is a

6     simple review of the affidavit and then whether he has

7     provided enough for probable cause to go search the Facebook

8     account, and in this case he hasn't because he has not tied

9     the prior general allegations, that some members or some gang

10    members do X, Y, or Z to that account, to the Account 23, and

11    so he did not act in good faith, he was not objectively

12    reasonable in relying on that affidavit in order to obtain

13    it.

14         Now, as part of the government's response, you

15    know, they seem to argue, and I'm sure that we will hear it

16    again today, that he should be congratulated simply for going

17    and getting a warrant, and that there is a danger that if the

18    Court were to suppress this that it sends a signal that, you

19    know, why bother to get a warrant.  I don't think that is a

20    realistic policy consideration for this Court to take into

21    account.  This agent was clearly aware of the fact that he

22    went to a warrant, he went to a federal magistrate to obtain

23    a warrant, but he did not include probable cause, it was

24    facially deficient, and so I do not think the good faith

25    applies.

| | |
|---|---|
| 1 | I will say as to my argument regarding it not being |
| 2 | signed, before filing this I made several attempts to obtain |
| 3 | the signature page from the government.  I saw that it was |
| 4 | attached, I was able to speak with government counsel, and so |
| 5 | I will withdraw the argument regarding the affidavit being |
| 6 | unsigned. |
| 7 | THE COURT:  Okay. |
| 8 | MR. MACHASIC:  Thank you, Your Honor. |
| 9 | THE COURT:  All right.  Thank you, Mr. Machasic. |
| 10 | Are we going to hear from the government on each or |
| 11 | am I going hear all of the defendants and then the |
| 12 | government? |
| 13 | MR. WECHSLER:  Your Honor, preference I would |
| 14 | prefer is Ms. Mannarino address the Court or whoever wants to |
| 15 | address the Court, and then I will. |
| 16 | THE COURT:  All right. |
| 17 | MS. MANNARINO:  Well, on behalf of Mr. Arnold my |
| 18 | motion is substantially similar to co-counsel's, and I join |
| 19 | and I will adopt the arguments may by co-counsel and stand on |
| 20 | my brief.  Thank you. |
| 21 | THE COURT:  All right.  Thank you. |
| 22 | MR. ARNONE:  Your Honor, on behalf of Mr. Gooch, we |
| 23 | joined in as more of a procedural matter for our case so I |
| 24 | would just rely on Mr. Machasic's arguments, Judge. |
| 25 | THE COURT:  Okay.  Thank you. |

1        MR. JOHNSON:  Good morning, Your Honor.

2  Bertram Johnson on behalf of Devon Patterson, and I waive his

3  presence today, they forgot to bring him over today.

4        I join in, Judge, and concur with the arguments and

5  motions of brother counsel.

6        THE COURT:  All right.

7        MR. JOHNSON:  Thank you.

8        THE COURT:  All right.  Thank you.  So that's it.

9  Mr. Wechsler?

10        MR. WECHSLER:  Thank you, Judge.

11        Your Honor, we obviously set out in our brief all

12  of the relevant case law.  I just want to go through the

13  arguments very briefly as Your Honor is obviously aware of

14  the relevant law.

15        From Gates we know that the magistrate simply needs

16  to make practical common sense determination whether or not

17  the circumstance at play, that there was fair probability of

18  evidence of a crime that would be found in a particular

19  place, in this instance the Facebook pages that are being

20  contested today.

21        Also under Gates this Court must decide whether or

22  not the magistrate had a substantial basis to conclude the

23  probable cause existed when the warrant was signed.

24        And under Allen, the Sixth Circuit, the Court has

25  to -- the Court should give great deference to the

Motion to Suppress - August 31, 2017

1      magistrate.  In other words, this Court simply has to find

2      whether under the totality of the circumstances probable

3      cause existed at the time the warrant was signed.

4           Your Honor, in the affidavit itself we have

5      probable cause to demonstrate that that crime would be --

6      evidence of a crime would be found in those pages,

7      specifically evidence of a RICO conspiracy.  As such, there

8      was a nexus between the place to be searched and the criminal

9      activity.  Agent Horvath in his affidavit set out his

10     training and experience, he discussed his other gang

11     relations, gang investigations, and then he set out why he

12     believed that the Seven Mile Bloods constituted an enterprise

13     for purposes of the RICO statute.  He discussed meeting with

14     and discuss -- talking about the case with other witnesses,

15     with confidential informants who weren't deemed reliable by

16     the FBI, they had their information corroborated.

