## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                          Case No. 015-cr-20652 (GCS)

vs.                                    Hon. George Caram Steeh

BILLY ARNOLD,

      Defendant.

_____

## DEFENDANT'S MOTIONS TO DECLARE THE DEATH PENALTY UNCONSTITUTIONAL AND STRIKE THE NOTICE OF INTENT

1. The government has filed a Notice of Intent to Seek the Death Penalty against Billy Arnold. Jury selection is scheduled to begin on July 20, 2020, with trial starting on September 1st.

2. Through counsel, Mr. Arnold moves the Court to declare the death penalty unconstitutional because (1) the federal death penalty has been sought and imposed in an arbitrary, capricious, irrational and discriminatory manner; (2) evolving standards of decency that mark the progress of a maturing society have rendered the federal death penalty a cruel and unusual punishment; and (3) imposition of the death penalty has resulted and will continue to result in the execution of innocent individuals.

3.   The government, through its Assistant United States Attorney, does not concur in this motion.

4.   Mr. Arnold respectfully requests the Court to enter an order declaring the federal death penalty unconstitutional and striking the Notice of Intent to Seek a Sentence of Death.

Respectfully submitted,

/s/ Maria P. Mannarino
Maria P. Mannarino
500 Griswold, Suite 2450
Detroit, MI 48226
248−761−7347
mmannarino@comcast.net

/s/ Eric K. Koselke
Eric K. Koselke
320 N. Meridian, Suite 506
Indianapolis, IN 46204
317−722−2591
ekoselke711@gmail.com

/s/ Richard M. Jasper , Jr.
Richard M. Jasper , Jr.
Law Office of Richard Jasper
276 Fifth Avenue Suite 501
New York, NY 10001
212−689−3858
ricjasp@aol.com

Beverly Van Ness, Of Counsel

Dated: May 1, 2019

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,                              Case No. 015-cr-20652 (GCS)

vs.                                    Hon. George Caram Steeh

BILLY ARNOLD,

      Defendant.

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTIONS**
**TO DECLARE THE DEATH PENALTY UNCONSTITUTIONAL AND**
**<u>STRIKE THE NOTICE OF INTENT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF THE CASE AND RELIEF REQUESTED ....................... iii

ARGUMENT

    <u>POINT I</u>

    THIRTY YEARS OF EXPERIENCE WITH A FEDERAL DEATH PENALTY HAS DEMONSTRATED THAT IT OPERATES IN AN ARBITRARY, CAPRICIOUS, IRRATIONAL AND DISCRIMINATORY MANNER. THIS COURT SHOULD DECLARE THE PENALTY UNCONSTITUTIONAL AND STRIKE THE NOTICE OF INTENT TO SEEK DEATH. ................................ 1

    A.    The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty.................... 3

    B.    The federal death penalty as actually sought and imposed and what the figures mean ................................................................. 12

    C.    The absence of any discernible principled basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional. ................................. 15

    D.    The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect................................. 26

        1. Introduction....................................................................... 26
        2. The 2000 DOJ Study. ........................................................ 29

i

3. The persistent capricious circumstance of region.................. 34

4. The continuing and unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty ................................................................................. . 40

    a. The law on race and the death penalty. ........................... 42

    b. The effect of race and gender of victim in the application of the FDPA. ....................................................................... 50

E.     Conclusion: the federal death penalty experiment has failed...... 58

POINT II

"THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY" HAVE RENDERED THE FEDERAL DEATHPENALTY INVALID AS BOTH CRUEL AND UNUSUAL IN VIOLATION OF THE UNITED STATES CONSTITUTION. ........................................... 62

POINT III

THE COURT SHOULD DECLARE THE FEDERAL DEATH PENALTY UNCONSTITUTIONAL IN LIGHT OF THE OVERWHELMING EVIDENCE THAT CONTINUED ENFORCEMENT OF THE FDPA WILL LEAD TO THE EXECUTION OF A MEANINGFUL NUMBER OF INNOCENT PEOPLE. .......................................................................... 70

A. The Quinones Decision. ......................................................... 71

B. The Unacceptable Risk of Executing the Innocent. .................... 72

C. The real question: How many innocent people is it Acceptable to execute so that the government may execute others who are undoubtedly guilty? ........................................................................ 76

CONCLUSION .............................................................................. 78

## STATEMENT OF THE CASE AND RELIEF REQUESTED

Billy Arnold has been charged with racketeering conspiracy, murder in aid of racketeering, and other offenses.  The government is seeking the death penalty against him alone, in connection with two homicides he is accused of committing with others.

The Court has issued a scheduling order, pursuant to which Mr. Arnold must file motions challenging the Federal Death Penalty Act and the death penalty *per se* on or before May 1, 2019.  The instant motion raises three *per se* challenges based on the Eighth Amendment, asking the Court to strike the Notice of Intent to Seek Death because (a) the death penalty is imposed in an arbitrary and capricious manner, and is infected by geographic disparities and racial discrimination (Point I); (b) the death penalty is a cruel and unusual punishment based on evolving standards of decency (Point II); and (c) applying the death penalty has resulted and will continue to result in the execution of innocent individuals (Point III).  To our knowledge, none of these issues has been addressed by the Court of Appeals for the Sixth Circuit.

<u>ARGUMENT</u>

<u>POINT ONE</u>

THIRTY YEARS OF EXPERIENCE WITH A
FEDERAL      DEATH      PENALTY      HAS
DEMONSTRATED THAT IT OPERATES IN AN
ARBITRARY, CAPRICIOUS, IRRATIONAL AND
DISCRIMINATORY MANNER. THIS COURT
SHOULD      DECLARE      THE      PENALTY
UNCONSTITUTIONAL AND STRIKE THE NOTICE
OF INTENT TO SEEK DEATH.

A "modern" federal death penalty has been in effect for over 30 years. On November 18, 1988, Congress enacted a federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking. 21 U.S.C. § 848(e). The reach of the federal death penalty was later expanded when, on September 13, 1994, President Clinton signed into law the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 *et seq*. In March, 2006, the procedural provisions of the ADAA, 21 U.S.C. §§ 848(g), were repealed. This prosecution is brought pursuant to the FDPA.

There are presently 61 men and 1 woman under an active federal sentence of death.[1] Some have been there for more than 25 years. Over the past

---

[1] *See* Current Statistics re Use of Federal Death Penalty, published by the Federal Death Penalty Resource Counsel Project, p. 2, available at https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017. Since

quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself as arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, incapable of answering in a rational and predictable way the profound question of who should live and who should die. This court should strike it down.

If the government disputes the accuracy of any of the data underlying this argument, a hearing is requested at which counsel will establish the truth of all factual assertions made in this memorandum. To summarize what is to follow:

- Only a tiny handful of those federal defendants who could face the federal death penalty ever do.

- The theoretically national federal death penalty is, in practice, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the FDPA has consistently and disproportionately targeted members of minority groups.

- Of the few defendants actually targeted for death, nearly half (234/498) have been simply permitted to enter plea agreements that take death off the table.

- Of the cases that proceed to trial, two-thirds of defendants are spared the death penalty by juries or judges.

- There has been a sharp drop in the number of cases authorized by the Department of Justice for capital

---

the statistics were compiled, one death row inmate has had his death sentence vacated, with the case remanded for a new penalty proceeding. *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018).

> prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of federal death verdicts returned by juries.

- Approximately one-third of federal death sentences have been set aside on direct appeal or in proceedings brought pursuant to 28 U.S.C. § 2255.

- Despite the fact that federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for more than 25 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.

- In the past 27 years there have been just three federal executions, the most recent of which took place more than 12 years ago, a circumstance stripping the FDP of any valid penological purpose.

(*See* Declaration of Kevin McNally, of the Federal Death Penalty Resource Counsel Project, available online at https://fdprc.capdefnet.org/ ["McNally Dec."]). A full discussion of the issues follows.

**A. The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty.**

In 1972, the United States Supreme Court, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death- penalty schemes (including the then-existing federal penalty) as

incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972).[2]

The random and capricious imposition of the death penalty is perhaps best captured by the comparison drawn in *Furman* by Justice Stewart between receiving a sentence of death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

---

[2] Four years after *Furman*, the issue of capital punishment returned to the Court, this time in the cases of five men who had been prosecuted and sentenced to death – all in the South – under newly-enacted post-*Furman* statutes. On July 2, 1976, the Court issued opinions in those five cases. In three of the cases, the Court concluded that the states had successfully met the constitutional concerns raised in the *Furman* opinion. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976). The other two state schemes were struck down because they required automatic imposition of a sentence of death for certain murders without allowing for the "particularized consideration of all relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (Opinion of Justices Stewart, Powell and Stevens); *Roberts v. Louisiana*, 428 U.S. 325 (1976).

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted). In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court summarized its holding in *Furman* as follows:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court had also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority. . . ." *Furman*, 408 U.S. at 255 (Douglas, J., concurring). Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). In fact, the infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10

(Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied," 408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." *Id.* The United States is now a nation of 328 million people. This does not include the 3.3 million people on Puerto Rico. The last time this country carried out 50 or more executions was 2009.[3]  As noted earlier, in the 30 years since 1988, in thousands of cases where the penalty was theoretically available, the United States has carried out the federal death penalty three times. To reiterate Justice Brennan's observation, "the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system."

