UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BILLY ARNOLD, D-1,

    Defendant.
_____/

Case No. 15-20652-01

HON. GEORGE CARAM STEEH

ORDER DENYING DEFENDANT'S MOTION TO
DECLARE THE DEATH PENALTY UNCONSTITUTIONAL
AND TO STRIKE THE NOTICE OF INTENT [ECF No. 1399]

This matter is before the court on defendant Billy Arnold's motion to declare the death penalty unconstitutional and to strike the notice of intent. ECF No. 1399. The government filed a response brief, ECF No. 1425, and defendant did not file a reply. Neither party has requested oral argument or an evidentiary hearing and the court agrees that the motion can be resolved on the briefs. For the reasons stated below, the court denies defendant's motion.

# I. BACKGROUND

On January 3, 2018, a federal grand jury returned a sixth superseding indictment charging 21 defendants with various crimes, including violating the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Defendant Arnold is charged with two counts of murder in aid of racketeering, two counts of using and carrying a firearm during and in relation to a crime of violence causing death, RICO conspiracy, numerous VICAR counts, possession of a firearm during and in relation to a crime of violence (RICO conspiracy), and felon in possession of a firearm. ECF No. 812. On January 8, 2018, the government filed its notice of intent to seek the death penalty against Arnold. ECF No. 817.

Defendant raises three *per se* challenges to the federal death penalty based on the Eighth Amendment and the Fifth Amendment Due Process Clause, including the guarantee of equal protection under the clause. Defendant asks the court to strike the notice of intent to seek the death penalty because (1) the death penalty is imposed in an arbitrary and capricious manner, and is infected by geographic disparities and racial discrimination; (2) the death penalty is cruel and unusual punishment based on evolving standards of decency; and (3) applying the death

penalty has resulted and will continue to result in the execution of innocent individuals.

## II. DISCUSSION

### A. Background of Modern Federal Death Penalty

In 1972, the Supreme Court held that all then-existing death penalty statutes were unconstitutional in violation of the Eighth and Fourteenth Amendments because those statutes gave juries unhindered discretion to impose or withhold the death penalty. *Furman v. Georgia*, 408 U.S. 238 (1972). Each of the justices filed a separate opinion in the 5-4 decision. In his concurring opinion, Justice Douglas recognized that our nation is committed to equal protection of the laws, "[y]et we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position." *Id*. at 255 (Douglas, J., concurring). Justice White highlighted the infrequent utilization of the death penalty, which "is exacted with great infrequency even for the most atrocious crimes and that

3

there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313 (White, J., concurring). The infrequency with which defendants were targeted for capital punishment was noted by each of the five justices who concurred in the majority. *See id.* at 248 n. 11 (Douglas, J. concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); and *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

Following the decision in *Furman*, many states reinstated revised death penalty statutes that addressed and sought to correct the Supreme Court's concerns. In 1976, the Court heard challenges from five men who had been prosecuted and sentenced to death under newly-enacted post-*Furman* statutes. In three of the cases the Court concluded that the states had successfully met the constitutional concerns raised in *Furman*. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976). The Court struck down the sentencing schemes in the other two statutes because they provided for a mandatory death penalty and did not allow for juror discretion and the consideration of mitigation information about a defendant's background and

4

character. *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Roberts v. Louisiana*, 428 U.S. 325 (1976).

In 1988, Congress enacted a federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for a defendant convicted of a murder committed while engaging in a continuing criminal enterprise. 21 U.S.C. § 848(e). In 1994, the Federal Death Penalty Act ("FDPA") was signed into law, 18 U.S.C. § 3591 *et seq*. The FDPA expanded the application of the federal death penalty by making 60 crimes death-eligible. This includes murder of designated government officials, kidnapping resulting in death of the victim, murder for hire, fatal drive-by shootings, car-jacking resulting in death, and certain crimes not necessarily resulting in death such as the running of a large-scale drug enterprise. 18 U.S.C. § 3591 (incorporating other statutes). The prosecution of Billy Arnold is brought pursuant to the FDPA for the offenses of: (1) murder in aid of racketeering activity, aiding and abetting, which resulted in the deaths of two individuals, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Counts 4 and 16); and (2) use and carry of a firearm during and in relation to a crime of violence causing death, aiding and

abetting, which resulted in the deaths of the two individuals, in violation of 19 U.S.C. §§ 924(c); 924(j); and 2 (Counts 5 and 17).