17          He then got into discussing his training and

18     experience regarding gangs of this nature and how they use

19     social media pages to promote their activity, to take credit

20     for the gang's activities, to communicate with each other.

21     And then he went further than that, he didn't just leave it

22     as a bare-bones training and experience, he discussed how in

23     this particular enterprise he had recovered information or

24     learned information that members of the Seven Mile Bloods

25     were using their social media accounts to do just that.  So

1    he linked his training and experience to actual what happened

2    in these instances with this particular enterprise such as

3    posting gang colors, hand signs, memorials to dead members,

4    the structure of the gang, criminal activity.

5            As such, Judge, there was probable cause to believe

6    that members of this gang, members of this enterprise, would

7    be using their social media pages to promote the enterprise's

8    activity.

9            We don't need to get into the specifics of what

10   probable cause existed for each defendant, that's been laid

11   out in the affidavit, I reiterated it in the government's

12   brief, but suffice it to say that in each of the pages that

13   are being contested today there was evidence of gang signs,

14   colors, monickers, hand symbols, each one of those pages had

15   indicia of evidence that the members of the gang were using

16   these pages to at least promote the activities of the

17   enterprise itself.

18           And importantly, counsel mentioned that there were

19   42 accounts lumped in together in this affidavit.  What's

20   important is that many of the pages at play here, they

21   communicated -- they were linked through Facebook to the

22   other members of the Seven Mile Bloods.  Now that's obviously

23   important and should not be dismissed because it demonstrates

24   that they were using this social media to communicate with

25   each other.  If they weren't linked to one another they

1    wouldn't have the opportunity to use Facebook messenger or to

2    post things and have other members to be able to see it.  So

3    they used this medium to promote -- or possibly promote the

4    gang's activity and communicate with one another to do so.

5            As a result, Judge, there was more of a fair

6    probability that evidence of the RICO conspiracy would be

7    found within these Facebook pages itself, if not evidence of

8    specific racketeering activity at least there would be

9    evidence that these members -- these individuals were members

10   of the enterprise and were using the Facebook pages to

11   promote their activities and that evidence itself could be

12   used later at trial.

13           Your Honor, even if the Court finds that there was

14   no probable cause in the warrant itself, which obviously we

15   don't believe that's the case, we believe there was probable

16   cause for each one of these counts, under Leon of course the

17   result of this search warrant should not be suppressed.

18   There is absolutely no evidence that Agent Horvath acted in

19   bad faith at all.  In fact, he acted in good faith by taking

20   his information to the magistrate and providing them with the

21   information that he believed would constitute probable cause.

22   There is nothing to demonstrate he knowingly supplied any

23   information in the affidavit that was anything less than

24   completely truthful.  There is no evidence that the

25   magistrate abandoned their role when they signed the

Motion to Suppress - August 31, 2017

1    affidavit.  It was not facially defective.

2         And, again, based upon the factors that I set out,

3    it is subjectively reasonable that any well trained law

4    enforcement officer would look at this -- look at these

5    factors and say yes, there was probable cause to believe that

6    within these pages members who were -- who -- the owners of

7    the pages were promoting their enterprise.  So at the very

8    least, again, a well trained officer would look at this and

9    say look, pictures that were public at the time Agent Horvath

10   looked at the page, that's demonstrative of what could be

11   found inside those pages and that evidence itself could be

12   used to establish the membership in the enterprise itself.

13        Additionally, Judge, when you look at various

14   Sixth Circuit cases in situations like this where Leon arose,

15   the Courts have said that the reviewing court should weigh

16   the egregiousness of the officers' conduct versus the loss to

17   the judicial system.  In this case there is nothing to

18   demonstrate that there was any egregious conduct at all,

19   everything was out there for the magistrate to review.

20        If we were to suppress the evidence on the other

21   hand we would loss possible evidence of membership in the

22   enterprise which would, again, go to proving the RICO

23   conspiracy itself and membership in the RICO conspiracy.  So

24   there would be nothing to deter by actually suppressing this

25   evidence under Leon and cases that follow it.

1        For those reasons, Your Honor, we believe that the

2    evidence that was recovered pursuant to the search should not

3    be suppressed, and the motions denied.

4        THE COURT:  Can you explain to me why a warrant was

5    required in the first instance?  Was there an expectation of

6    privacy?  Was -- I know there's some difference between a

7    public posting and a private posting.  Were these clearly

8    private postings?