In the 30 years since the return of the federal death penalty, from a universe of thousands of potential federal capital cases, there have been 520 defendants authorized for capital prosecution (McNally Dec., par. 7). Of this

---

[3] This information is based on figures compiled by the Death Penalty Information Center (current as of 12/13/18), available at https://deathpenaltyinfo.org/views-executions.

number, juries have returned 85 death verdicts involving 81 defendants, some of whom were sentenced to death twice after a first death verdict was set aside (*id.*). Three federal prisoners have been executed.[4] There has not been a federal execution in15 years.

It is estimated that the Attorney General authorizes just 14% of the cases potentially eligible for a capital prosecution (*id.*). Thus, only a handful of the many federal defendants who are potentially eligible for capital punishment are ever targeted. And those who are targeted are rarely sentenced to death and even more rarely are they executed.

Recently, a federal court in California struck down the California death penalty on the basis, in part, that it was so rarely carried out. *Dwayne v. Chappell*, 09-cv-02158-CJC (CDCA) 07/16/2015) (DE 117). The court noted:

> In California, the execution of a death sentence is so infrequent, and the delays preceding it so extraordinary, that the death penalty is deprived of any civilized notion of just punishment.

*Id.* At 19, 20. More recently, the Connecticut Supreme Court, employing state and federal constitutional analysis, declared that state's capital punishment scheme unconstitutional in general and specifically as it applied to those who were serving a sentence of death when the Connecticut legislature repealed capital

---

[4] Two federal executions took place in 2001 (Timothy McVeigh and Raul Garza) and one in 2003 (Louis Jones). The McVeigh and Jones executions were carried out pursuant to the 1994 federal death penalty; Mr. Garza was executed pursuant to the 1988 enactment. (McNally declaration, A12.)

punishment. *State v. Santiago*, 380 Conn. 1 (2015). That opinion also relied in part on the rarity with which sentences of death were pursued and imposed. *Id*. at 75-77.

Also of recent significance is the dissenting opinion filed in 2015 by Justices Breyer and Ginsburg in *Glossip v. Gross*, 135 S.Ct. 2726, 2755-2780 (2015) ("*Glossip* dissent").[5] That dissent called into question the continued constitutionality of capital punishment, citing, among other reasons, the increasing rarity of the punishment, its disproportionate racial impact, its regional application, and the arbitrary manner in which it is sought.

This argument–that the federal death penalty should be struck down because it is so infrequently sought or imposed–should not be misunderstood as a call for more frequent use of the federal death penalty. As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.
>
> Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one. That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who

---

[5] Although there was a second dissent in *Glossip* on the merits of the issue presented – the constitutionality of the drugs utilized in lethal injections – this brief will utilize the shorthand "*Glossip* dissent" to refer to the opinion of Justices Breyer and Ginsburg.

> commit the worst crimes are selected for this
> punishment. No one has yet suggested a rational basis
> that could differentiate in these terms the few who die
> from the many who go to prison. Crimes and criminals
> simply do not admit of a distinction that can be drawn
> so finely as to explain, on that ground, the execution of
> such a tiny sample of those eligible. Certainly the laws
> that provide for this punishment do not attempt to
> draw that distinction; all cases to which the laws apply
> are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

At the time *Furman* was decided, as the opinion itself reflects, 15-20% of convicted murderers and rapists were sentenced to death in those jurisdictions where the death penalty was available for such offenses. *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissented, citing four sources to support the statistic). Justice Powell, also dissenting, cited similar statistics. *Id.* at 435 n.19. For his part, Justice Stewart utilized Chief Justice Burger's statistical analysis to lend further support to his conclusion that the death penalty was, indeed, in an Eighth Amendment sense, "unusual." As stated by Circuit Judge Gregory of the Fourth Circuit, dissenting in a case where the federal death penalty was imposed:

> When the government selects a few offenders from such
> a large pool for execution, it cannot further its
> legitimate penological interests; instead it merely
> inflicts gratuitous pain and suffering.

*United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, Cir. J., dissenting).

9

In *Furman*, arbitrariness and caprice were determined to be inevitable side- effects of a rarely-imposed punishment of death. This view is in harmony with Justice White's observations, premised on his experience reviewing hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring); *see also*, Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed." In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion). This understanding was repeated in *Woodson v. North Carolina*, *supra*, 428 U.S. at 295 n.31.

After 30 years of experience with a post-*Gregg* federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases examined in *Furman*. Being sentenced to death in the federal

10

system is truly akin to being struck by lightning.[6] Indeed, as argued *infra*, no meaningful basis may be discerned for distinguishing the cases of those sentenced to death from those spared the sentence, even among the most extreme.[7]

In 2011, the Death Penalty Information Center published a report on this issue, entitled, "Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976" (Death Penalty Information Center Washington, DC 2011). The report catalogues the arguments and collects the data for declaring the scheme of capital punishment that is practiced in our courts unconstitutional based on arbitrariness.  It examines the

---

[6] *See also*, G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty", 85 WASHINGTON LAW REV. 425, 431 (2010) ("The infrequency of the federal death penalty – with 67 federal death sentences in the face of over 150,000 murders – makes death by lightning-strike look positively routine. Indeed, a federal death sentence is akin to winning (or in this instance losing) the lottery.") (noting that there were 424 deaths by lightning in the years 1999–2008.) In August 2006 *National Geographic* published a chart setting out the odds of dying by various means. For example, there is a 1 in 5 chance of dying from heart disease, and a 1 in 84 chance of dying in a car accident. Far down the list is the chance of dying by lethal injection, 1 in 62 (468). The next item on the list reported the odds of being killed by lightning as 1 in 79 (746). *Id.* at p. 21.

[7]  In the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up the Murrah Federal Building in Oklahoma City, killing 168 people and injuring hundreds.  In the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs, that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks. Eric Rudolph – the Olympics and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber, as did Jared Loughner whose mass-shooting murder victims included a child and a federal judge. In Boston, in 2015, Dzhokhar Tsarnaev was sentenced to death for the bombing of the Boston Marathon where fewer people were killed than in other terrorism cases.

facts of several extremely aggravated federal death penalty cases in which the death penalty was not sought or imposed (*e.g.*, Eric Rudolph, Steven Flemmi, Oscar Veal, Joseph Massino, Vincent Basciano, Theodore Kaczynski, Zacharias Moussaoui, and Terry Nichols), and rightly points out that "[e]ven in cases evoking national fear, a death sentence is not a predictable result." The Report also notes that "[n]ationally, the most comprehensive study of death penalty appeals found that two-thirds of death sentences were overturned, and upon reconsideration over 80% received an outcome of less than death. In all of these re-sentencings, the judgment went from 'worst of the worst' to something less severe—the difference between life and death."

**B. The federal death penalty as actually sought and imposed and what the figures mean.**

The current state of the post-*Gregg* federal death penalty, as it has been sought and imposed, is summarized in the following table.

**TABLE 1: <u>THE STATUS AND DISPOSITION OF ALL POTENTIAL FEDERAL CAPITAL CASES FROM NOVEMBER 1988 TO SEPTEMBER 2018</u>**

| | | |
|---|---|---|
| a. | Potential cases: | 4,144 |
| b. | Presently pending DOJ review: | 305 |
| c. | Defendants authorized for capital prosecution: | 520 |
| d. | Presently pending or in trial: | 23 |
| e. | Jury sentences of death: | 85 |

      f.  On federal death row, active death sentence      62

      g.  Executed:                                       3

(McNally Dec., pars. 6-8) Attachment A to the Declaration is an Excel spreadsheet summary of the outcome of every completed authorized federal capital case since 1988, current as of October 12, 2018.

Subtracting the cases presently under review, the Department of Justice has authorized local prosecutors to seek the death penalty in approximately 14% (520/3,389) of cases of individual federal defendants charged with death-eligible offenses and therefore potentially exposed to a capital prosecution.   In *Furman*, the Court cited the infrequency with which the death penalty was sought and imposed as a circumstance virtually guaranteeing the arbitrary and capricious application of the ultimate penalty. This conclusion was reached on the basis of a showing that, on a nation-wide basis, fewer than 20% of defendants convicted of capital crimes were actually sentenced to death. In the federal system, the figure is lower by a factor of 10. In fact, far fewer than 20% of those eligible for federal capital punishment are even *exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to death. Taking the highest figure for actual death sentences returned against federal defendants by federal juries at 85, approximately 2.0% (85/4,144) of all potentially death-eligible federal defendants—one in fifty—were in fact sentenced to death. In terms of federal

executions to date – three – the figure is infinitesimal. This baseline figure includes 23 authorized cases that are pending trial or re-trial. It is reasonable to predict that a certain number of those cases will be resolved by plea agreement and that a certain number will proceed to trial, with an overall statistical likelihood of very few resulting in death sentences. It is also reasonable to assume that some of the 62 federal inmates now under an active sentence of death will succeed in appellate or post-conviction challenges to their convictions or sentences.

These figures demonstrate that in terms of decisions reached by juries and judges, even in the case of defendants who qualify as the "worst of the worst" and were therefore targeted for the federal death penalty, life sentences result in two-thirds of the cases that actually proceed to a penalty-phase. As noted *infra*, there are truly shocking regional variations in where death sentences are returned. Two-thirds of federal defendants who stand trial for their life in the Fifth Circuit are sentenced to death. In the Second Circuit the figure is 10%. In the D.C. Circuit, the figure is 0%.

Thus, utilizing an analysis that was persuasive to the Supreme Court in *Furman,* the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf., Roper v. Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because

14

of "the infrequency of its use even where it remains on the books"); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon"); *see also Thompson v. Oklahoma*, 487 U.S. 815, 822 n. 7 (1988) (plurality) ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance."). Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the court should strike it down.