The FDPA sets forth the mechanics of a federal death penalty trial. First, the jury must decide whether the defendant had the requisite intent to commit the death eligible offense. 18 U.S.C. § 3591(a). The jury must unanimously find that intent was established beyond a reasonable doubt to move to the penalty phase. At that point, the jury considers the statutory aggravating factors alleged by the government in the notice of intent to seek the death penalty. 18 U.S.C. § 3592 (b)–(d). The jury must unanimously determine that the government has proven at least one of the statutory aggravating factors beyond a reasonable doubt to move to the next step of the penalty process. § 3593(c). The next step in determining whether the death penalty is appropriate is for the jury to consider the statutory aggravating factor or factors, plus the non-statutory aggravating factors for which notice has been given, and to weigh them against any mitigating factors. Non-statutory aggravating factors must be unanimously found beyond a reasonable doubt, while mitigating factors need only be established by a preponderance of the evidence. Furthermore, unanimity is not required when it comes to mitigating factors; any juror persuaded that

a mitigating factor exists may consider it in reaching a sentencing decision. § 3593(c), (d). *See United States v. Nguyen*, 928 F. Supp. 1525, 1532 (D. Kan. 1996).

The government points out that defendant's challenges are not ripe as a sentence of death has not been imposed in this case. The government indicates it has no objection to the court considering the motion at this time and applying its decision later as law of the case. ECF No. 1425, PageID 18815-18816, n. 1. This is the course the court will take.

**B.     Arbitrary and Capricious**

**1.     Infrequently Sought, Imposed or Carried Out**

Defendant argues that because the federal death penalty is utilized so infrequently, it is arbitrary and capricious in violation of the Fifth and Eighth Amendments. In support, defendant cites data from the Declaration of Kevin McNally of the Federal Death Penalty Resource Counsel Project ("McNally Dec."). Since 1988, out of 3,389 potential federal capital cases, the Attorney General has authorized 520 defendants, or 15%, for capital prosecution. (McNally Dec., par. 7) Of this number, juries have returned 85 death verdicts involving 81 defendants (some of whom were sentenced

7

to death twice after a first death verdict was set aside). *Id.* Three federal prisoners have been executed, two in 2001 and one in 2003. There has not been a federal execution in over 15 years.

Defendant contends that the federal death penalty is sought and imposed even more rarely than in the state cases examined in *Furman*. Defendant compares the likelihood of being sentenced to death in the federal system to the chance of being struck by lightning. Invoking *Furman*, defendant argues that the infrequency with which the federal death penalty is sought and imposed, makes it arbitrary, capricious and unusual.

Defendant's argument misinterprets the *Furman* majority's concern as it pertains to arbitrariness. The primary concern with arbitrariness was that the death penalty was applied to some but not other equally culpable defendants and was imposed discriminatorily. *See id.* at 309-310 (Stewart, J., concurring). *Furman* stands for the position that death sentences imposed under Georgia's and Texas's capital punishment statutes constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments because the statutes provided "no standards [to] govern the selection of the penalty. People live or die, dependent on the

whim of one man or of 12." *Furman*, 408 U.S. at 253 (Douglas, J., concurring).

As described above, the FDPA responded to *Furman's* concerns by providing a procedure that guides jurors in narrowing the class of defendants eligible for the death penalty. *See United States v. Lawrence*, 735 F.3d 385, 418 (6th Cir. 2013). In doing so, the FDPA avoids the arbitrariness that the *Furman* Court condemned. When the Supreme Court considered Georgia's post-*Furman* capital statute, it determined that the death penalty is not unconstitutional in all circumstances and that the "concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). The *Gregg* Court described the bifurcated proceeding, where the sentencing authority is apprised of any information relevant to the imposition of sentence and provided with clear and objective standards to guide the use of the information, as a system that best meets the concerns expressed in *Furman*. *Id*.

The proper focus in examining the constitutionality of a capital statute must be on the guidance it provides to the sentencing body. The Supreme Court, citing *Furman* and *Gregg* as support, held that in order to be constitutional, a "capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). The bifurcated scheme of the FDPA, which narrows the class of death-eligible defendants using statutory and non-statutory aggravating factors and permits the jury to render an individualized sentencing determination, satisfies this standard.