9        MR. WECHSLER:  For -- it depends.  For Facebook you

10   can either make your profile completely public where anybody

11   who is also on Facebook can go in and look at any of the

12   photos you have posted or any comments that you have posted.

13   On the other hand, you can change your privacy settings so

14   that only if you are connected or friended with each other on

15   Facebook can you see those postings and those comments.

16       So what Agent Horvath was able to view was what was

17   actually made public to anybody on Facebook.  So there was

18   obviously more material that was not made public and that's

19   why the warrant would have been required to see the material

20   that was not open to any member of the Facebook community.

21       THE COURT:  So when you say that you believe the

22   relevance of the evidence contained in these Facebook

23   postings was to demonstrate membership, what about the

24   affidavit would support a finding that the -- that the

25   enterprise was a racketeering organization?

1     MR. WECHSLER:  Well, Your Honor, what was laid out

2  in the affidavit was that Agent Horvath indicated he had

3  talked to numerous individuals as part of his investigation,

4  and based upon what he learned he believed that members of

5  Seven Mile Bloods constituted an enterprise under 1962.  Now

6  obviously we'll have to prove that at trial, and that's an

7  issue for the jury.  However --

8     THE COURT:  What are the elements of 1962?

9     MR. WECHSLER:  That each individual participated in

10  at least two activities of racketeering activity in the

11  enterprise itself, acting with a common goal to promote its

12  objectives.

13     So the evidence that would have been recovered in

14  the Facebook pages -- let me step back.  The evidence does

15  not have to be indicative of a crime on its face, it can be

16  used to later prove a crime.  The fact that these members

17  were throwing up gang signs and wearing certain colors

18  demonstrates at the very least they were using these pages to

19  show their membership in this gang.  The evidence that could

20  have been recovered from those pages would then be used to

21  further prove that they were members of the conspiracy

22  itself, the enterprise itself.

23     So at the very least whether or not there was an

24  individual holding a gun that was used in a crime, at the

25  very least we would have evidence that these individuals were

1    members of that enterprise itself which we would then have to

2    prove at trial, but the pages would actually be useful in our

3    prosecution in reaching that goal.

4              THE COURT:  All right.  Thank you.

5              MR. WECHSLER:  Thank you.

6              THE COURT:  Any further argument?

7              MR. MACHASIC:  May I just briefly, Your Honor?

8              THE COURT:  Mr. Machasic, yes.

9              MR. MACHASIC:  Just to address a couple points made

10   by brother counsel.

11             One, he seems to have hit on the fact that there

12   was a link and he says we cannot minimize the fact that there

13   was link.  I don't know a lot about Facebook but I know that

14   these -- I think the link is called a friend, and so people

15   have, I mean, hundreds and thousands of friends, it is not

16   common, and this is from a fairly limited geographical area,

17   so the fact that you are linked I don't think gets him to

18   that probable cause to search the Account 23.

19             In addition, I don't -- I hope I didn't understand

20   the argument correctly, but to the extent that the argument

21   is that this Court should not suppress because the agent went

22   in and obtained a warrant and because we want to use the

23   evidence at trial, this is a four-corner's argument, Your

24   Honor.  There is a Fourth Amendment violation and the remedy

25   for that is to suppress.  So to say because the government

1    wants to now use this at trial because now we've got it

2    whether or not it was obtained in violation of my client's

3    Constitutional rights I think misses the point of the Fourth

4    Amendment.  If we simply said every time there is not

5    probable cause and the agent did not act in good faith that

6    because the government wants to use the evidence we are going

7    to allow it in, that is not the proper standard and that's

8    not the proper remedy for depriving somebody of their

9    Constitutional right.

10         Those are the only few topics raised in the

11   response that I wanted to reply to.  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         Mr. Wechsler, I didn't directly ask the question

14   concerning the bare-bones argument made by the defense.  Can

15   you give me a concrete example of statements made in the

16   affidavit that go beyond bare-bones?

17         MR. WECHSLER:  Sure.  Let me just grab the

18   affidavit.