**C. The absence of any discernible principled basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

The Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other

side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." More recently in *Kennedy v. Louisiana*, *supra*, the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 128 S.Ct. 2650. For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* In practice, the FDP has failed to meet this constitutional standard and operates in an arbitrary and irrational manner. This point was made both in the *Glossip* dissent and in the Connecticut Supreme Court's *Santiago* opinion.

An examination of the federal death penalty in operation shows that there is no consistency or predictability in the manner in which federal juries (and in three cases, federal judges) have imposed or declined to impose the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to trial. The Federal Death Penalty Resource Project, described by Mr. McNally in his declaration (pars. 1-2), maintains a compendium of penalty-phase verdict sheets returned in virtually every federal capital case that has proceeded to trial since 1988.[8]  The verdict sheets reflect findings in aggravation

---

8    The following is a link to those verdict sheets, last visited November 4, 2018: https://fdprc.capdefnet.org/verdict-forms.

and mitigation in the penalty phases of virtually all completed federal death penalty prosecutions. Those hundreds of federal verdict sheets offer clear insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system. There is no rhyme, reason, or predictability concerning who is sentenced to death and who is spared or who simply never has to face a jury on a life-or- death decision. The Project website also maintains a summary of the factual circumstances and outcome to hundreds of capital cases, whether tried or not, and much other useful information regarding the federal death penalty.

This argument is not refuted by simply pointing out that there are always difficulties inherent in comparing cases. A review of summaries of the cases and the verdict sheets available to this court on line should put that reflexive and simplistic argument to rest. Some examples of the outcomes in federal capital cases follow:

- *United States v. Joseph Sablan and William Guerrero* (CDCA). Two inmates murdered a federal corrections officer at USP/Atwater in 2008. Both had prior murder convictions and were serving life sentences. One defendant had murdered a prison guard previously while serving a sentence in Guam. In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Jessie Con-Ui* (MDPA). Federal inmate, with prior murder conviction and life sentence, murders federal correctional

officer at USP/Canaan; murder captured on videotape, more than 200 stab wounds inflicted. Defendant convicted and sentenced to life.

- *United States v. Anthony Battle* (NDGA). In 1994 a federal inmate serving a life sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer. Tried, convicted, sentenced to death. Remains on death row 24 years later.

- *United States v. Roy C. Green* (CDCA). In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second. Three other officers were also seriously injured. Mr. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Larry Lujan*, (DNM). Lujan was convicted of what the Tenth Circuit described as a "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome." (*Id.* at 853). These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire. . . . The victims' eleven-year-old daughter discovered the bodies the next afternoon." (*Id.*) Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future. On October 5, 2011, after the jury was unable to reach a unanimous verdict, Larry Lujan received a life sentence.

- *United States v. Dzohkhar Tsarnev* (DMA), bombing of Boston Marathon, murder of a police officer, total of 4 killed, dozens injured. Tried, convicted, sentenced to death.

- *United States v. Timothy McVeigh*, (DCO). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted,

18

sentenced to death, executed.

- *United States v. Terry Nichols*, (DCO). McVeigh's co-defendant. Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*, (SDNY). Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph*, (NDAL). The Olympic and abortion-clinic bomber. Victims included a police officer. Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive." Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui*, (EDPA). Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski*, (EDPA). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner* (DAZ). Mass shooting at public event resulting in 6 deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Johnson*, (WVA). Defendant indicted for a murder at USP/Lee where he was serving a virtual life sentence when he stabbed another inmate to death. On March 21, 2012 – after DOJ approval of a life plea – Antonio Johnson entered a guilty plea.

- *United States v. Basciano*, (EDNY). Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

19

- *United States v. Duong*, (NDGA). Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in 1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3 capital homicides (arising out of a string of robberies), and an additional 5 RICO murders. On December 15, 2010, a federal jury sentenced Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort*, (NDGA). Attorney General approved 40-year plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v Joseph Minerd,* (WDPA). Arson/pipe bomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

- *United States v. Coleman Johnson*, (WVA.). Pipe bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean*, (DVT). Defendant sends pipe bomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

- *United States v. Billy Cooper*, (DAZ). Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard*, (WDTX). Car-jacking double homicide. Tried, convicted, sentenced to death.

- *United States v. Gary Sampson*, (DMA). Two murders during separate car-jackings. Plead guilty, sentenced to death by jury. Later set aside. Again sentenced to death on re-trial.

- *United States v. David Paul Hammer,* (MDPA). Prison inmate guilty of strangling to death cellmate at USP/Allenwood. Sentenced to death. Sentence later vacated. Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll*, (MDPA). Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood. Same judge, same courtroom, same defense attorneys as *Hammer*. Sentenced to life.

- *United States v. Storey*, (DKS). Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth. Plea agreement. Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle*, (DCO). Inmates at USP/Florence attack two suspected "snitches," one killed one injured. Plea agreements. Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan*, (DCO). Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers. Defendants tried separately. Life verdicts in each case.

- *United States v. Barry Mills*, *et al*. (CDCA). A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders. Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions. After two lengthy trials, juries spared the first four defendants facing the death penalty – the alleged leaders of the gang – and the government has withdrawn its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng*, (E.D.N.Y.). Chinese gang members who kidnap, rape and murder victims held for ransom. Fu Xin Chen and Jai Wu Chen enter plea agreements. Attorney General withdraws death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

- *United States v. Louis Jones*, (NDTX). Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier. Tried, convicted, sentenced to death, executed.

21

- *United States v. Chevy Kehoe and Daniel Lee*, (WDAR) Triple murder of two adults and small child in connection with activities of white supremacist organization. Tried and convicted together. Kehoe – considered more culpable – sentenced to life. Lee sentenced to death by the same jury.

- *United States v. Michael Jacques* (DVT). Defendant with prior convictions for sexual assaults kidnaps, rapes and murders 12-year-old niece. Allowed to enter guilty plea; sentenced to life. Case authorized for federal capital punishment. Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa*, (EDNY). Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul*, (WDAR). Murder of elderly retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

- *United States v. Kristen Gilbert*, (DMA). VA nurse murders four patients and attempts to murder three more. Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, (EDPA). Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

- *United States v. Billie Allen and Norris Holder*, (WDMO). Fatal shooting of bank teller during robbery. Tried, convicted, and both defendants sentenced to death.

The disparities are particularly striking in cases where murder has taken place in the context of drug-dealing.

- *United States v. Azibo Aquart*, (DCT). Three drug-related murders.

22

Tried, convicted, sentenced to death (sentence vacated on appeal in 2018).

- *United States v. Azikiwi Aquart ,* (DCT). Same three drug-related murders committed with his brother Azibo. Pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton*, (EDPA). Eleven drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford*, (EDPA). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff*, (SDNY). Fourteen drug-related murders. Plea agreement. Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez*, (SDNY) Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (SDNY). Execution-style triple murder by father and son. Tried, convicted, sentenced to life.

- *United States v. Thomas Pitera*, (EDNY). Nine drug-related murders in organized crime and large-scale drug trafficking context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz*, (WDMO). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

- *United States v. John Bass* (EDMI). Four drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore*, (DDC). Thirty-one drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson*, (NDIL). Two drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Peter Rollock*, (SDNY). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

- *United States v. Tommy Edelin*, (DDC). Fourteen drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal*, (EDTX). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson*, (EDPA). Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza*, (SDTX). Three drug-related murders. Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis*, (EDPA). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Emile Dixon*, (EDNY). Two drug-related murders, including machine-gunning death of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Anthony Jones*, (DMD.). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker* (NDNY). Two defendants kill a drug-dealer and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years old. Both defendants tried, convicted, sentenced to life.

24

These are just selected cases from the larger pool of potential and authorized federal capital cases. This argument draws further force from the cumulative effect gained from reviewing the summaries of authorized cases compiled by the Federal Death Penalty Resource Counsel Project and the verdict sheets available on-line. By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the "worst of the worst" the federal system has to offer. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries (and in three instances judges) returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

The point is that one cannot read these chronicles of the many ways in which man can demonstrate his inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, while an overwhelming majority were not. If any basis can be discerned, it is, as the following discussion illustrates, race, region, and gender and, perhaps, plain bad luck; none of which are permissible criteria for selecting defendants for capital punishment.

25

In *Walker v. Georgia*, 129 S.Ct. 453 (2008), Justice Stevens, dissenting from the denial of *certiorari*, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "The likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." *Id.* at 457. *See* B. Sarma, "*Furman's* Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill *Furman's* Promise," 2009 CARDOZO L. REV. DE NOVO 238 (2009). As argued in the Cardozo article:

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness. In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*. If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

*Id.* at 242.

**D.   The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect.**

1.   Introduction.

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, the federal death penalty was utilized almost

26

exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

The grossly disproportionate racial targeting of racial minorities (Mr. Arnold is African-American) for federal capital prosecution has remained unchanged for 30 years. By 1994—barely six years after the return of a "modern" federal death penalty —obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

> Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on The Judiciary, 103rd Congress, 2nd Session, March 1994. That report found that as of 1994 there had been 37 defendants authorized for capital punishment under

the § 848(e) (ADAA) scheme, of whom 33 (87 per cent) were black or Hispanic. *Id.* The percentage has not substantially improved since then (see McNally Dec., par. 9).

Earlier evidence of the potential race-effect of the death penalty had been examined by the agency formerly known as the General Accounting Office (now the Government Accountability Office). At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2) (Repealed). The GAO in fact undertook that study in 1990 and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision. In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks. This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques. The finding held for high, medium, and low quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-57, Feb. 1990) at p. 5. In a 1999 law review article, Professor Rory Little, writing from the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions

28

about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. R.K. Little, 26 FORDHAM URBAN L.J. 347 (1999) at 450-90.