### 2. Lack of Predictability

Defendant next argues that the absence of any discernible basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional. Defendant refers to the compendium of penalty-phase verdict sheets returned in every federal capital case that has proceeded to trial since 1988 and maintained by the Federal Death Penalty

Resource Project. Defendant includes examples of cases and verdicts to demonstrate "[t]here is no rhyme, reason, or predictability concerning who is sentenced to death and who is spared or who simply never has to face a jury on a life-or-death decision." ECF No. 1399, PageID 18219 - 18226 Each case is horrific, and all involve the infliction of agony on victims and their loved ones, yet some defendants were sentenced to death while an overwhelming majority were not.

Defendant's argument was addressed and discredited by Justice Scalia in his concurring opinion in *Glossip v. Gross*. 135 S. Ct. 2726, 2747-48 (2015). Scalia wrote that there is no system of metrics that can measure the egregiousness of a defendant's conduct such that the death penalty can be predictably imposed. This is because "[e]gregiousness is a moral judgment susceptible of few hard-and-fast rules. More importantly, egregiousness of the crime is only one of several factors that render a punishment condign -- culpability, rehabilitative potential, and the need for deterrence also are relevant. That is why this Court has required an individualized consideration of all mitigating circumstances, rather than formulaic application of some egregiousness test." *Id.* at 2748.

11

The FDPA guides the jury in undertaking an analysis of the aggravating factors and mitigating factors presented as to each defendant. The FDPA's mechanics require the jury to evaluate the factors and weigh them to come to an individualized decision. While this approach is not predictable in a statistical sense, it rectifies the fairness concerns raised by the Supreme Court in *Furman*.

### 3. Regional and Racial Bias

Defendant's next argument is that the federal death penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect. Defendant relies on numerous studies to support the conclusion that the federal death penalty is overwhelmingly used in the southern states and targets African Americans and Hispanics at a disproportionate rate. Based on the data and statistics provided in the studies, defendant argues the regional and racial disparities in the imposition of the death penalty renders it unconstitutional in violation of the Fifth and Eighth Amendments. In addition to the studies, defendant cites to dissenting opinions to support his arguments. *McCleskey v. Kemp*,

481 U.S. 279, 322 (1987) (race and race of victim); *Glossip*, 135 S. Ct. at 2755-80 (geography and race of victim).

Defendant does not argue that his race, geographic location or the race or gender of his alleged victims were considerations in the government's decision to seek the death penalty. Even if defendant did make this argument under the implicit Equal Protection Clause in the Fifth Amendment, it would fail because he has not presented any specific evidence of purposeful discrimination against him. *See McCleskey*, 481 U.S. at 292 ("a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and "must prove that the decisionmakers in *his* case acted with discriminatory purpose." (emphasis in original)).

The *McCleskey* Court also rejected Eighth Amendment claims based on statistical studies indicating race-based discrepancies in capital sentencing. *Id.* at 312-13. The Court stated that its "consistent rule has been that constitutional guarantees are met when the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible. Where the discretion that is fundamental to our criminal process is involved, we decline to assume that

what is unexplained is invidious." *Id.* at 313.  Defendant's Eighth Amendment claim fails because he has not explained how discrepancies that appear to correlate with race, region or race/gender of victim are caused by something invidious rather than the discretion given to juries under the FDPA and our criminal justice system in general.

Justice Thomas addressed the argument that death sentences appear to correlate to arbitrary factors such as the location of the crime. Thomas pointed out this argument ignores the constitution's guarantees that a defendant has a right to a trial by a jury of his peers, held in the state where the crime is committed.  *Glossip*, 135 S. Ct. at 2751-52 (Thomas, J., concurring) (citing Art. III, § 2, cl. 3 and 6th Amend.).

Where the Supreme Court has directly decided an issue, this court must follow that decision, "leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  Applying Supreme Court precedent, this court rejects defendant's arguments that the death penalty, as implemented by the FDPA, is unconstitutionally arbitrary and capricious.