19         Regarding at least Account 23, Judge.

20         THE COURT:  Account 3?

21         MR. WECHSLER:  Account 23.

22         THE COURT:  Involves all the defendants here.

23         MR. WECHSLER:  No, it is Mr. Machasic's client.

24         THE COURT:  Okay.

25         MR. WECHSLER:  Your Honor, had the affidavit simply

Motion to Suppress - August 31, 2017

1    said we believe they are members of the gang and therefore we

2    want evidence of gang membership, I think that would be

3    deemed bare-bones.  In this case, we have specific

4    statements, at least in Account 23, where we have a posted

5    picture of a deceased member of the gang, we have an

6    individual of -- a posting of 55 which is a moniker used by

7    the gang to denote membership, and Blood Day which is also

8    used -- Blood Day is an event used by Seven Mile Bloods.  The

9    fact that they are drinking Sizzurp, yes, multiple people

10   will be drinking Sizzurp but that's something this gang also

11   engages in.  I don't think that alone is enough to get us to

12   probable cause, but I think taken into conjunction with the

13   other factors it leaves an objectively reasonable officer to

14   believe that there is probable cause that gang membership

15   activity will be inside this affidavit.

16         Additionally, Account 23 also posts that

17   Steven Arthur is a federal informant, and that was made on

18   one of the, quote/unquote, public viewings so that if you

19   weren't even friends with the individual, if you weren't

20   connected on Facebook, you would still see that Steven Arthur

21   was a federal informant according to the user of this

22   account.

23         So, in addition, it goes on and discusses media

24   correlation -- social media correlation or connection with

25   numerous others accounts which were described in the

Motion to Suppress - August 31, 2017

1    affidavit itself, and I believe there's over 10 or 12 counts

2    that Account 23 itself was linked with that are also

3    discussed in the four corners of this affidavit and probable

4    cause is laid out for each one of those accounts as well.

5             So if you take all of that together in addition

6    with the training and experience that Agent Horvath

7    discussed, his knowledge about the gang in general, here you

8    have specifics that demonstrate how those pages and how those

9    colors and pictures and gang symbols are being used by

10   members of the enterprise, how these pages are being used by

11   members of the enterprise.  So I don't think this is a

12   bare-bones affidavit, Judge.  I think if you cut out the

13   other 41 accounts, which I don't think you can do because in

14   part they are corresponded as friends on Facebook, but even

15   if you cut out those other 41 accounts I think you would

16   still have probable cause to demonstrate that these users

17   were furthering their gang activity using that particular

18   page.

19             THE COURT:  Okay.  All right.  Thank you.

20             MR. WECHSLER:  Thank you, Judge.

21             THE COURT:  This is a reasonable close call but the

22   Court is convinced that the search warrant that is subject to

23   this challenge is sufficient when you consider the general

24   allegations that are made, as argued by Mr. Wechsler,

25   together with the few specifics that involve the individual

1    defendants, that the warrant should be upheld, understanding

2    that the -- that the -- one thing I haven't quite resolved

3    because we are dealing with the Fourth Amendment issues and

4    the anchor of those kinds of decisions is the reasonableness

5    of a search and seizure in this instance, the -- whether this

6    is a public or a private site, even if private, is accessible

7    by anyone who is a friend, and the -- and so there may be

8    dozens of friends to say that there is an expectation of

9    privacy even to require a warrant under those circumstances

10   is, I think, at least an arguable issue, but that -- and I'm

11   going to issue a written opinion in this instance also to

12   explain further the Court's ruling, but given the totality of

13   the circumstances here the Court is persuaded that the --

14   that the warrant is something more than bare-bones and is

15   appropriately upheld.  Their motion challenging the validity

16   of that warrant then is denied.

17            Okay.  So I think that's all we have on for today.

18            MR. GRAVELINE:  That's correct, Your Honor.

19            THE COURT:  Okay.  All right.  We will see you at

20   the next round.

21            THE LAW CLERK:  All rise.  Court is adjourned.

22            (Proceedings concluded at 12:30 p.m.)

23                           —    —    —

24

25

```
 1

 2                              CERTIFICATION

 3

 4           I, Robert L. Smith, Official Court Reporter of

 5    the United States District Court, Eastern District of

 6    Michigan, do hereby certify that the foregoing pages comprise

 7    a full, true and correct transcript taken in the matter of

 8    UNITED STATES OF AMERICA vs. BILLY ARNOLD, et al., Case No.

 9    15-20652, on Thursday, August 31, 2017.

10

11                              s/Robert L. Smith
                                Robert L. Smith, CSR 5098
12                              Federal Official Court Reporter
                                United States District Court
13                              Eastern District of Michigan

14

15

16    Date:  10/17/2017

17    Detroit, Michigan

18

19

20

21

22

23

24

25
```