Thus, from the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematical. This shameful pattern remains in place. Over two-thirds of the defendants authorized for a federal capital prosecution are members of minority groups. This includes Mr. Arnold.

2.      The 2000 DOJ Study.

In a press conference that took place on June 28, 2000, President William Jefferson Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." In response, the President said the following about the application of the federal death penalty, acknowledging concerns about race and regional practices:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of

29

both those issues at this time.

(Transcript of President Clinton's June 28, 2000 press conference: available on line at http://www.presidency.ucsb.edu/ws/index.php?pid=1666.

On September 12, 2000, the Department of Justice released the comprehensive study alluded to by President Clinton in his remarks. The study detailed how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[9] The essence of the 2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. The Study reported that federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, over two-thirds of the defendants receiving death verdicts were tried in the South.[10]

In terms of which defendants faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution between 1995 and 2000, 44 defendants where white (27.7%),

---

[9]   The DOJ Study is available on the Death Penalty Information Center website: http://www.deathpenaltyinfo.org/federal-death-penalty#studies   (also   including   a Department of Justice supplemental report, dated, on June 6, 2001, statistics and more recent findings on the administration of the Federal death penalty transmitted to Senator Feingold by the Department of Justice on June 7, 2007, in preparation for oversight hearings).

[10] DOJ Study, Table 24-2.

71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%). *See* Table 1A at T-2 of DOJ Study. Thus, as of the summer of 2000, more than 70% of the federal defendants targeted for the death penalty had been non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty. The DOJ Study revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution. (DOJ Study at 14.)

- Twenty-two federal districts had never submitted a case for review at all. (DOJ Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case. (*Id.*).

The release of the report drew the following public comment from officials at the Justice Department and the White House.

> Saying she was "sorely troubled" by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, "Reno Troubled by Death Penalty Statistics," *N.Y. Times*, September 13, 2000. The *Times* also reported the reaction of then Deputy

Attorney General Eric Holder, who was, at the time, the highest-ranking African American at the Justice Department:

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

*Id.*

The DOJ Report noted additionally that the recommendation that accompanies a submission is of great importance. In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General. (DOJ Study at 43.) In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General. *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000. In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital- authorization. The approval rate for those cases was 90%. (DOJ Study at 10.)

In *United States v. Bass,* 266 F.3d 532 (6th Cir. 2001), *reversed*, 532 U.S. 1035 (2002) (per curium), the Sixth Circuit quoted at length from the public statements of Attorney General Reno and Deputy Attorney General Holder in

32

response to the release of the DOJ Study. 266 F.3d at 538. Considering the impact of the study, Judge Sand in *United States v. bin Laden*, 126 F. Supp.2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence (unchanged 18 years later) "indeed troubling," but ultimately rejected a challenge to that capital prosecution. In confirmation hearings the year following the Study's release, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." Quoted in *United States v. Bass, supra*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations or remedy arbitrary and invidious practices. As this discussion continues, it will be seen that nearly two decades later, nothing has changed. If anything, to quote the title of Mr. McNally's DePaul Law Review article, a "non-existent" problem has gotten worse. K. McNally, "Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse", 53 DEPAUL L. REV. 1615 (2004).

The pursuit of the death penalty on the basis of race is shameful and cannot be tolerated under the Eighth Amendment. This Court is respectfully urged to do something about it by striking the notice in this case of an African-American defendant facing death.

3.      The persistent capricious circumstance of region.

As to the regional bias of federal capital prosecutions, the FDPA remains a largely Southern phenomenon. Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states of the former Confederacy. Additionally, these states sentence federal defendants to death at a significantly higher rate than elsewhere in the country.

**TABLE 2: 1988-2018**

**STATES WITH MORE THAN ONE**
**FEDERAL DEATH VERDICT**

Texas —16

Missouri—10

Virginia—8

Louisiana—4

North Carolina—4

South Carolina—3

Georgia—3

Oklahoma—3

Maryland—2

Pennsylvania—2

Arkansas—2

California—2

Florida—2

Illinois—2

Iowa—2

New York—2

34

Massachusetts—2

West Virginia—2

(McNally Dec., par. 13)

The following table summarizes the chances of receiving a death sentence by the happenstance of the circuit in which the case is tried.

## TABLE 3

## DEATH SENTENCING RATE BY CIRCUIT

| CIRCUIT | DEFENDANTS TRIED | DEATH SENTENCED | RATE |
|---|---|---|---|
| FIRST | 12 | 2 | 17% |
| SECOND | 31 | 3 | 10% |
| THIRD | 18 | 2 | 11% |
| FOURTH | 72 | 15 | 21% |
| FIFTH | 31 | 21 | 68% |
| SIXTH | 19 | 3 | 19% |
| SEVENTH | 9 | 3 | 33% |
| EIGHTH | 32 | 15 | 47% |
| NINTH | 11 | 4 | 18% |
| TENTH | 18 | 5 | 28% |
| ELEVENTH | 20 | 6 | 30% |
| D.C. | 3 | 0 | 0% |

(McNally Dec., pars. 1 4 - 2 8 ).

It should go without saying that a sentence of death should not depend on where a federal prosecution happens to be brought. This is the essence of an Eighth Amendment claim of the arbitrary and capricious infliction of the ultimate punishment. In *Santiago*, noting the regional caprice of the death-penalty on a nation-wide basis, the Connecticut Supreme Court examined the death-penalty sentencing rates of the 13 states that made up the Confederacy and concluded that those states were responsible for 75% of the executions carried out in the United States since 1976. *State v. Santiago*, 318 Conn. at 81-82.

36

In terms of federal death verdicts and the confederacy (the number of federal executions – three – is too low to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas) shows that 49 of 81 federal death verdicts have come out of the states that formed the confederacy, more than 62% of all federal capital verdicts. Just three of those former confederate states – Texas, Missouri and Virginia – account for 32 federal death verdicts, 40 per cent of the total. The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

When one examines the numbers on a circuit basis, the results reflect the same regional bias. To put it bluntly, if we have a national death penalty it should not matter whether you are tried in Texas or New York in terms of the likelihood of receiving a death sentence. But that very much is the reality.

Historically, the death penalty has been a largely Southern phenomenon; that remains the case today. As of November 2, 2018, there have been 1,485 post-*Gregg* executions carried out in the United States. (A86.) Of these, 1,212 – or 82% – have been carried out by Southern states. (A84.) Five states alone – Texas, Oklahoma, Virginia, Missouri and Florida – have accounted for 962 executions, substantially more than half (67%) of all post-*Gregg* executions. (*Id.*). With this historical perspective in mind, it is no surprise that those federal

jurisdictions in states with an established "culture of death"—often with an history of *de facto* and *de jure* racial discrimination, and slavery — reflect that culture, consciously or not, in decisions to pursue the death penalty.

Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same. Regional bias, however, is inimical to a national penalty that is, theoretically at least, that sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in a given case. The Department has failed miserably at this.

The "ideal" of a national standard aside, the federal death penalty well into 2018 continues to be a Southern phenomenon and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts. Thus, "[o]f the 85 federal death sentences imposed by juries since 1988, 55 [65%] have come from the traditional 'death belt' states, the states that have historically executed the most people." (McNally Dec., par. 13) In a study of this issue published in 2010, the authors noted:

> Geographic disparities . . . persist. To promote
> uniformity, United States Attorneys submit all death-

> eligible federal cases to the United States Attorney General for death- authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty", 85 WASHINGTON LAW REV. 425, 429-430 (2010). As of 2015, 25% of the 94 federal districts have *never* had an authorized federal capital case.

The reality is there has been no appreciable change since the 2000 DOJ Study, and the federal death penalty remains a disproportionately and distinctly regional phenomenon. It thus appears – whether one takes a micro or macro view – that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed. This is the essence of arbitrariness and caprice. To quote former President Clinton, "[W]hat your prosecution is may turn solely on where you committed the crime." See also, *Glossip v. Gross*, 135 S. Ct. at 2761 (Breyer and Ginsburg, JJ., dissenting) ("Geography also plays an important role in determining who is sentenced to death."); State v. Santiago, 318 Conn. at 85 ("In the case of capital punishment, the regional disparities are both instructive in their character and striking in their

magnitude.").

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See*, *Bush v. Gore*, 531 U.S. 98, 106 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment."

4.  The continuing and unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty.

After more than 25 years of a federal death penalty, it is undeniable and clear that the patterns of race and region that disturbed and troubled government officials 15 years ago persist. It seems undeniable that these problems are intractable and part of the DNA of capital punishment, including the federal version. The following tables reflect the present state of affairs:

## TABLE 4

### THE RACE OF THE 520 FEDERAL DEFENDANTS TARGETED FOR FEDERAL EXECUTION 1988-2018

| RACE OF DEFENDANT | NUMBER | PER CENTAGE |
|---|---|---|
| African-American | 258 | 49% |

40

| | | |
|---|---|---|
| Caucasian | 139 | 27% |
| Latino | 97 | 19% |
| "Other" | 26 | 5% |

(McNally Dec., par. 9)

As Table 4 demonstrates, in terms of targeting decisions, 81% of those selected for capital prosecutions are members of minority groups. At the time of the 2000 DOJ Study, the figure was 70%. As the pie chart on the following page demonstrates, the disproportionate targeting of minorities for the federal death penalty has had what would be the expected effect on the population of death row. Thus, as of the fall of 2018, 60 percent of those presently on federal death row are non-white. This is an unacceptable state of affairs and, bluntly, one that should be a source of intense concern to the Justice Department. The chart here reproduced would have looked the same in the year 2000.

41



(a)   **The law on race and the death penalty.**

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan, Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death and what would factor into that process. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense counsel would have to level

with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting). In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans. One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287.

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Id.* at 373-74. The historical truth is that in the United States capital punishment and race have always been intertwined. That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the*

*Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, "What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh," 53 DEPAUL L. REV. 1591 (2004); K. McNally, "Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse," 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, "Black Man's Burden: Race and the Death Penalty in America," 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, "Race, Region, and Death Sentencing in Illinois," 81 OREGON L.REV. 39 (2002); S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty," 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, "Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction," 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 RUTGERS L.REV. 27, 100-57 (1988).

In Connecticut's recent *Santiago* decision, the issue of race and the death penalty in that affluent northeastern state was examined with the following conclusion:

> [D]ata from three authoritative governmental sources.
> . . all suggest that the death penalty in Connecticut
> continues to be imposed disproportionately based on

> the race and ethnicity of the offender and the victim.
> The alleged disparities are significant and hold across
> hundreds of cases. We are not aware of any study or
> report to have reached a contrary conclusion.

*State v. Santiago*, 318 Conn. at 151. In recent weeks, the Supreme Court of the State of Washington reached the same conclusion, invalidating its capital-punishment statute on a finding that jurors in that state were three times more likely to reach a death verdict in a case involving a black defendant than for a white defendant in a similar case. *State v. Gregory,* 192 Wn.2d 1 (2018).

In *Furman*, Justice Douglas had explored the ugly correlation between race and the death penalty and concluded:

> In a Nation committed to equal protection of the
> laws there is no permissible "caste" aspect of law
> enforcement. Yet we know that the discretion of judges
> and juries in imposing the death penalty enables the
> penalty to be selectively applied, feeding prejudices
> against the accused if he is poor and despised, lacking
> political clout, or if he is a member of a suspect or
> unpopular minority, and saving those who by social
> position may be in a more protected position. In ancient
> Hindu law, a Brahman was exempt from capital
> punishment, and in those days, "[g]enerally, in the law
> books, punishment increased in severity as social status
> diminished." We have, I fear, taken in practice the same
> position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.) As recently as 1991, the execution of a white man for the murder of a black man was front- page news as an event that had not occurred in the nation for 50 years. *See*, D.

Margolick, "Rarity for U.S. Executions: White Dies for Killing Black," *N.Y. Times*, September 7, 1991, p.1, col. 1.  The Death Penalty Information Center reports that since executions resumed in the wake of Gregg in 1976, through February 28, 2019, there have been 34 executions of a white defendant for killing a black victim, and 306 executions of black defendants who killed a white victim (https://deathpenaltyinfo.org/views-executions).

A study of death verdicts returned in Philadelphia further illustrates the invidious and odious nature of the problem of race and the death penalty. The study concluded that convicted murderers with stereotypical African-American features (flat noses, large lips, kinky hair) and dark skin were more likely to receive the death penalty for killing a white person than lighter-skinned African- American defendants with more Caucasian features. J. Eberhardt, P.G. Davies, J. Purdie-Vaughns, S.L. Johnson, "Looking Deathworthy: Perceived Sterotypicality of Black Defendants Predicts Capital-Sentencing Outcomes," 17 PSYCHOLOGICAL SCIENCE 383 (Spring 2006). *See also*, Mona Lynch and Craig Haney, "Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide''', 45 LAW & SOCIETY REVIEW 69, 91 (2011), where the authors found that "[T]he white male jurors in this study judged a black defendant whom they tended to view as driven by the defendant's own depraved predispositions, and as someone whose criminal behavior they

46

were reluctant to interpret as the product of the defendant's dysfunctional and psychologically damaging background."

Mr. Arnold's showing in this motion is sufficient to establish a case of arbitrariness in the enforcement of the federal death penalty. It is difficult to imagine how, other than racism, one can explain the arbitrary manner in which the federal death penalty has been administered in terms of the race of those who are targeted. *See Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.* , 429 U.S. 252, 266 (1977).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). This case, as a federal prosecution, is subject to the Due Process Clause of the Fifth Amendment which has long been held to embody a guarantee of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.") In the area of criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court

47

has "consistently" articulated a "strong policy . . . of combating racial discrimination." *Id.* at 558. That the federal death penalty operates with an impermissible racist effect is powerful evidence that it operates fundamentally unfairly and with arbitrariness and caprice. Accordingly, Mr. Arnold has standing pursuant to the Eighth Amendment and Fifth Amendment Due Process Clause not to be subjected to an arbitrary system of capital punishment.

There is strong and consistent evidence that minority defendants are many times more likely than white defendants to face the death penalty at the hands of the federal government. This is a problem that demands our government's "most rigid scrutiny" of the kind described in *Loving*. The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments. *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital

48

defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Secondly, it is obvious that racial discrimination is a species of the arbitrariness condemned in *Furman*. This is apparent from the opinions of the Justices in the majority and of those in dissent alike. For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and thus ran directly counter to "the desire for equality . . . reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-366 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J. dissenting); *id.* at 449-50 (Powell, J., dissenting). Later Supreme Court cases have applied this interpretation. Thus, for example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman* would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant." 462 U.S. at 885.

Taken together, then, these two points can be summarized as follows: The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes

a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the (implicit) equal protection clause of the Fifth Amendment. In *Graham v. Collins*, 506 U.S. 461 (1993), Justice Thomas' concurring opinion summed this point up succinctly when he noted that racial prejudice or bias in the context of capital punishment "is the paradigmatic capricious and irrational sentencing factor." *Id*. at 484. Where a death penalty appears to operate so as to institutionalize racism, it offends the same constitutional values that yielded *Furman* and this nation's abandonment of capital punishment.

### (b)    The effect of race and gender of victim in the application of the FDPA.

For obvious reasons, a capital punishment scheme which explicitly provided that the death penalty is more appropriate where the victim is white or white and female would not be constitutional. A scheme that operates in practice to the same effect is no better. On the question of race-of-victim, research that is consistent across several decades has demonstrated that those who kill whites are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups.   A race-of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system.[11]   In their *Glossip* dissent, Justices Breyer and Ginsburg noted,

---

[11] *See, e.g.,* Death Penalty Information Center execution statistics at https://deathpenaltyinfo.org/views-executions.

"Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty." *Glossip* dissent, 135 S.Ct. at 2760. The dissenting justices also noted that "[M]any studies have found that the gender of the victim makes a not-otherwise-warranted difference." *Id*. at 2761.

For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, "Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," 53 DEPAUL L. REV. 1411, 1423-1428 (2004). Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83% range, while whites were victims of murder in only approximately 45% of such cases. *Id* at 1423. *See also,* K. McNally, "Race and the Federal Death Penalty: A Non-existent Problem Gets Worse," 53 DEPAUL L. REV. 1615 (2004). The dissenters cited the following law review article which had synthesized more than 20 studies conducted between 1990 and 2013, all reaching the same conclusion, *i.e.*, that the race of the victim is a significant factor in which defendants receive the death penalty with those who kill whites significantly more likely to be sentenced to die. Shatz & Dalton, "Challenging the Death Penalty With Statistics: *Furman, McCleskey,* and a Single County Case," 34 CARDOZO L.REV. 1227, 1245-12551 (2013).

Recent studies have begun to demonstrate that there is a gender-based irrationality to capital punishment schemes as well, with the net effect that those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males. This is further evidence of the arbitrary, capricious and biased nature of the death penalty.

Studies of state capital schemes have uniformly detected a significant race- of- victim effect. *See, e.g.* Marcia Wilson, "The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: an Empirical Analysis", 38 N.M. L. REV. 255, 260 (2009) ("The data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die."); State Bar of New Mexico, Task Force on the Administration of the Death Penalty in New Mexico: Final Report (2004) p. 13 ("[S]ome states have done studies in an effort to determine what factors make it more or less likely that an individual defendant will receive the death penalty. These studies have found that the race of the defendant and the race of the victim affect to a significant degree whether a particular defendant convicted of first-degree murder will be sentenced to die.") *See also*, Pierce and Radelet, "Death Sentencing in East Baton Rouge Parish, 1990-2008", 71 LOUISIANA LAW REV. 671 (2011) (In Louisiana, the odds of a death sentence were 97 % higher for those whose victim was white than for those

52

whose victim was black.); G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty", 85 WASHINGTON LAW REV. 425, 428 (2010) ("Statistics suggest that defendants are more likely to be sentenced to death for killing a white victim than a black victim."); R. Paternoster, G. Pierce, & M. Radelet, "Race and Death Sentencing in Georgia, 1989-1998, in "American Bar Association: Evaluating Fairness And Accuracy In State Death Penalty Systems: The Georgia Death Penalty Assessment Report" (with respect to capital prosecutions in Georgia, "[t]he data show that among all homicides with known suspects, those suspected of killing whites are 4.56 times as likely to be sentenced to death as those who are suspected of killing blacks"); Andrew Welsh-Huggins, "Death Penalty Unequal - Study: Race, Geography Can Make a Difference," *The Cincinnati Enquirer* (May 7, 2005) (analysis of death penalty verdicts in the state of Ohio from 1981 to 2002 reveals that "[o]ffenders facing a death penalty charge for killing a white person were twice as likely to go to death row [compared to those charged with having] killed a black victim. Death sentences were handed down in 18 percent of cases in which the victims were white, compared with 8.5 percent of cases when victims were black"); G.L. Pierce & M. Radelet, "The Impact of Legally Inappropriate Factors on Death Sentencing in California Homicides," 46 SANTA CLARA L. REV.1 (2005), noting that the killers of whites were over three times more likely to be sentenced to death than those who killed blacks and 4 times as likely than those who killed

53

Latinos.

In addition, research commissioned by state governments in, for example, California, Maryland, Nebraska and Illinois has consistently found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. *See, e.g.*, *Maryland Commission on Capital Punishment: Final Report To the General Assembly* (2008), p. 10 ("The evidence shows that the troublesome factor of race plays a dominant role in the administration of the death penalty in Maryland. Research presented to the Commission showed that cases in which an African-American offender killed a Caucasian victim are almost two and a half times more likely to have death imposed than in cases where a Caucasian offender killed a Caucasian victim."); State of Illinois, *Report of the Governor's Commission on Capital Punishment* (2002), p. 196 ("When certain facts in aggravation, such as previous criminal history of the defendant, are controlled for, there is evidence that the *race of the victim* influences who is sentenced to death. In other words, defendants of any race who murder white victims are more likely to receive a death sentence than those who murdered black victims.") (emphasis in original).

As a result of these studies, and others, it is clear that "[d]eath row's racial disparity . . . is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." *See* J.

54

Blume, T. Eisenberg, and M. T. Wells, "Explaining Death Row's Population and Racial Composition," 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 1, 167 (March 2004).

Although the significance of the victim's race in death sentencing outcomes has been discussed for at least 40 years, very little prior research has examined whether the combined effect of victim race and gender improperly skews sentencing outcomes in capital cases. This area has only recently gained the attention of researchers. Research has identified just three empirical studies, all very recent, that considered the joint effects of victim race and gender in capital prosecutions. Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present.[12]   A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases spanning the two decades from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination. See Hindson,

---

[12] As noted earlier, in the *Glossip* dissent, it was observed, that "[M]any studies have found that the gender of the victim makes a not- otherwise- warranted difference." *Glossip*, 135 S.Ct. at 2761.

Potter and Radelet, "Race, warranted difference." *Glossip*, 135 S.Ct. at 2761.

Gender, Region and Death Sentencing in Colorado, 1980-1999," 77 COL. L.

REV. 549 (2006). The authors concluded:

> The death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization.

*Id.* at 577.

A November 2007 study analyzed state court data from Georgia cases in

the 1970's and concluded:

> Defendants who murder females are more likely to receive a death sentence than defendants who murder males. Furthermore, we show that large differences exist in the likelihood of receiving a death sentence when the variables "victim race" and "victim gender" are considered jointly. Cases that involve white female victims are treated the most harshly. . . ."

Williams, DeMuth, Holcomb, 45 CRIMINOLOGY 885. In a 2004 Ohio study,

the same research group found that death sentences were a product of a strong

association between one victim race-gender group – white female victims – and

the imposition of a death sentence. Holcomb, Williams, DeMuth, "White Female

Victims and Death Penalty Research," 21 *Justice Quarterly* 877-902 (2004).

In December 2008, the defendants in *United States v. Valerie Friend and*

*and George Lecco* , 05-cr-00107 (S.D.W.Va.), a case involving the murder of a white female victim, brought a motion to bar the death penalty on the basis of an asserted arbitrary and discriminatory victim-related race and gender effect  Based on an analysis of over 400 authorized federal capital cases, it was determined by a qualified expert statistician, Lauren Cohen Bell, Ph.D., that defendants in federal capital cases whose victims were white females were more than three times as likely to be sentenced to death than other federal capital defendants (McNally Dec., Exhibit B). This finding was, moreover, found to be "highly statistically significant, systemic, and not the result of chance." The examination of the cases revealed, as well, that as of December 2007, federal capital cases involving white female victims constituted 43% (26 of 61) of those sentenced to death in the federal system, but only 9% (61/626) of all potential defendants since 2000.  Thus, the death-sentencing rate is many times higher than the death-sentencing rate for non-white female victim cases.[13]

As stated previously, the issue of the "white victim effect" has been studied and found to exist before. It now also appears that there is a "white female victim effect." When the gender of the victim is considered, the evidence of an arbitrary and capricious operation of the federal death penalty becomes apparent. When the

---

[13] Although both defendants in the *Lecco* and *Friend* prosecution were initially sentenced to death by the jury, the trial court set the verdicts aside due to juror misconduct. Ms. Friend subsequently entered into a plea agreement with the government, resulting in withdrawal of the death notice. On re-trial, Mr. Lecco received a life verdict from the jury.

penalty decisions of juries are examined, the results are nothing short of astonishing. Accordingly, this Court should find that the existence of a "white female victim" effect renders any death sentence in this case presumptively unconstitutional and/or in violation of 18 U.S.C. §§3593(f).

### E. Conclusion: the federal death penalty experiment has failed.

What the results of failed efforts to apply the federal death penalty illustrate is the inherently contradictory nature of two lines of Supreme Court cases. *See* Mary Sigler, "Contradiction, Coherence and Guided Discretion in the Supreme Court's Capital Sentencing Jurisprudence," 40 AMER.CRIM.L.REV 1151 (2003). In *Gregg*, the Court posited the concept of "guided discretion" as a check on the untrammeled discretion given juries in the pre-*Furman* era, requiring that a sentencing body's discretion "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at189. However, in cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings Oklahoma*, 455 U.S. 104 (1982), the Court held that while a jury's discretion to impose a sentence of death must be guided and channeled, a jury's discretion to impose a *life* sentence could not be limited.

This battle had long been fought in the Supreme Court principally by the late Justices Scalia and Blackmun. *See, e.g.,* Justice Scalia's concurrence in *Callins v. Collins*, *supra*, 510 U.S. at 1141-42, and his dissent in the since-overruled *Walton v. Arizona*, 497 U.S. 639, 657-73 (1990). It was Justice Scalia's

basic view that cases such as *Lockett* and *Eddings* are incompatible with the idea of guided discretion and that those cases should be overruled. Other critics, however, point out that if the lines of cases are in fact irreconcilable, it is the death penalty that must be overruled. *See*, Steven G. Gey, "Justice Scalia's Death Penalty," 20 FLA.ST.U.L.REV. 67 (1992). *See also* the discussion of this issue by the Connecticut Supreme Court in *Santiago*, 2015 Conn. Lexis at *40 where the Court, examining the federal standard from *Furman* to *Gregg* summarized the competing constitutional imperatives:

> The inherently incompatible nature of these two lines of cases has resulted in a return to arbitrary and capricious death sentences. Justice Blackmun concluded that both goals – guided discretion in imposing death, but no limitation on the information a jury may consider to spare a defendant's life are unattainable. *See Callinsv. Collins*, *supra*, 497 U.S. at 1155 ("All efforts to strike an appropriate balance between these conflicting Constitutional commands are futile.")

In their *Glossip* dissent, Justices Breyer and Ginsburg reviewed numerous rigorous studies of the death penalty and summarized the results of that review as follows:

> Thus, whether one looks at research indicating that irrelevant or improper factors – such as race, gender, local geography, and resources – *do* significantly determine who receives a death sentence, or whether one looks at research indicating that proper factors – such as egregiousness – do *not* determine who receive the death penalty, the legal conclusion must be the same: The research strongly suggests that the death penalty is imposed arbitrarily.

59

135 S.Ct. at 2762. The federal death penalty suffers from the same flaws. The federal experiment is a failure and should be declared unconstitutional. The process should begin with a decision from this court dismissing the death-notice in this case. Alternatively, this court should conduct a hearing at which time a full and searching inquiry of the data presented here can take place, in order to determine whether there is a convincing and constitutionally-sufficient justification for the past, current, and apparently enduring and irremediable, arbitrary, cruel, invidious, and patently cruel and unusual state of the federal death penalty.

Mr. Arnold urges this court to strike down the death penalty for the above-stated reasons.  In *United States v. Fell*, 224 F. Supp.3d 327 (D. Vt. 2016), after a two-week evidentiary hearing, Chief Judge Crawford concluded, "The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence." *Id.* at 345; *see also id.* at 341 ("The decision to impose death is subjective, multifactorial, unreproducible, and, for these reasons, irremediably arbitrary"); 358 ("The record of arbitrary imposition of the death penalty through the FDPA is clear . . . ."). Judge Crawford highlighted that, contrary to *Gregg*, the federal death penalty continues to operate in an arbitrary

manner:

> As the court's findings indicate, the Federal Death
> Penalty Act, 18 U.S.C. §§ 3591 et seq. ("FDPA"), falls
> short of the standard required in Furman v. Georgia, 408
> U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and in
> Gregg for identifying defendants who meet objective
> criteria for imposition of the death penalty. Like the state
> statutes enacted after Furman, the FDPA operates in an
> arbitrary manner in which chance and bias play leading
> roles.

*Id.* at 329.

Although finding that the federal death penalty is administered in an arbitrary and capricious manner, Judge Crawford held that only the Supreme Court had the authority to act. *Fell*, 224 F. Supp. 3d at 357-58. However, there is nothing in *Gregg* or any other Supreme Court case precluding this Court from deciding the issue. Rather, as recognized by Judge Wolf in *United States v. Sampson*, No. CR 01-10384-MLW, 2015 WL 7962394, at *4 (D. Mass. Dec. 2, 2015), if there has been a material change in facts relevant to the Eighth Amendment analysis, "an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute." *Id*.

Thus, it is no answer to this motion that the Supreme Court has, to date, upheld the constitutionality of the death penalty based on the facts before it. This Court is free (indeed must) apply the Supreme Court's existing legal principles

regarding the death penalty to the updated facts presented in this motion. That process should yield a decision that Mr. Arnold's case cannot go forward with the death penalty as a possible punishment.

POINT TWO

"THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY" HAVE RENDERED THE FEDERAL DEATHPENALTY INVALID AS CRUEL AND UNUSUAL IN VIOLATION OF THE UNITED STATES CONSTITUTION.

The "evolving standards of decency that mark the progress of a maturing society"[14] have reached that point where the federal death penalty is out of place with current societal values.  For that reason, its employment violates the Eighth Amendment.

Justices Breyer and Ginsburg, in their *Glossip* dissent, pointed to eleven specific recent developments in support of their conclusion that in the last two decades the death penalty has become constitutionally "unusual":

1. The trajectory of the number of annual death sentences nationwide is that "approximately 15 years ago, the numbers began to decline, and they have declined rapidly ever since." 135

---

[14]  *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  The idea that the Eighth Amendment is not static has long been a key element of Eighth Amendment analysis. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014); *Trop v. Dulles, supra* (plurality opinion); *Weems v. United States,* 217 U.S. 349, 378 (1910).

S.Ct at 2772-73; 2777;

2. That trend, a significant decline in the last 15 years, also holds true with respect to the number of annual executions. *Id*. at 2773, 2777;

3. 30 States have either formally abolished the death penalty or have not conducted an execution in more than eight years. Of the 20 States that have conducted at least one execution in the past eight years, 9 (Delaware, Idaho, Indiana, Kentucky, Louisiana, South Dakota, Tennessee, Utah, Washington) have conducted fewer than five in that time, making an execution in those States a fairly rare event. That leaves 11 States in which it is fair to say that capital punishment is not "unusual." And just three of those States (Texas, Missouri, and Florida) accounted for 80% of the executions nationwide (28 of the 35) in 2014. Indeed, last year, only seven States conducted an execution. In other words, in 43 States, no one was executed. *Id*. at 2773-74;

4. In terms of population, if we ask how many Americans live in a State that at least occasionally carries out an execution (at least one within the prior three years), the answer two decades ago was 60% or 70%. Today, that number is 33%. *Id*. at 2774, 2778;

5. The use of the death penalty has become increasingly

concentrated geographically, and by the early 2000's, the death penalty was only actively practiced in a very small number of counties. In short, the number of active death penalty counties is small and getting smaller. And the overall statistics on county-level executions bear this out. Between 1976 and 2007, there were no executions in 86% of America's counties. *Id.* at 2774, 2779;

6. In sum, if we look to States, in more than 60% there is effectively no death penalty, in an additional 18% an execution is rare and unusual, and 6%, i.e., three States, account for 80% of all executions. If we look to population, about 66% of the Nation lives in a State that has not carried out an execution in the last three years. And if we look to counties, in 86% there is effectively no death penalty. *Id.* at 2774;

7. It "is not so much the number of these States that is significant, but the consistency of the direction of change." *Roper*, 543 U.S., at 566. Seven States have abolished the death penalty in the last decade. And several States have come within a single vote of eliminating the death penalty. Eleven States have not executed anyone in eight years. And several States have formally stopped

executing inmates. *Id.* at 2774-2775;[15]

8. The direction of change is consistent. In the past two decades, no State without a death penalty has passed legislation to reinstate the penalty. Indeed, even in many States most associated with the death penalty, remarkable shifts have occurred. In Texas, the State that carries out the most executions, the number of executions fell from 40 in 2000 to 10 in 2014, and the number of death sentences fell from 48 in 1999 to 9 in 2013 (and 0 thus far in 2015). Similarly dramatic declines are present in Virginia, Oklahoma, Missouri, and North Carolina. *Id.* at 2775;

9. A majority of Americans, when asked to choose between the death penalty and life in prison without parole, now choose the latter. *Id.* at 2775;

10. In 2009, the American Law Institute withdrew the Model Penal Code section on capital punishment from the Code, in part because of doubts that the American Law Institute could "recommend procedures that would" address concerns about the administration of the death penalty. *Id.* at 2776. *cf. Gregg*, 428

---

[15] Currently, the death penalty is legal in 30 states. *See* map on Death Penalty Information Center website, https://deathpenaltyinfo.org/ States With and Without the Death Penalty. As of April 17, 2019, there are pending abolition bills in various stages in an additional 13 states. *See* chart at https://deathpenaltyinfo.org/Recent Legislative Activity.

U.S., at 193–194 (joint opinion of Stewart, Powell, and Stevens, JJ.) (relying in part on Model Penal Code to conclude that a "carefully drafted statute" can satisfy the arbitrariness concerns expressed in *Furman*); and,

11. Many nations—indeed, 95 of the 193 members of the United Nations—have formally abolished the death penalty and an additional 42 have abolished it in practice. In 2013, only 22 countries in the world carried out an execution. No executions were carried out in Europe or Central Asia, and the United States was the only country in the Americas to execute an inmate in 2013. Only eight countries executed more than 10 individuals (the United States, China, Iran, Iraq, Saudi Arabia, Somalia, Sudan, Yemen). . . . And almost 80% of all known executions took place in three countries: Iran, Iraq, and Saudi Arabia. *Id*. at 2775-76.

Based on the combination of these compelling and recent developments, "[i]t seems fair to say that it is now unusual to find capital punishment in the United States, at least when we consider the Nation as a whole." *Id*. at 2774, citing *Furman*, 408 U.S., at 311 (White, J., concurring) (executions could be so infrequently carried out that they "would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system ... when

imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied").

On a nationwide basis, as documented in the *Glossip* dissent, there has been a sharp decline in the numbers of death sentences returned by juries and death sentences carried out by the states. (*See* graph on Death Penalty Information Center website, https://deathpenaltyinfo.org/documents/FactSheet.pdf, p.1). From a high of 98 executions in 1999, the number has declined steadily to 35 executions in 2014 and 25 in 2018. In the federal system, there have only been three executions since 1988. There have been none since 2003. In terms of nationwide death sentences returned by juries, that figure has also declined precipitously. From a high in 1999 of 279 death sentences, the figure has dropped by nearly 85 per cent to 42, nationwide, in 2018. (*Id.*, "Death Sentencing" chart, p. 3).

In terms of the regional nature of the death penalty nationwide, the point has been made earlier that both the death penalty in general and the federal death penalty in particular are largely unknown outside the south. The following three charts illustrate this sharp decline in federal authorizations, federal trials, and federal death sentences.







What these charts document is the dramatic fading away of the federal death penalty from its "heyday" in 2003 when 49 defendants were authorized for a federal capital prosecution to 2017 when just two defendants were authorized (the number rose to 17 in 2018). In 2005, 32 federal defendants stood trial in capital cases. In 2018 there were two such trials and none are scheduled for the remainder of the year. In 2004, there were eight defendants sentenced to death. In 2018 there were two.

Where a particular penalty ceases to serve a valid penological purpose it is, by definition, excessive. *Gregg v. Georgia*, 428 U.S. at 183 (joint opinion of Justices Stewart and Powell). As detailed in the *Glossip* dissent, if any basis for a death penalty can be identified it is for deterrence and retribution. *Glossip* dissent,

69

135 S.Ct. at 2767. However, where sentences of death are imposed with increasing rarity and the number of executions falls, neither purpose is met.

Our standards of decency have evolved to the point that the federal death penalty no longer serves a valid governmental purpose and lacks a penological justification or rationale.  This court should strike it down.

POINT III

> THE COURT SHOULD DECLARE THE FEDERAL DEATH PENALTY UNCONSTITUTIONAL IN LIGHT OF THE OVERWHELMING EVIDENCE THAT CONTINUED ENFORCEMENT OF THE FDPA WILL LEAD TO THE EXECUTION OF A MEANINGFUL NUMBER OF INNOCENT PEOPLE.

The dead can never be exonerated. The issue posed is whether our constitution can tolerate the appreciable risks of executing the innocent.  As of March 2018, there have been 165 death-row exonerations. *See* Death Penalty Information Center website, The Innocence List, at https://deathpenaltyinfo.org/innocence-list-those-freed-death-row.   And, as recognized by the dissent in *Glossip*, it is certain that innocent people have been executed. 135 S.Ct. at  2756.

The Hon. Michael Ponsor, U.S.D.J., presided over the first post-*Gregg* federal death penalty case brought in the District of Massachusetts,

70

*United States v. Gilbert*, 120 F. Supp.2d 147 (D. Mass. 2000). Writing

about that experience on the op-ed page of The Boston Globe on July 8,

2001, Judge Ponsor said the following:

> The experience left me with one unavoidable
> conclusion: that a legal regime relying on the
> death penalty will inevitably execute innocent
> people—not too often, one hopes, but
> undoubtedly sometimes. Mistakes will be made
> because it is simply not possible to do something
> this difficult perfectly, all the time. Any honest
> proponent of capital punishment must face this
> fact.

A. **The Quinones Decision.**

On July 1, 2002, the Hon. Jed S. Rakoff of the Southern District of New

York issued an opinion finding that the risk of executing the innocent was of

sufficient constitutional magnitude that the federal death penalty could not be

enforced. *United States v. Quinones* (Quinones II), 205 F. Supp.2d 256 (S.D.N.Y.

2002).[16] Summarizing his findings in Quinones II, Judge Rakoff wrote:

> [T]he best available evidence indicates that, on
> the one hand, innocent people are sentenced to
> death with materially greater frequency than was
> previously supposed and that, on the other hand,
> convincing proof of their innocence often does
> not emerge until long after their convictions. It is

---

[16] In an earlier opinion in the same case, Judge Rakoff had announced his tentative findings
on this issue and permitted the government a further opportunity to be heard on the issue.
*United States v. Quinones* (Quinones I), 196 F. Supp.2d 416, 420 (S.D.N.Y. 2002).

therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove their innocence. It follows that implementation of the Federal Death Penalty Act not only deprives innocent people of a significant opportunity to prove their innocence, and thereby violates procedural due process, but also creates an undue risk of executing innocent people and thereby violates substantive due process. Id. at 257.[17]

Although Judge Rakoff's decision was eventually reversed by the Second Circuit,[18] this Court is urged to determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people as the *Glossip* dissent suggested. *See United States v. Sampson*, 275 F. Supp. 2d 49, 56-57 (D. Mass. 2003).

### B. The Unacceptable Risk of Executing the Innocent.

Only the most naive would take the position that the American system of justice is free from the possibility of error. It would be the height of arrogance to

---

[17] There is an additional reason, not discussed in Judge Rakoff's opinions, for concern over the time between sentence and execution in the federal system as that time period bears on the opportunity to establish innocence. In the state systems, condemned prisoners may resort to direct and collateral state court review of their convictions and sentences of death—a process that may consume many years—before entering the federal system via habeas corpus, as provided by 28 U.S.C. § 2254. In the federal system, there is one round of direct appeal and one round of post-conviction challenge, as allowed by 28 U.S.C. § 2255, and that is all.

[18] *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) (reversing, on government's appeal, district court's order declaring the FDPA unconstitutional); opinion on panel rehearing, 317 F.3d 86 (2d Cir. 2003).

presume the federal system immune from these problems.[19] There were significant doubts about the innocence of David Ronald Chandler, the very first federal defendant to have been sentenced to death in the era of the "modern" (post-1988) death penalty. Mr. Chandler was originally sentenced to death in 1991. In 1999, the Eleventh Circuit vacated his death sentence on grounds of ineffective assistance of counsel at the penalty phase. *Chandler v. United States*, 193 F.3d 1297 (11th Cir. 1999). That opinion was itself vacated, however, by a 6-5 vote of the court sitting en banc, and the sentence of death was re-affirmed. *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc). After the Supreme Court denied certiorari review, and citing Attorney General Reno's serious concerns about whether Mr. Chandler was actually innocent of the crime for which he had been prosecuted and condemned to death, President Clinton, on January 20, 2001, commuted Mr. Chandler's death sentence to one of life imprisonment, noting that "the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt." W.J. Clinton, My Reasons for the Pardons, N.Y. Times, February 18, 2001.

---

[19] In J. Dwyer, P. Neufeld, and B. Scheck, Actual Innocence (Doubleday 2000), the authors tracked the cases of numerous innocent people convicted of crime and identified the following eight factors most commonly involved where the innocent are convicted: (1) mistaken eyewitness testimony; (2) false confessions; (3) falsified scientific testing; (4) "snitch" witnesses who lied for advantage; (5) junk science; (6) police and prosecutorial misconduct; (7) lackluster or impaired performance by defense counsel; and (8), systemic racial bias. It may hardly be said that the federal system is free from any of these factors.

Moreover, it is not simply that the system of capital punishment in this country is fraught with factual error, it is also fraught with legal error. Professor James Liebman of Columbia University, who led a team of researchers, studied the rate of error in state and federal capital cases and found that in an astonishing 68% of cases, death penalty prosecutions were subject to outcome-determinative legal error. J.S. Liebman, et al., A Broken System: Error Rates in Capital Cases, 1973-1995 (2000); see also, J.S. Liebman, et al., A Broken System, Part II: Why There Is So Much Error In Capital Cases, And What Can Be Done (2002).[20] In the federal system, eight death sentences have been set aside on post-trial motion, appeal or on post-conviction challenge.

In Quinones II, Judge Rakoff reached the logically unassailable conclusion that the number of DNA exonerations—*i.e.*, cases where scientific evidence was available to establish innocence conclusively—means that there is more than an appreciable risk that the innocent will be executed (and have been) "given what DNA testing has exposed about the unreliability of the primary techniques developed by our system for the ascertainment of guilt. . . ." 205 F. Supp.2d at 264-65. Responding earlier to the government's argument that the

---

[20] In Quinones II, Judge Rakoff described the Liebman study as "the most careful and comprehensive study in this area, and one based, moreover, almost exclusively on public records and court decisions," 205 F. Supp. 2d at 268, and also noted that the Liebman study had been cited by Justice Breyer in his concurring opinion in *Ring*, who described the study as one that has generally been favorably received by scholars. *Id.* at n. 16.

availability of pre-trial DNA testing had magically "solved" the problem of the

wrongfully-convicted defendants, Judge Rakoff stated:

> This completely misses the point. What DNA testing has proved, beyond cavil, is the remarkable degree of fallibility in the basic fact-finding processes on which we rely in criminal cases. In each of the 12 cases of DNA-exoneration of death row inmates referenced in Quinones, the defendant had been found guilty by a unanimous jury that concluded there was proof of his guilt beyond a reasonable doubt; and in each of the 12 cases the conviction had been affirmed on appeal, and collateral challenges rejected, by numerous courts that had carefully scrutinized the evidence and the manner of conviction. Yet, for all this alleged "due process," the result in each and every one of these cases, was the conviction of an innocent person who, because of the death penalty, would shortly have been executed (—some came within days of being so—) were it not for the fortuitous development of a new scientific technique that happened to be applicable to their particular cases.

*Id.* at 264.

As conclusively demonstrated in Quinones I and Quinones II, the

actual holding of the Court in *Herrara v. Collins*, 506 U.S. 390 (1993),

does not bar either the substantive or procedural due process bases of the

*Quinones* opinion. *See* Quinones II, 205 F. Supp. 2d at 261-64; *see also*

*Sampson*, 275 F. Supp. 2d at 49.

75

### C. **The real question: How many innocent people is it acceptable to execute so that the government may execute others who are undoubtedly guilty?**

This is really the crux of this issue. No one looking at the studies and cases regarding the numbers of demonstrably innocent people convicted and sentenced to death can argue that it is anything but overwhelmingly probable that some of the 1,493 people executed in this country since 1976, and some of the 2,782 who wait on state and federal death rows,[21] and some of the thousands executed prior to 1976, were overwhelmingly likely to be wholly innocent of wrongdoing. The real question is whether that is a price worth paying to have a system of capital punishment. Mr. Arnold's counsel respectfully suggest that executing the occasional innocent person is, by an order of magnitude, too great a price to pay for the ability to execute capriciously-selected truly guilty individuals.

In the *Glossip* dissent, Justices Breyer and Ginsburg cited these disturbing numbers and discussed several individual cases making the point that, at a fundamental level, the death penalty is unreliable and has in the past and inevitably will in the future yield the execution of the innocent. Justice Breyer cited "convincing evidence" that "in the past three decades, innocent people

---

[21]    Death Penalty Information Center, Facts about the Death Penalty, https://deathpenaltyinfo.org/documents/FactSheet.pdf, p.2 (state figures as of 10/1/18).

have been executed," 135 S.Ct. at 2756, and cited evidence that "about [four per cent] of those sentenced to death are actually innocent." *Id.* at 2758. The *Glossip* dissenters concluded:

> [These figures and research] suggest that there are too many instances in which courts sentence defendants to death without complying with the necessary procedures; and they suggest that, in a significant number of cases, the death sentence is imposed on a person who did not commit the crime.

*Id.* at 2758.

The former Attorney General of Virginia, Mark Earley, presided over 31 executions. In 2015 he announced, in a law review essay, why he no longer supported capital punishment. Earley, A Pink Cadillac, An IQ of 63, and a Fourteen Year-Old from South Carolina: Why I Can No Longer Support the Death Penalty, 49 U. RICH. L. REV. 811 (2015). Mr. Earley wrote: "I have come to the conclusion that the death penalty is based on a false utopian premise. That false premise is that we have had, do have, and will have 100% accuracy in death penalty convictions and executions." *Id.* at 813.

Concluding his op-ed piece, Judge Ponsor stated:

> I love our system, and I am proud to serve in it. As I believe this trial demonstrated, no structure of law anywhere or at any time, has tried so earnestly to protect the rights of those involved in it. But I have a hard time imagining anything as

77

> complicated as a capital trial being repeated very
> often, even by the best system, without an
> innocent person eventually being executed. The
> simple question – not for me as a judge, but for
> all of us as citizens – is: Is the penalty worth the
> price?

To allow the machinery of death to grind inexorably onwards, in the face of incontrovertible proof that our system convicts and condemns to death the innocent, is unacceptable in a society of evolving standards of decency. On this basis, this Court should strike down the federal death penalty as unconstitutional.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should hold that the federal death penalty is unconstitutional and strike the Notice of Intent against Mr. Arnold, and grant such other relief as the Court deems just and proper. An evidentiary hearing is requested on all disputed facts.

Respectfully submitted,

*/s/ Eric K. Koselke*
*/s/ Maria P. Mannarino*
*s/ Richard M. Jasper, Jr.*

Co-Counsel to Billy Arnold

*Beverly Van Ness*, Of Counsel

Dated:  Detroit, Michigan
         May 1, 2019

<u>CERTIFICATE OF SERVICE</u>

I certify that on May 1, 2019, I filed the foregoing with the Clerk of the

Court via the ECF system, which will send notification to all attorneys of record.


/s/ Eric Koselke

Eric K. Koselke
Attorney at Law
320 N. Meridian Street, #506
Indianapolis, IN  46204
317-722-2591
ekoselke71@gmail.com

79