## B. Evolving Standards of Decency

Defendant argues that the "evolving standards of decency that mark the progress of a maturing society" have reached the point where the federal death penalty is out of place with current societal values. ECF No. 1399, PageId 18264. Relying heavily on Justice Breyer's and Justice Ginsburg's dissenting opinions in *Glossip*, defendant claims that "there has been a sharp decline in the numbers of death sentences returned by juries and death sentences carried out by states." *Id.*, PageId 18269. For example, there were 98 executions in 1999, but only 25 in 2018. In the federal system, there have only been three executions since 1988 and none since 2003. *Id.* The number of defendants facing capital prosecutions has similarly decreased from 32 federal capital trials in 2005 to 2 trials in 2018. *Id.* at PageID 18271. Based on the declining numbers, defendant argues that the federal death penalty no longer serves the penological purposes of deterrence and retribution identified by the *Glossip* dissent. *Glossip*, 135 S. Ct. at 2767.

Capital punishment is written into the Constitution. The Supreme Court has acknowledged that "[i]t is impossible to hold unconstitutional that which the Constitution explicitly contemplates. The Fifth Amendment

provides that '[n]o person shall be held to answer for a capital . . . crime, unless on a presentment or indictment of a Grand Jury,' and that no person shall be 'deprived of life . . . without due process of law.'" *Id.* (Scalia, J., concurring). As for the declining numbers of executions, the Attorney General recently announced that the federal government will resume executions of death row inmates after a nearly two-decade hiatus. Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. TIMES, July 25, 2019, https://www.nytimes.com/2019/07/25/us/politics/federal-executions-death-penalty.html. Five men convicted of murdering children are to be executed in December and January at the federal penitentiary in Terre Haute, Indiana, and additional executions will be scheduled after that. *Id.*

There is not a consensus of public opinion to support a conclusion that evolving standards of decency have evolved to the point where capital punishment in all cases is prohibited by the Eighth Amendment. *See United States v. Fell*, 224 F. Supp. 3d 327, 359 (D. Vt. 2016) ("The record in this case does not support a view that the country has achieved consensus on the desirability of abolishing the death penalty. Public opinion is turning against the death penalty and state legislatures have

16

done so as well, but the change is insufficiently broad to meet the *Atkins* requirement of consensus at this time.") The Supreme Court reaffirmed the constitutionality of the death penalty in 2015, *see Glossip*, 135 S. Ct. at 2732, and continues to acknowledge its vitality, *see Kansas v. Carr*, 136 S. Ct. 633 (2016); *Hurst v. Florida*, 136 S. Ct. 616 (2016). This court is bound by Supreme Court precedent and must therefore reject defendant's argument regarding evolving standards of decency.

**C.    Execution of Innocent Individuals**

This court agrees with defendant's assertion that "[o]nly the most naïve would take the position that the American system of justice is free from the possibility of error." ECF No. 1399, PageID 18274. However, the argument that a person convicted of a crime, including a conviction that results in a death sentence, has a right to the continued opportunity for exoneration throughout the course of their natural life, is one that has been rejected by the Supreme Court. *Herrera v. Collins*, 506 U.S. 390, 407-408, 411 (1993); s*ee also Furman*, 408 U.S. 238, 311 (White, J., concurring), 366-68 (Marshall, J., concurring); *United States v. Quinones*, 313 F.3d 49, 62 (2nd Cir. 2002).

While considering the bill that became the FDPA, Congress was presented with extensive evidence that innocent individuals might be executed. Yet, despite this evidence, Congress still enacted the FDPA. "This informed, deliberative legislative action itself casts doubt on the assertion that the right to a continued opportunity for exoneration throughout the course of one's natural life is 'rooted in the . . . conscience of our people.'" *Quinones*, 313 F.3d at 64-65.

With respect to defendant's argument that the FDPA is unconstitutional under the Fifth Amendment due to an unacceptable risk of executing the innocent, this court is bound to follow Supreme Court precedent discussed above, and only the Supreme Court can overrule its own decisions. *Rodriguez de Quijas*, 490 U.S. at 484. To the extent defendant's argument relies on the Eighth Amendment, the argument is foreclosed by the Supreme Court's decision in *Gregg*, 428 U.S. 153.

## III. CONCLUSION

For the reasons stated above, defendant's motion to declare the death penalty unconstitutional and to strike the notice of intent is DENIED.

So ordered.

Dated: August 13, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 13, 2019, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk